UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 07-22502-CIV HOEVELER

RANDALL VANESSA FORBES,                    :

                Plaintiff,        :

vs.                                        :

ST. THOMAS UNIVERSITY, INC., :

              Defendant.        :
_____/

COPY

CONTINUED DEPOSITION OF RANDALL VANESSA FORBES

taken before Estelle Pregen, Court Reporter and Notary

Public in and for the State of Florida at Large, at

420 South Dixie Highway, Third Floor, Coral Gables,

Florida, on Thursday, July 16, 2009, commencing at

11:05 a.m., pursuant to Notice of Taking Deposition.

PORTER, WALKER & ASSOCIATES, INC.

APPEARANCES:

      PHILLIPS LANIER
      (BY MS. EMILY JOYCE PHILLIPS)
      14 Northeast 1st Avenue, 2nd Floor
      Miami, Florida 33132
      On behalf of the Plaintiff.

      GAEBE, MULLEN, ANTONELLI, ESCO & DIMATTEO
      (BY MAXIMO A. SANTIAGO)
      420 South Dixie Highway, Third Floor
      Coral Gables, Florida 33146
      On behalf of the Defendant.

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| RANDALL VANESSA FORBES | | | | |
| BY MR. SANTIAGO | 161 | | -- | |
| BY MS. PHILLIPS | | -- | | -- |

E X H I B I T S

DEFENDANT'S FOR IDENTIFICATION                    PAGE

Composite No. 7  - Law School Application          162

No. 8            - Memorandum Dated 8/9/04         163

No. 9            - Memorandum Dated 4/23/07        166
                   Contracts II

No. 10           - Memorandum Dated 4/23/07        167
                   Civ Pro II

No. 11           - Memorandum Dated 4/23/07        169
                   Torts II

No. 12           - Memorandum Dated 4/23/07        170
                   Property II

Composite No. 13 - Medical Records Dated           219
                   4/25/07, Dr. Ross

No. 14           - Email Dated 5/9/07 from         220
                   Randall Forbes to John
                   Hernandez

No. 15           - Email Dated 5/9/07 from         223
                   Janelle Jackson to Randall
                   Forbes

Composite No. 16 - Petition for Readmission        251

Composite No. 17 - Email Dated 5/25/07             266

Composite No. 18 - Report to Academic Standards    271
                   Committee Dated 6/14/07
                   Dr. Lydia Kalsner-Silver

No. 19           - Email Dated 6/4/07              275

1    Thereupon:

2                    RANDALL VANESSA FORBES

3    was called as a witness by the Defendant, and being

4    first duly sworn, was examined and testified on her

5    oath as follows:

6                    DIRECT EXAMINATION

7    BY MR. SANTIAGO:

8         Q.   We're continuing your deposition that we

9    started yesterday, and I'm going to go over some of

10   the emails that you and Dean Hernandez drafted.

11             Before I get into those, do you recall when

12   it was that you applied to St. Thomas University?

13        A.   I think it was in January of '06.

14        Q.   Did you have to prepare an application?

15        A.   Yes.

16        Q.   And did you have to submit an essay of some

17   sort?

18        A.   Yes.

19        Q.   Do you remember what you talked about in

20   your essay?

21        A.   Yes, I talked about the rape.

22        Q.   Did you ever state in your application that

23   you suffered from post-traumatic stress syndrome?

24        A.   No.

25        Q.   Why not?

1      A.   I just didn't.  The topic was how you

2    overcame something, how you dealt with it.

3      Q.   Okay.  And did you also attach a resumé to

4    you application?

5      A.   Yes.

6      Q.   Give me one second.

7           (Interruption off the record.)

8           MR. SANTIAGO:  I think yesterday we left off

9    on Exhibit No. 7.  I'm going to mark your application

10   as Defendant's Exhibit No. 7.

11          (Thereupon, the Law School Application

12          referred to was marked as Defendant's

13          Composite Exhibit No. 7 for Identification.)

14     Q.   (BY MR. SANTIAGO)  Can you just briefly

15   review your information, your application?

16     A.   Okay.

17     Q.   Is everything that is on Defendant's

18   Exhibit 7 that you filled out accurate?

19     A.   Yes.

20     Q.   Did you look at your resumé?

21     A.   Yes.

22     Q.   Is everything on your resumé accurate?

23     A.   I actually submitted more than one resumé.

24     Q.   The one that is there attached to

25   Defendant's Exhibit 7, is that one accurate, at least

Page 163

1    at the time that you had submitted it?

2        A.    Yes.

3        Q.    Prior to starting law school at St. Thomas

4    University, did you ever put St. Thomas on notice that

5    you were suffering from post-traumatic stress

6    syndrome?

7        A.    No.

8        Q.    Prior to starting law school, did you ever

9    tell anyone at St. Thomas that you would need either

10   testing or classroom accommodations?

11       A.    No.

12       Q.    Let me show what we're going to mark as

13   Defendant's Exhibit No. 8 and ask you to review that.

14       A.    Okay.

15             (Thereupon, the Memorandum Dated 8/9/04

16             referred to was marked as Defendant's

17             Exhibit No. 8 for Identification.)

18       Q.    (BY MR. SANTIAGO)   Does that look familiar

19   to you?

20       A.    Yes.

21       Q.    What is it?

22       A.    It's the letter sent to professors at

23   University of Miami about the accommodations I got

24   there.

25       Q.    Is that the first time that you received

Page 164

1    accommodations at University of Miami?

2         A.   That's the first time I got official

3    accommodations at the University of Miami.

4         Q.   Official accommodations being time and a

5    half in a room by yourself?

6         A.   Yes.

7         Q.   May I see that?

8              MS. PHILLIPS:  Let me see this one.  Can I

9    just look at it?

10             MR. SANTIAGO:  Yes.  Sure.

11        Q.   (BY MR. SANTIAGO)  According to this

12   memorandum from the University of Miami dated

13   August 9, 2004, provides that accommodations which

14   were going to be provided to you included extended

15   time up to time and a half for examinations and any

16   class assignments; correct?

17        A.   Correct.

18        Q.   And a distraction-reduced location as

19   needed; correct?

20        A.   Correct.

21        Q.   What was your understanding of what a

22   distraction-reduced location meant?

23        A.   It meant a room alone.  They couldn't

24   control the noise back there from outside.  There was

25   a lot of construction back then.  But it was a room

Page 165

1    alone.

2        Q.    Below that it says, "AR as a testing room

3    with a proctor."

4              And AR meaning accessibility resources?   Is

5    that what AR meant?

6        A.    Can I look at it again?

7        Q.    Absolutely.

8        A.    I think that's what it means.   I'm not sure

9    though.

10       Q.    And it states, "If the student feels that a

11   separate testing location is needed, he/she will speak

12   to you at least one week prior to the test date.   If

13   you approve, we will contact you to make

14   arrangements"; correct?

15       A.    Correct.

16       Q.    Does it state here in this memorandum that

17   they were going to provide you with a room by

18   yourself?

19       A.    No, not specifically like that.

20       Q.    As far as providing you with a location,

21   isn't it true that it states a distraction-reduced

22   location as needed?

23       A.    Correct.

24       Q.    Now, this memorandum was provided to

25   St. Thomas University by you; correct?

Page 166

1     A.    Correct.

2     Q.    I don't recall if I asked you this

3    yesterday.  If I did, I apologize.

4          The email that we have referenced in

5    Defendant's Exhibit No. 5, I think earlier, yesterday

6    you testified that you don't recall receiving that

7    email; is that correct?

8     A.    That's correct.

9     Q.    Do you recall receiving the following

10   memorandum, it will be Defendant's Exhibit No. 9?

11    A.    Yes.

12          (Thereupon, the Memorandum Dated 4/23/07,

13          Contracts II referred to was marked as

14          Defendant's Exhibit No. 9 for

15          Identification.)

16    Q.    (BY MR. SANTIAGO)  Do you recall reviewing

17   this document before your examinations?

18    A.    Yes.

19    Q.    Can you briefly describe what this document

20   is?

21    A.    The document is from St. Thomas.  It's

22   saying that on the contracts exam for the second

23   semester, I would be in the library computer room from

24   2 to 5 p.m.

25          And the accommodation says, "Time one-half,

PORTER, WALKER & ASSOCIATES, INC.

Page 167

1    limited distraction."

2        Q.   What was your understanding as to what that

3    meant as far as accommodations?

4        A.   When I met with that secretary or whatever

5    her position was?

6        Q.   Janelle Jackson?

7        A.   She told me I was getting everything that I

8    asked for.

9        Q.   But my question is, what is your

10   understanding as to what the accommodations that were

11   going to be provided to you, meaning time and a half

12   with limited distractions, meant?

13       A.   Well, my understanding was the limited

14   distractions part meant a room by myself.

15            The time and a half is time and a half.

16       Q.   Certainly this memorandum does not state

17   that in a solitary room by yourself; correct?

18       A.   No, it does not.

19       Q.   It simply states limited distraction;

20   correct?

21       A.   Correct.

22       Q.   Let's look at another memorandum dated

23   April 23, 2007.  We'll mark this as Defendant's

24   Exhibit No. 10.

25            (Thereupon, the Memorandum Dated 4/23/07,

Page 168

1        Civ Pro II referred to was marked as

2        Defendant's Exhibit No. 10 for

3        Identification.)

4    Q.   (BY MR. SANTIAGO)  Again, this is a

5    memorandum that was sent from Janelle Jackson to you;

6    correct?

7    A.   Correct.

8    Q.   And did you recall receiving this

9    memorandum?

10   A.   Yes.

11   Q.   Do you recall reviewing this memorandum?

12   A.   Yes.

13   Q.   This memorandum provides the exact same

14   accommodations that we just discussed in the other

15   memorandum in Defendant's Exhibit No. 9; correct?

16   A.   Correct, except that it applies to Civil

17   Procedures.

18   Q.   Exactly.  But the accommodations are the

19   same; correct?

20   A.   Correct.

21   Q.   That's time and a half, room with limited

22   distractions; correct?

23   A.   Correct.

24   Q.   And, again, this memorandum does not provide

25   that St. Thomas was going to provide you with a room

PORTER, WALKER & ASSOCIATES, INC.

1    by yourself or a solitary room or anything like that;

2    correct?

3         A.   Correct, but she told me it did.

4         Q.   That's not the question I asked you.

5         A.   Okay.

6         Q.   Let's go to the next exhibit.  We'll mark

7    this as Exhibit No. 11.

8              (Thereupon, the Memorandum Dated 4/23/07,

9              Torts II referred to was marked as

10             Defendant's Exhibit No. 11 for

11             Identification.)

12        Q.   (BY MR. SANTIAGO)  Again, this is a

13   memorandum from Janelle Jackson to Randall Forbes

14   dated April 23, 2007.  It's regarding the Torts II

15   examination.

16             And do you recall receiving this memorandum?

17        A.   Yes.

18        Q.   And you have reviewed the memorandum?

19        A.   Yes.

20        Q.   And it provides for the exact same

21   accommodations as the other memorandums; correct?

22        A.   Correct.

23             MR. SANTIAGO:  I'm going mark as Defendants

24   Exhibit No. 12, another memorandum dated the same

25   date, but this time it applies to the Property II

PORTER, WALKER & ASSOCIATES, INC.

Page 170

1   exam.

2           (Thereupon, the Memorandum Dated 4/23/07,

3           Property II referred to was marked as

4           Defendant's Exhibit No. 12 for

5           Identification.)

6       Q.   (BY MR. SANTIAGO)  Again, this memorandum

7   provided for the same exact accommodations; correct?

8       A.   Correct.

9       Q.   And you reviewed this memorandum before you

10  took your examinations; correct?

11      A.   Correct.

12      Q.   At any time before you took your

13  examinations in these courses, did you ever approach

14  Dean Hernandez, or any other dean for that matter, for

15  clarification as to what a room with, quote, limited

16  distractions meant?

17      A.   Not the dean, but I talked to Janelle.

18      Q.   Janelle Jackson, do you know who she is?

19      A.   I don't know her title.

20      Q.   You don't know what role she has at

21  St. Thomas?

22      A.   No.

23      Q.   Up to that point, if there was anyone that

24  had knowledge about what accommodations you should or

25  should not be receiving, that would be Dean Hernandez;

Page 171

1    correct?

2         A.   No, because he told me to talk to her.

3         Q.   But it was ultimately Dean Hernandez's

4    decision as to what accommodations you would be

5    receiving; correct?

6         A.   Correct.  That's what he said in January.

7         Q.   And it was ultimately his decision, as far

8    as you're concerned, about whether or not you would be

9    receiving any accommodations at all; correct?

10        A.   Correct.

11        Q.   I mean, initially you told me that in April,

12   he initially said you weren't going to get any

13   accommodations; correct?

14        A.   Correct.

15        Q.   And then for whatever reason, he changed his

16   mind and he provided you with some accommodations;

17   correct?

18        A.   Correct.

19        Q.   Did you ever send Dean Hernandez an email

20   asking for clarification as to what limited

21   distraction meant?

22        A.   I don't believe so.  I did send an email

23   that I told him what I thought it meant, though.

24        Q.   What day was that email?

25        A.   I'm not sure.

Page 172

1      Q.    Give me the gist of what you said.

2      A.    I basically said -- I referred to limited

3    distraction.  I used that phrase.  And then I said,

4    "By myself."

5            So that indicated my understanding was by

6    myself in a room.

7      Q.    Was this email sent before you started your

8    final exams?

9      A.    Yes.

10     Q.    Do you recall when was the date of your

11   first final exam?

12     A.    I don't recall offhand.

13     Q.    Actually, how about this?  We have the

14   memos, and the memos provide the dates of the exam.

15           Why don't you look them over, and you tell

16   me what was the date of your first final exam.

17     A.    The first exam was on May 2nd.

18     Q.    What exam was that?

19     A.    That was Contracts II.

20     Q.    And that was May 2, 2007?

21     A.    Yes.

22     Q.    And when was the date of your next exam?

23     A.    The next exam was on Friday, May 4.

24     Q.    So two days later?

25     A.    Correct.

PORTER, WALKER & ASSOCIATES, INC.

Page 173

 1          Q.    What class was that?

 2          A.    Civil Procedure II.

 3          Q.    And when was the next exam?

 4          A.    The next exam was Torts II, and it was on

 5    May 9.

 6          Q.    So five days later?

 7          A.    Correct.

 8          Q.    And the next exam?

 9          A.    It was on May 11.

10          Q.    Okay.  Two days later.  And what class was

11    that?

12          A.    That was Property II.

13          Q.    Did you have any other exams other than

14    those four?

15          A.    No.

16          Q.    So the email that you sent to Dean Hernandez

17    was it?

18          A.    Yes.

19          Q.    Was pretty much summarizing what your

20    understanding was as to limited distractions?

21          A.    Correct.

22          Q.    And it would have been at some point before

23    your first exam, which was May 2nd; correct?

24          A.    Correct.

25          Q.    Give me one second.  I want to make sure I

Page 174

 1    have that email.

 2          Are you sure you sent it to Dean Hernandez

 3    and not some other Dean?

 4          A.    No.   It was probably Dean Hernandez.

 5          Q.    Do you know if you still have that email?

 6          A.    I would have to look.

 7          Q.    Recently your attorney provided me with a

 8    lot of different emails.

 9          Do you know if that email would have been

10    provided to your attorney?

11          A.    I would have to look.

12          MR. SANTIAGO:   Do you have the emails and

13    documents that you sent me on your computer?

14          MS. PHILLIPS:   Not with me.

15          MR. SANTIAGO:   I have them, and I will just

16    print them out, but I want to just make sure that she

17    didn't provide it, because I would like to question

18    her on that.

19          Q.    (BY MR. SANTIAGO)   So your first exam was

20    Contracts, and it was May 2, 2007.

21          Tell me what accommodations were provided to

22    you for that exam.

23          A.    For that exam, I had time and a half, and I

24    was in a separate room, but not alone.   And it was

25    proctored.

PORTER, WALKER & ASSOCIATES, INC.

Page 175

1    Q.   So you were in a separate room.  And where

2    was that room in relation to the room where all the

3    other students took the exam?

4    A.   I believe that room was upstairs as opposed

5    to downstairs, where all the other students were.

6    Q.   So it was on the second floor?

7    A.   Yes.

8    Q.   And how many students were in that room?

9    A.   I believe there were four other students,

10   plus the proctor.

11   Q.   And how big of a room was this?  If you

12   could sort of describe it for me.

13   A.   This room was like a small classroom.

14   Q.   Small classroom.  Was this a classroom that

15   you had been in before for other classes or was it

16   just a completely different classroom?

17   A.   It was a completely different classroom.  I

18   wasn't there for any classes.

19   Q.   In that particular room?

20   A.   Correct.

21   Q.   Do you recall taking that exam, the

22   Contracts exam?

23   A.   Yes.

24   Q.   When you took the Contracts exam, do you

25   recall experiencing anything that was a distraction as

Page 176

1    a result of those other students being in the

2    classroom or the proctor being in the classroom?

3         A.   Yes.

4         Q.   Describe for me what you experienced.

5         A.   I was distracted with the proctor walking

6    around.

7              Well, at first I was distracted because I

8    didn't think that anybody was going to be in the room.

9              I thought since it was mostly enclosed in

10   glass, that the proctor would be outside the room.

11   They would give me the exam, and then I would take it

12   inside, but they would be watching me from the

13   outside.

14        Q.   So the room that you were in was enclosed in

15   glass?

16        A.   Yes.

17        Q.   Okay.  So first you were distracted by the

18   fact that there were other people in the classroom;

19   correct?

20        A.   Correct.

21        Q.   What else were you distracted by?

22        A.   I was also thinking about how I was misled

23   to believe that I was going to be alone in the class.

24             But then it was, also, each student got up a

25   few times to go to the bathroom.  And the proctor

Page 177

1    actually paced the room, even though there were only a

2    few students.

3        Q.   Do you remember who the proctor was?

4        A.   No.  She didn't introduce herself.

5        Q.   Any other distractions?

6        A.   Those were the main ones.

7        Q.   At any point before you took the exam, did

8    you voice your concerns to the proctor?

9        A.   To the proctor, no.  Well, I'm not sure

10   about that exam.

11       I did voice my concerns on one of the exams.

12   I'm not sure if it was that one.

13       Q.   Okay.  How close in proximity were the

14   students to you?  Just give me an idea.

15       A.   The students were in different rows.  I was

16   in the back row.

17       Q.   How many rows were in that classroom?

18       A.   I'm not sure.

19       Q.   Was it more than five rows?

20       A.   Yes.

21       Q.   Okay.  How many seats did each row have?  An

22   approximation.

23       A.   Approximately ten, but I would be guessing.

24       Q.   So you think you can fit about 50 students

25   in the classroom comfortably?

PORTER, WALKER & ASSOCIATES, INC.

1    A.   I don't know about comfortably, but, yes.

2    Q.   And each seat had its own desk, I presume?

3    A.   No.

4    Q.   Okay.  Would you have to pull it out, or

5    explain that to me?

6    A.   No.  It's a table.

7    Q.   So it's a table?

8    A.   Yes, all of them.

9    Q.   Okay.  So were the students in such close

10   proximity to you that it bothered you, or was it just

11   the fact that they would get up or the proctor would

12   move around that was a distraction?

13   A.   The main distraction was the proctor there,

14   and that each student got up to go use the bathroom,

15   presumably, at least twice.

16   Q.   Did you ever have to get up and use the

17   restroom?

18   A.   Yes.

19   Q.   How many times?

20   A.   I think I got up twice.

21   Q.   How long were you in that exam, do you

22   recall?

23   A.   I don't recall.

24   Q.   Do you remember what time the exam started?

25   A.   I don't recall.

Page 179

```
 1          Q.    According to Defendant's Exhibit No. 9, it
 2    states that the exam started at 2:00 and finished at
 3    5:00.
 4                Does that help you as far as remembering if
 5    this was accurate?
 6          A.    I believe it was accurate.
 7          Q.    Okay.  Actually, if we look at the bottom,
 8    it says, "Extra time allocation."  It says,
 9    "Four-and-a-half hours."  And it says, "1:30 p.m. to
10    6 p.m."
11          A.    Okay.  Yes, that's right.
12          Q.    So you were in that room for at least
13    four-and-a-half hours; correct?
14          A.    Correct.
15          Q.    Now, how long did it take you to complete
16    the exam, Contracts exam?
17          A.    I took up almost all that time.
18          Q.    What kind of exam was it?  Was it multiple
19    choice, essay, a combination?
20          A.    I believe this Contracts exam was either all
21    essay or mostly essay.
22          Q.    Do you remember how many questions were in
23    the exam?
24          A.    I don't.  I remember him saying that there
25    were going to be three.
```

PORTER, WALKER & ASSOCIATES, INC.

 1      Q.   Okay.  So based on your recollection, at

 2  least three essay questions, correct, with subparts?

 3      A.   I'm not sure exactly.

 4      Q.   Okay.  Were you able to answer all of the

 5  questions on the exam?

 6      A.   Yes, but not fully.

 7      Q.   When you say, "Yes, but not fully," what do

 8  you mean?

 9      A.   I was distracted.  So I didn't answer every

10  single issue that I could have.

11      Q.   Well, whether or not you identified every

12  issue is a separate question.

13           My question simply is, you had three essay

14  questions, just let's say you had three essay

15  questions, did you answer the three essay questions?

16      A.   Yes.

17      Q.   Part of doing well in a law school exam is

18  identifying issues; correct?

19      A.   Correct.

20      Q.   Certainly the professors grade based on how

21  many issues you identify; correct?

22      A.   Correct.

23      Q.   So whether or not you identified all the

24  issues is a completely different question.  Okay.

25           But you were able to answer all, whatever,

1 however many number essay questions there were on that

2 exam; correct?

3          MS. PHILLIPS:  Objection.  Leading.

4          THE WITNESS:  Answer?

5          MS. PHILLIPS:  Yes.

6          THE WITNESS:  I had an answer for each one.

7     Q.   (BY MR. SANTIAGO)  You used the full

8 four-and-a-half hours or did you finish a little bit

9 before?

10    A.   I used almost the full time.

11    Q.   So the fact that you almost used the full

12 time, to me at least means that you finished before

13 the four-and-a-half-hour mark.  Is that fair to say?

14    A.   I'm not sure.  I might have had a minute to

15 spare.  Nothing that big.

16    Q.   Were there other students that completed the

17 exam and had left?

18    A.   I believe so.

19    Q.   Were there other students towards the end of

20 the exam that were still there at the end?

21    A.   Yes.

22    Q.   How many students?

23    A.   I don't remember.

24    Q.   Do you recall what you ultimately got in

25 that exam, what grade?

1      A.   I believe I got a C.

2      Q.   Your next exam was the Civ Pro II exam on

3  May 4, 2007; correct?

4      A.   Correct.

5      Q.   Between the time that you took your

6  contracts exam and your Civ Pro II exam, did you ever

7  talk to Dean Hernandez or write him an email saying,

8  "I wasn't provided with the accommodations that I

9  requested"?

10     A.   No.

11     Q.   Why not?

12     A.   I felt like he lied once.  He would just lie

13  again.  And I also felt like there wasn't enough time.

14  I had to study.

15     Q.   I just want to be clear on this.  You didn't

16  communicate with Dean Hernandez the fact that he

17  didn't provide you with the accommodations that you

18  requested because you were too busy studying, No. 1,

19  or, No. 2, however you want to put it, and also the

20  fact that Dean Hernandez wasn't very honest with the

21  accommodations that he would be providing you?

22          MS. PHILLIPS:  Objection.  Leading.

23          THE WITNESS:  Correct.

24     Q.   (BY MR. SANTIAGO)  Did you ever try to

25  complain or bring to the attention of some other dean

1   or some other school official, the fact that you

2   weren't getting the accommodations that you had

3   requested from the time that you finished your

4   Contracts exam to the point in time when you were

5   going to take your Civ Pro II exam?

6       A.   I did, but I'm not sure at what point, but I

7   did try to talk to Janelle about it.

8       Q.   Okay.  But you don't recall if that was

9   after your Contracts II exam and Civ Pro II exam?

10      A.   I'm not sure when it was.

11      Q.   So your next exam was the Civ Pro II exam.

12  According to Defendant's Exhibit No. 10, the exam was

13  held on a Friday, and again it was

14  four-and-a-half-hour allocation time, 1:30 to 6 p.m.,

15  correct, according to the memo?

16      A.   Correct.

17      Q.   Do you remember where you took that exam,

18  what classroom?

19      A.   I believe it was in the same classroom as

20  the other one.

21      Q.   Do you remember how many students were in

22  that classroom?

23      A.   Yes.

24      Q.   How many students?

25      A.   It was approximately the same amount as last

1    time.

2         Q.    So about four students?

3         A.    Three to four students.

4         Q.    Three to four?

5         A.    Other students.

6         Q.    And the accommodations that they provided

7    you for that exam, was it time and a half in a room

8    with limited distractions?

9         A.    It was time and a half with the students in

10   the room.

11        Q.    Okay.  Are you saying that that room with

12   the three or four students and the proctor is not a

13   room with limited distractions?

14        A.    Correct.

15        Q.    Let me ask you this.  Would there be more

16   distractions if you took the exam in a room full of

17   other students and a proctor?

18        A.    In some ways, yes.  In some ways, no.

19        Q.    Explain that answer.  How in some ways, yes?

20        A.    You are definitely more aware of your

21   surroundings when it was just a few people, and you're

22   definitely more aware when it was the proctor pacing

23   the room when it was only a few students.

24              But there are fewer people obviously getting

25   up to go to the bathroom.

PORTER, WALKER & ASSOCIATES, INC.

Page 185

1      Q.    Okay.  So are you saying is it better for

2  you to take an exam in a smaller room with just three

3  or four students and a proctor versus taking an exam

4  in a room with 50, 60 students and a proctor?

5      A.    That's not what I said.

6      Q.    I'm asking you, which one is better for you?

7      A.    I don't think I can make that determination

8  to neither of them.

9      Q.    Understood that you would prefer to take an

10  exam in a room by yourself.  I understand that.

11          But my question is, if you had the option or

12  there was only two options available, one, take the

13  exam in a room with everyone else or take an exam in a

14  room with just three or four students, which option

15  would you prefer?

16      A.    Is this totally hypothetical?

17      Q.    This is a hypothetical.

18      A.    Because I didn't know that there was a

19  second option to go back and do that.  I honestly

20  can't answer that question.  I have no idea.

21      Q.    Well, let me ask you this.  Your first

22  semester you took the exams with other students;

23  correct?

24      A.    Correct.

25      Q.    Your second semester you took the exam in a

PORTER, WALKER & ASSOCIATES, INC.

1   room with just three or four students and a proctor;

2   correct?

3       A.   Correct.

4       Q.   Which of the two did you prefer?

5       A.   I don't have a preference.

6       Q.   So they're both equally unsuitable for you,

7   is that what you're saying?

8       A.   I'm saying they're both unsuitable.

9       Q.   That's exactly what I just said.  They're

10  both unsuitable?

11      A.   Correct.

12      Q.   What format was the Civ Pro II exam?

13      A.   I believe it was both multiple choice essay.

14      Q.   Do you remember how many multiple choice

15  questions?

16      A.   No.  I'm not sure.

17      Q.   Do you recall how many essay questions?

18      A.   I'm not sure.  There might be two, one or

19  two.

20      Q.   Do you perform better with multiple choice

21  questions versus essay questions?

22      A.   No.

23      Q.   If you had a preference, you would prefer to

24  do essay questions?

25      A.   Correct.

1    Q.   Why is that?

2    A.   I find essay questions a little bit easier.

3    Q.   In what sense?

4    A.   Well, in multiple choice I find like two

5    answers might be satisfactory, and I can't narrow it

6    down.

7    Q.   Is this just true for law school or is that

8    also true when you were in University of Miami?

9    A.   Actually, University of Miami was the

10   opposite, I think, the exact opposite.  But I don't

11   really remember.

12   Q.   So is it more the format of law school exams

13   that is just more difficult when it pertains to

14   multiple choice questions rather than just the format

15   itself?

16   A.   The way these particular questions were

17   worded was a little bit hard.

18   Q.   Did you experience any type of distractions

19   during your Civ Pro II exam?

20   A.   Yes.

21   Q.   Tell me about those distractions.

22   A.   It was the same distractions as before.

23   Q.   Tell me what those distractions were.

24   A.   It was the people getting up.

25   Q.   Students?

Page 188

1      A.   Students.  Sorry.

2      Q.   Okay.

3      A.   The proctor pacing the room, even going

4  behind me.

5      Q.   When you say going behind you, what do you

6  mean by that?

7      A.   There's a little bit of space behind the

8  last row, and she would go behind and walk around.

9      Q.   And do you recall where you were seated

10  during that exam?

11      A.   Toward the back.

12      Q.   Was there any tables or desks behind you?

13      A.   I was either in -- I was in one of the last

14  three rows.

15      Q.   What was it about her going behind you that

16  was a distraction for you?

17      A.   I wasn't expecting it.

18      Q.   Was the proctor walking around continuously

19  or did she sit down on occasion?

20           Describe for me ---

21      A.   She sat down on occasion.

22      Q.   Do you have any idea why the proctor was

23  walking around?

24      A.   No.

25      Q.   Did she ever tell you before you started

1    taking the exam that she would be roaming around in

2    the classroom?

3         A.    No.

4         Q.    Prior to this, prior to going to law school,

5    had you ever taken exams where there were proctors in

6    the room and they would be walking around?

7         A.    Yes.

8         Q.    That was when you were at the University of

9    Miami?

10        A.    You asked prior to law school.  This was

11   even elementary school, high school.

12        Q.    So let's talk about the University of Miami.

13        A.    Okay.

14        Q.    When you went there, when you took exams,

15   were there proctors in the room on occasion?

16        A.    Yes.

17        Q.    And did they walk around while you were

18   taking exams?

19        A.    Not so much.

20        Q.    So when you went to law school, were

21   proctors walking around more than you were used to?

22        A.    Yes.

23        Q.    Did you ever voice those concerns to anyone

24   at the school?

25        A.    Yes.

Page 190

1          Q.   Who did you voice those concerns to?

2          A.   Hernandez.

3          Q.   When did you voice those concerns?

4          A.   Well, we met in February, and then we met

5     again in April.  Even before that, too.

6          Q.   That was February, April of 2007?

7          A.   Correct.

8          Q.   Two years before your second semester

9     examinations?

10         A.   Correct.

11         Q.   Did you ever memorialize those concerns in

12    an email or a letter?

13         A.   I said I needed to be alone.

14         Q.   But specifically I'm talking about the

15    proctors and the fact that they walk around too much.

16         A.   I'm not sure.

17         Q.   Did you get up at any point in time during

18    that Civ Pro II exam to go to the restroom?

19         A.   Yes.

20         Q.   How many times?

21         A.   I believe twice.  I was having a panic

22    attack.

23         Q.   So during your Civ Pro II exam, you were

24    having a panic attack?

25         A.   Yes.

Page 191

1    Q.   Tell me about that.  What happened?

2    A.   Basically the same thing that happened the

3  first semester during the Contracts exam.  Just got

4  really sweaty, the heartbeat in my ears, because it

5  was going so fast.

6         Just really short breathing.  I felt like I

7  couldn't breathe and just like panic.

8         And I couldn't really like focus on anything

9  but the pain, because it kind of hurts when you can't

10  breathe.

11    Q.   How far along into the exam were you when

12  you had the first panic attack during that Civ Pro II

13  exam?

14    A.   I don't think I was that far in.

15    Q.   Were you at least an hour into the exam?

16    A.   No.

17    Q.   So 30 minutes into the exam?

18    A.   Maybe a little bit before that, but that's

19  fair.

20    Q.   So would it be fair to say somewhere between

21  15 and 30 minutes?

22    A.   Sure.

23    Q.   So somewhere between 15 and 30 minutes you

24  had your first panic attack?

25    A.   I only had one.

1    Q.   You only had one?

2    A.   Yes, but I went to the bathroom twice.

3    Q.   So you had one panic attack during the Civ

4  Pro II exam, and it was 15 to 30 minutes into the

5  exam.

6         Did you take the multiple choice portion of

7  the exam first and then the essay portion?

8         Tell me what the format was of the exam, if

9  you recall.

10   A.   I'm not sure, but I probably would have gone

11  with a portion of the essay first, but I'm just

12  guessing.

13   Q.   Do you recall what you were doing at the

14  point that you had your panic attack?

15   A.   I was doing the exam.  The proctor walked

16  back, and that's when I had it.

17   Q.   The proctor walked back where?

18   A.   Where I was, towards my side, actually.

19   Q.   Towards which side?

20   A.   My right side.

21   Q.   So the proctor was walking towards your

22  right side when you had the panic attack?

23   A.   She was already there, but I'm having the

24  panic attack.

25   Q.   Are you saying that the proctor caused your

1  panic attack?

2      A.   That's worded a little funny, but her coming

3  back there was -- her being that close was the cause

4  of that.

5      Q.   So her proximity to you while you're taking

6  an exam is what causes your panic attack; is that

7  right?  Correct me if I'm wrong.

8      A.   It wasn't only the person.  It was -- I was

9  looking down.

10          I wasn't paying attention to her.  I was

11  trying to focus on the exam.  Then all of a sudden

12  she's right there.

13     Q.   So she startled you?

14     A.   Yes.

15     Q.   So it was the fact that you were

16  concentrating on your exam, not paying attention to

17  where she is; correct?

18     A.   Correct.

19     Q.   Then the next thing you know, she's there on

20  your right-hand side, and that's what you startled

21  you?

22     A.   Right.

23     Q.   How long did the panic attack last for?

24     A.   It lasted for a few minutes.

25     Q.   How many minutes, approximately?

PORTER, WALKER & ASSOCIATES, INC.

Page 194

1     A.    Several.  Approximately like ten.

2     Q.    Ten minutes?

3     A.    It's not the worst part about it, though.

4     Q.    What's the worst part about it?

5     A.    The worst part is how you feel afterwards.

6  It's just -- it's exhausting, not in the sense that

7  you're tired, but in the sense that it hurts to move

8  almost.

9     Q.    Okay.  It hurts to move.  And how long does

10 that sensation last for?

11    A.    That lasts for a little bit longer.

12    Q.    Tell me how long.  20 minutes?  30 minutes?

13 An hour?

14    A.    No, not an hour.  20 minutes is fair.

15          But also when you asked me about times,

16 that's part of the post-traumatic stress disorder.

17 I'm not really an accurate gauge of timing.

18    Q.    Okay.  I'm not going to hold you to the

19 exact time.

20    A.    Okay.

21    Q.    I just want an idea of, you know, what you

22 experience and how long, an approximation.  If it's

23 more or less, I'm not going to hold you to it.

24    A.    Okay.

25    Q.    So during the time that you had his panic

PORTER, WALKER & ASSOCIATES, INC.

1    attack and the subsequent manifestation of whatever

2    feelings you're having, are you incapacitated?

3         A.   Yes.

4         Q.   So you cannot focus or work on the final

5    exam?

6         A.   Correct.

7         Q.   Did you bring it to the attention of the

8    proctor?

9         A.   I believe so.

10        Q.   What did you tell her?

11        A.   I think I told her that I was going to the

12   bathroom, why I was going to the bathroom.

13        Q.   What was your explanation?  What did you

14   tell her?

15        A.   I just said I was having a panic attack.

16        Q.   Now, this proctor that you told this to, it

17   was a female?

18        A.   Yes.

19        Q.   Do you recall her name?

20        A.   No.  They never introduced themselves.

21        Q.   Had you ever seen this proctor before?

22        A.   I don't believe so.

23        Q.   Did you ever see her since?

24        A.   I'm not sure.

25        Q.   Do you know if she's employed by St. Thomas

Page 196

1    in any official capacity?

2         A.    I don't know for sure.  I assume that she's

3    employed for this proctor thing.

4         Q.    Immediately after you had this panic attack,

5    is that when you went to the bathroom the first time?

6         A.    It wasn't immediate, but, yes.

7         Q.    Did you ultimately regain your composure and

8    continue with the examination?

9         A.    Yes.

10        Q.    How long would you say you were

11   incapacitated as a result of this panic attack?

12        A.    Well, I never regained total composure, but

13   I got enough of it to actually write some.

14        Q.    So you never fully recovered from that panic

15   attack that day?

16        A.    That exam period, no.

17        Q.    That exam period.  All right.

18             But you certainly regained enough composure

19   that you were able to continue with the examination;

20   is that fair?

21        A.    That's fair.

22        Q.    How long would you say you were

23   incapacitated for during that exam period as a result

24   of this panic attack?

25        A.    You mean totally incapacitated?

Page 197

1    Q.   Yes.   Where you couldn't continue with the

2    exam and you had to stop for whatever reason.

3    A.   It was over in 30 minutes.

4    Q.   Now, at some point you resume your exam;

5    correct?

6    A.   Correct.

7    Q.   At some point later you went to the restroom

8    again; correct?

9    A.   Correct.

10   Q.   Did you ultimately finish the exam?

11   A.   Well, what do you mean by "finish"?

12   Q.   Let's break it down.   Did you answer all of

13   the multiple choice questions?

14   A.   I guess I did.

15   Q.   Why do you guess you did?

16   A.   Well, I don't remember exactly.

17   Q.   Do you remember if you answered all of the

18   essay questions?

19   A.   Which exam are we talking about?

20   Q.   Talking about the Civ Pro II exam.

21   A.   Okay.

22   Q.   And let me ask you a question again.   Do you

23   recall answering all of the multiple choice questions

24   in the Civ Pro II exam?

25   A.   I'm not sure.

Page 198

1      Q.   Do you remember answering all of the essay

2  questions in the Civ Pro II exam?

3      A.   I put something down as an answer for all of

4  them.

5      Q.   I will ask it a different way.  Were there

6  any questions, either multiple choice or essay, that

7  you left blank for whatever reason?

8      A.   No, not to leave blank, I don't think.  But,

9  again, I'm not sure about the one ---

10     Q.   Do you remember if you used the full amount

11 of time that was provided?

12     A.   I believe so, yes.

13     Q.   Do you remember if you left early, earlier

14 than the amount of time that was provided?

15     A.   I don't think I would have.

16     Q.   But do you specifically recall --

17     A.   No.

18     Q.   (Continuing) -- whether or not you did?

19     A.   No.

20     Q.   Do you remember what grade you got in the

21 Civ Pro II exam?

22     A.   I think I got a C.

23     Q.   Okay.  The next exam that you took was your

24 Torts II exam, and that was May 9, 2007; correct?

25     A.   Correct.

PORTER, WALKER & ASSOCIATES, INC.

Page 199

1      Q.   From the time that you took the Contracts

2    exam to the time that you took your Torts II exam, did

3    you ever tell Dean Hernandez that you weren't being

4    provided the accommodations that you had requested?

5            MS. PHILLIPS:  Objection.  Leading.

6            THE WITNESS:  No.

7      Q.   (BY MR. SANTIAGO)  From the time that you

8    took the Contracts examination on May 2nd to the time

9    that you took the Torts II exam on May 9th, did you

10   ever write an email to Dean Hernandez or any other

11   dean telling them that you weren't getting the

12   accommodations that you had requested?

13     A.   You mean before I took the Torts?

14     Q.   Correct.

15     A.   No.

16     Q.   Okay.

17           (Interruption off the record.)

18           (Thereupon, a brief recess was taken.)

19           MR. SANTIAGO:  Back on the record.

20     Q.   (BY MR. SANTIAGO)  Next exam you took was

21   your Torts II exam; correct?

22     A.   Correct.

23     Q.   And that was May 9, 2007.  Do you remember

24   what classroom you took that exam in?

25     A.   That was in the same room.

PORTER, WALKER & ASSOCIATES, INC.

Page 200

1      Q.   So the same classroom.  And do you remember

2   what accommodations were provided to you?

3      A.   Yes.

4      Q.   And were those the same accommodations that

5   you had previously, time and a half in that room with

6   just three students in it?

7      A.   Yes.  But they actually changed the time at

8   the last minute.

9      Q.   Do you remember what time the exam was

10  scheduled to begin originally?

11     A.   No, I don't recall off the top of my head.

12     Q.   Let's take a look at Defendant's Exhibit

13  No. 11.

14          And if you look at the bottom, it states,

15  "Extra time allocation, four-and-a-half hours, 8:30 in

16  the morning to 1 p.m."; correct?

17     A.   Correct.

18     Q.   When did you receive notice that time was

19  going to change?

20     A.   Right before the exam.

21     Q.   And what did they change the time to?

22     A.   I don't recall, but they shaved off the

23  time.  It wasn't going to end at 1:00.

24     Q.   Do you know why they did that?

25     A.   I didn't know then.

Page 201

1      Q.    Did you ultimately learn why they did it?

2      A.    Yes.

3      Q.    Why did they do it?

4      A.    Well, according to Janelle, she said that

5   the proctor -- I'm sorry, the professor changed the

6   time.

7      Q.    Why did the professor change the time, do

8   you know?

9      A.    I don't know.

10     Q.    Were you still getting time and a half,

11  though?

12     A.    I don't know.

13     Q.    Do you know if the professor reduced the

14  time for the original exam to the other students?

15     A.    I'm not sure.

16     Q.    Okay.  How many students were in the

17  Torts II exam?

18     A.    Either three to four other students.

19     Q.    And was there also a proctor?

20     A.    Yes.

21     Q.    Was this the same proctor or different

22  proctor than you had previously?

23     A.    I'm not sure.

24     Q.    Was it a male or female?

25     A.    Female.

Page 202

1      Q.   Do you know the name of the proctor?

2      A.   No.

3      Q.   What was the format of the exam, if you

4    recall?

5      A.   I believe it was both multiple choice,

6    essay.

7      Q.   Do you remember how many multiple choice

8    questions were on the exam?

9      A.   I don't know for sure.

10     Q.   Do you remember how many essay questions

11   were on the exam?

12     A.   I don't.

13     Q.   Did you encounter any distractions while you

14   were taking the Torts II exam?

15     A.   Yes.

16     Q.   What distractions did you encounter?

17     A.   The first distraction was when they changed

18   the time.

19     Q.   Did they start earlier, later?  How did they

20   change the time?

21     A.   Well, when they announced that the time was

22   going to be different, that threw me off a bit.

23     Q.   When you say change of time, what do you

24   mean?

25          Was the exam now shorter?  Was it longer?

1   Did they just move the time to a different day?

2        A.    It wasn't at 1 o'clock anymore.  It was an

3   earlier time.

4        Q.    When you say, "It wasn't at 1 o'clock,"

5   according to Defendant's Exhibit No. 11, the Torts II

6   exam was to begin at 8:30 in the morning; correct?

7        A.    Right.

8        Q.    And it was supposed to finish at 1 p.m.;

9   correct?

10       A.    Correct.

11       Q.    So when you're saying they changed 1 p.m.

12  time, what do you mean?

13             Are you saying the finishing time?

14       A.    Correct.

15       Q.    So at what time was the exam supposed to be

16  over by?

17       A.    I told you, I don't recall, but it was

18  before the 1 o'clock.

19       Q.    Okay.  And the reason why I'm asking, you're

20  saying it was a distraction.  So I'm trying to

21  understand what's the distraction, but ---

22       A.    You want me to explain?

23       Q.    Yes.

24       A.    The distraction was the fact that I was lied

25  to yet again.

PORTER, WALKER & ASSOCIATES, INC.

Page 204

1           Part of my post-traumatic stress disorder is

2    even -- I can't even forgive like the little things,

3    like, because I think it's going to be bigger.

4           So that really threw me off.  And I

5    constantly ruminate on what occurs to me.

6        Q.   How did they lie to you with respect to the

7    time?

8        A.   It wasn't that time anymore.

9        Q.   But why is that a lie?

10          In other words, why couldn't there just have

11   been a change in time that was set forth by the

12   professor?

13       A.   Because that's the time they told me, and

14   that's not -- that's more of a distraction.

15       Q.   And I'm still having a hard time

16   understanding how this is a lie.

17          Are you saying that if there's a change in

18   schedule and you aren't notified within a certain

19   amount of time, that it now is a lie?

20          Explain how this is a lie.

21       A.   It's a lie because it wasn't 1 o'clock

22   anymore.

23          They probably knew or they should have known

24   that it wasn't going to be 1 o'clock before then,

25   before two minutes before the exam was supposed to

PORTER, WALKER & ASSOCIATES, INC.

Page 205

1    start.

2        Q.   They notified you of the time change before

3    the exam started; correct?

4        A.   Right before.

5        Q.   Okay.  And who was it that notified you of

6    the time change?

7        A.   I believe Janelle came in and wrote it on

8    the board.

9        Q.   You would agree with me that one of the

10   accommodations that you requested was time and a half

11   to take the exams; correct?

12       A.   Correct.

13       Q.   If you were provided with four-and-a-half

14   hours originally to take the exam, then how much time

15   did the students that were taking an exam without any

16   accommodations, how much time did they have to take

17   the exam, do you know?

18       A.   I think you have asked me that already.  I

19   don't know.

20       Q.   What other distractions did you have during

21   the exam?

22       A.   The proctor walking around.  The students

23   getting up.

24       Q.   Did you have any panic attacks during the

25   exam?

Page 206

1      A.    Yes.

2      Q.    How far into the exam were you when you had

3   your panic attack?

4      A.    I'm really not sure.

5      Q.    Was it at the beginning?  Was it in the

6   middle?  Was it towards the end?

7      A.    I'm not sure now.

8      Q.    Did you have more than one panic attack?

9      A.    Yes.

10     Q.    How many panic attacks did you have during

11  that exam?

12     A.    I think I had two.

13     Q.    How far apart were they?

14     A.    They weren't all that far apart.

15     Q.    Were they 30 minutes apart, an hour apart?

16           Give me an indication as to how far apart

17  they were.

18     A.    I'm really not good with time, but they

19  weren't -- they were probably less than 30.

20     Q.    Less than 30 minutes apart?

21     A.    Yes.

22     Q.    Were you unable to work on your examination

23  during the time that you were having these panic

24  attacks?

25     A.    That would be correct.

PORTER, WALKER & ASSOCIATES, INC.

Page 207

1    Q.   How much time would you say you were unable

2   to work on your examination as a result of these panic

3   attacks, combined?

4    A.   I'm not sure, but it would have been more

5   than 30 minutes.

6    Q.   When you had these panic attacks, how long

7   did they last for?

8    A.   This lasted a little bit longer than the

9   last exam, slightly longer.

10    Q.   Ultimately, were you able to continue with

11   the examination?

12    A.   I'm not sure.

13    Q.   Why are you not sure?

14    A.   Because I'm not sure when they occurred, if

15   I continued after or if I was doing it before.

16    Q.   Did you use up the full time, whatever was

17   allotted to complete the exam?

18    A.   Yes.

19    Q.   Did you finish early?

20    A.   No.

21    Q.   Were there any questions that you didn't

22   have an opportunity to get to because you were short

23   on time?

24    A.   I feel like I didn't answer the essay

25   portion fully.

Page 208

1      Q.    Were there any questions that were left

2  blank?

3      A.    I don't think so.

4      Q.    Do you remember approximately what time you

5  finished the exam?

6      A.    No.  I believe I used the whole time.  So it

7  would have been whenever they ended.

8      Q.    Do you recall what grade you got in your

9  Torts II exam?

10     A.    I think I got a C plus.

11     Q.    Were there any other distractions, other

12 than the proctor walking around, the students getting

13 up to use the restroom, and your two panic attacks

14 that was a distraction for you during that

15 examination?

16     A.    The proctor was talking to some of the

17 students.

18     Q.    During the examination?

19     A.    Yes.

20     Q.    When he was talking to the students, how

21 long was he talking to them for?

22     A.    Well, I don't know what the substance, but

23 it was like a minute.  She also offered chocolates.

24     Q.    She offered chocolates during the exam?

25     A.    Yes.

Page 209

1      Q.   To all the students, or how did she go about

2   offering chocolates?

3      A.   She was walking around offering chocolates.

4   She also had some by the door.  She offered me a

5   chocolate after I came back.

6           After I informed her I was having a panic

7   attack and I went to the bathroom, she offered me a

8   chocolate.

9           And she -- I think she put a chocolate in my

10  pocket, too.

11     Q.   Did you ---

12     A.   "For later," she said.

13     Q.   Did you eat any chocolate during the exam?

14     A.   I don't think so.

15     Q.   So it is possible that you ate chocolate

16  during the exam?

17     A.   I don't think I did, no.

18     Q.   It sounds like you're not sure.  So is there

19  a possibility that you ate chocolate?

20     A.   Probably not.

21     Q.   Again, you don't sound very sure.

22           Is there a possibility?

23     A.   No.

24     Q.   So you did not eat chocolate?

25     A.   No.

Page 210

1    Q.   But the chocolate was offered to you?

2    A.   Yes.

3    Q.   And when you informed the proctor that you

4    were having a panic attack, what did she say, if

5    anything?

6    A.   Well, I wrote it -- I ripped out a piece of

7    paper from my blue book, and I told her I was having a

8    panic attack and could I or could she go in my bag and

9    get some Xanax for me.

10        And also informed her I would be in the

11   bathroom for at least ten minutes.

12   Q.   So you informed her by writing it on a piece

13   of paper you had ripped out of a blue book?

14   A.   Yes.

15   Q.   And you handed it to her, and you walked out

16   of the classroom, or did you wait for her to read it

17   and then walk out?

18   A.   I waited for her to read it.

19   Q.   And then you ---

20   A.   I think.

21   Q.   You think?

22   A.   I think.

23   Q.   Either way ---

24   A.   She did say, "Okay."

25   Q.   So you proceeded to go outside?

PORTER, WALKER & ASSOCIATES, INC.

1    A.   Yes.

2    Q.   And went to the bathroom?

3    A.   Yes.

4    Q.   And did the proctor ultimately go outside

5  and hand you your Xanax?

6    A.   No.   The proctor allowed me to get the Xanax

7  from my bag.

8         I left to go to the bathroom.   I was in

9  there.

10        She came to the bathroom and walked me back,

11  and that's when she offered more chocolate and put --

12  when I refused it, she put a chocolate in my pocket,

13  and she said, "For later."

14   Q.   The Xanax that you took, do you know how

15  many milligrams it was?

16   A.   No.   And I don't think I took it.

17   Q.   So you asked for the Xanax, but you didn't

18  take it?

19   A.   Yes.   I didn't feel like I needed to once I

20  went to the bathroom.

21   Q.   Who prescribed the Xanax?

22   A.   I'm not sure.   She has an Indian name.

23   Q.   You're not what?

24   A.   She has an Indian name.

25   Q.   She has an Indian name?

Page 212

1   A.   Yes.

2   Q.   The person that prescribed it?

3   A.   Yes.

4   Q.   Okay.  Who is she?  Is she a doctor?

5   A.   Well, I don't know if she's a doctor, but

6   she's in Miami.

7   Q.   Tell me how it was that she prescribed Xanax

8   to you.

9   A.   I asked her for it.

10   Q.   Is this one of the medical providers we

11   already talked about?

12   A.   I don't remember if you talked about her or

13   not.

14   Q.   Do you remember yesterday I asked you to

15   tell me who you have seen or treated with in the past

16   ten years?

17   A.   Yes, but I'm not sure what I said.

18   Q.   You're not sure what you said?

19   A.   No.

20   Q.   Well, this Indian doctor that you're talking

21   about, when did you first treat with her?

22   A.   I only treated with her once.

23   Q.   Where is her office located?

24   A.   In Miami.

25   Q.   Specifically where in Miami?

Page 213

1    A.   I don't know.  I don't drive.

2    Q.   General area, South Miami, North Miami?

3    A.   I don't know.

4    Q.   Is it Dr. Deepa Verma?

5    A.   Yes.

6    Q.   So you only saw her one time?

7    A.   Yes.

8    Q.   Do you remember when it was that you saw

9  her?

10   A.   No.

11   Q.   Was it in 2007?

12   A.   Yes.

13   Q.   Was it some point between January and May,

14 when you took the examinations; correct?

15   A.   Correct.

16   Q.   What was the reason that you went to see

17 Dr. Verma?

18   A.   I wanted to get Xanax.

19   Q.   Why did you want to get Xanax?

20   A.   To treat the anxiety.

21   Q.   Had you taken Xanax before that?

22   A.   Yes.

23   Q.   Who had prescribed that Xanax?

24   A.   Nobody did.

25   Q.   Where did you get it from?

Page 214

1    A.   My fiancé.  My ex-fiancé's, his boss.

2    Q.   How is it that you got your ex-fiancé's

3  boss' Xanax?

4    A.   I think she offered it to him.  I think he

5  must have been talking about me, and she offered it.

6  And he said, "Here, try this."

7    Q.   So when you went to Dr. Verma in January or

8  some point in early 2007, what were your complaints at

9  that time?

10      What did you present with?  Did you tell

11  Dr. Verma that you were experiencing or suffering from

12  depression --

13    A.   I said --

14    Q.   (Continuing) -- or anxiety?

15    A.   I described it.  I told her about the PTSD.

16  I told her that I was really, really anxious, also

17  depressed.  And that I really want Xanax just to

18  focus.

19    Q.   And she ultimately prescribed Xanax?

20    A.   Yes.

21    Q.   How many pills did she prescribe, do you

22  know?

23    A.   I don't know.

24    Q.   Did you take all the pills that were

25  prescribed?

Page 215

1      A.   Yes.

2      Q.   During that time in May when you were taking

3   your examinations, were you taking any prescription

4   medicine at that time?

5      A.   Wait.  In May when I was taking the exam?

6      Q.   Yes.  During that time period, were you

7   taking any prescription medicine?

8      A.   Yes.

9      Q.   Xanax was one of them?

10     A.   I'm not sure when I was weaned off Xanax.

11  Those are her words.  She also made gave me another

12  pill to wean me off Xanax.

13     Q.   What was that pill called, do you remember?

14     A.   I'm not sure.

15     Q.   Do you know who Dr. Ross is?

16     A.   Yes.

17     Q.   Who is he?

18     A.   He's another doctor in Miami.

19     Q.   What did you go see him for?

20     A.   I don't really remember.

21     Q.   Did he prescribe any medication to you?

22     A.   Well, I'm not sure.  They might be in the

23  same office.

24     Q.   Were you taking Zoloft at that time?

25     A.   I think that might have been it.

PORTER, WALKER & ASSOCIATES, INC.

Page 216

1       Q.   It appears that Dr. Verma is in the same

2   office as Dr. Ross.

3            Do you recall them being in the same office?

4       A.   I think they were.

5       Q.   Let me read you the first line of a report

6   dated April 26, 2007.

7            This report was prepared by Dr. Verma.   It

8   was electronically signed by Dr. Verma.

9            And it states, "Patient is a 25-year-old

10  African-American female who presents as a new patient

11  with the above chief complaints. Chief complaints were

12  anxiety, panic attacks, palpitations and states wants

13  Xanax."

14           Do you recall complaining of those symptoms,

15  anxiety, panic attacks, palpitations?

16      A.   I don't recall exactly.

17      Q.   But that would be consistent with what you

18  have already testified to; correct?

19      A.   Correct.

20      Q.   It further says, "She states that she is

21  here regarding new health issues, and this includes

22  the following:   New patient presents with anxiety,

23  panic attacks, palpitations."

24           Now, were these new health issues for you?

25      A.   No.

Page 217

1      Q.    Is Dr. Verma incorrect in stating that these

2   were new health issues?

3      A.    Yes.

4            MS. PHILLIPS:   Just one second.   Let me just

5   take this.   Excuse me.

6            MR. SANTIAGO:   Go ahead.

7            (Interruption off the record.)

8      Q.    (BY MR. SANTIAGO)   The report further

9   states, "Current anxiety due to fear of being kicked

10   out of law school."

11            Do you agree or disagree with that

12   statement?

13      A.    I partially agree and partially disagree.

14      Q.    Can you explain that further?

15      A.    I was fearful of being kicked out, but it's

16   not a new thing.

17            It wasn't a new problem, and that wasn't

18   exactly a new fear either.

19      Q.    Well, after you were placed on academic

20   probation, did your anxiety levels increase, decrease,

21   or stay the same?

22      A.    Well, I would say they slightly increased.

23      Q.    Why is that?

24      A.    Because I was going to get kicked out.

25   There was a chance.

PORTER, WALKER & ASSOCIATES, INC.

Page 218

1      Q.   So the statement that you were fearful of

2  being kicked out of law school, and that contributed

3  to some extent to the anxiety that you were

4  experiencing at the time, would that be accurate?

5      A.   Somewhat, yes.

6      Q.   Were there other factors that were

7  contributing to your anxiety at that time?

8      A.   Well, I had anxiety, period.  It was

9  associated with the PTSD.

10      Q.   So you had anxiety related to PTSD and the

11  fact that you were on academic probation increased

12  your anxiety level.  Would that be a fair statement?

13      A.   It certainly didn't help.

14      Q.   Were you at all concerned about your weight

15  at the time that you treated with Dr. Verma on

16  April 26, 2007?

17      A.   I don't remember either way.

18      Q.   Were you concerned about your cholesterol

19  level?

20      A.   No.

21      Q.   Have you ever been diagnosed with high

22  cholesterol?

23      A.   No.

24      Q.   So the statement that Dr. Verma states,

25  "States she is overweight and has very high

Page 219

1    cholesterol," you would disagree with that statement?

2         A.   I would.

3         Q.   Ultimately, Dr. Verma prescribed both Xanax

4    and Zoloft; correct?

5         A.   Correct.

6         Q.   And you never returned to see her?

7         A.   No.

8         Q.   Did she prescribe blood work?

9         A.   Probably.  I don't remember.

10        Q.   Did she prescribe an EKG?

11        A.   Yes, I think so.

12        Q.   Why didn't you ever return for follow-up

13   treatment?

14        A.   I don't know.

15             MR. SANTIAGO:  We are going to mark this

16   report as Defendant's Exhibit No. 13.

17             (Thereupon, the Medical Records, 4/26/07,

18             Dr. Ross referred to was marked as

19             Defendant's Composite Exhibit No. 13 for

20             Identification.)

21        Q.   (BY MR. SANTIAGO)  Take a look at that.  I'm

22   not going to ask you any questions about it, though.

23             Now, after you completed your Torts II

24   examination, did you ever contact Dean Hernandez or

25   write him an email telling him that he failed to

Page 220

1   provide you with the accommodations that you had

2   requested?

3       A.   Yes.   I told him about them shaving the

4   time.

5       Q.   How did you tell him that, in what way?

6       A.   Via email.

7       Q.   Why did you email him about that?   What was

8   the purpose?

9       A.   Actually, I was pretty -- not angry, but

10  sort of -- that it was just another lie about the

11  accommodations.

12      Q.   Let me show you what I'm going to mark as

13  Defendant's Exhibit No. 14.

14           (Thereupon, the Email Dated 5/9/07 from

15           Randall Forbes to John Hernandez referred to

16           was marked as Defendant's Exhibit No. 14 for

17           Identification.)

18      Q.   (BY MR. SANTIAGO)   And can you tell me if

19  this is the email that you wrote to Dean Hernandez

20  that you just were referring to?

21      A.   I believe so.

22      Q.   In your email you state, and I'm just going

23  to read it for the record, it's very short.   It says,

24  "Hi.   How are you?   I'm just emailing to let you know

25  that our section was not given time and a half in our

PORTER,  WALKER & ASSOCIATES,  INC.

Page 221

1    Torts exam day in the LCR starting at 8:30 a.m.   And

2    we should have been done at 1 p.m., but we were told

3    12:15."

4            Did you write that?

5        A.   Yes, I think so.

6        Q.   Then the next sentence states, "This

7    includes myself, Covington Campbell and Andrew

8    Ketterer."

9            Who is Covington Campbell and Andrew

10   Ketterer?

11       A.   They were two other students in the same

12   room with me.

13       Q.   Okay.  Were there other students other than

14   them?

15       A.   Yes.

16       Q.   So why did you only include them and not

17   everyone else?

18       A.   Those are the people I knew their names.   I

19   wasn't sure of the other people, what their names

20   were.

21       Q.   Okay.  Why didn't you voice concerns about

22   the fact that you weren't being provided a room by

23   yourself?

24       A.   I did, not in the email.

25       Q.   Well, let me ask you this.  When did you?

PORTER, WALKER & ASSOCIATES, INC.

Page 222

1      A.   I'm not sure what period I did, but I did

2  voice it to Janelle.

3           Hernandez wasn't around then.

4      Q.   I'm talking about only specifically Dean

5  Hernandez.

6      A.   Okay.

7      Q.   Why didn't you put in this email, the one

8  that you sent on May 9, 2007, your complaint or

9  concern about the fact that you weren't being provided

10 a room by yourself?

11     A.   I just felt like he would just lie again.

12 He wasn't being totally truthful.

13     Q.   If that's the case, though, why did you go

14 to the extent of telling him about the time being

15 shaved?

16     A.   Well, this was just like the last straw, the

17 final lie about it.  I was just furious.

18          And I had already talked to -- by that time,

19 I had already talked to Janelle about it.  She kind of

20 just shrugged and walked off.

21     Q.   You didn't send her an email, right, you

22 just talked to her about it?

23     A.   I'm not sure if I sent her an email, too.  I

24 did talk to her.

25     Q.   Did Dean Hernandez respond to this email,

PORTER, WALKER & ASSOCIATES, INC.

Page 223

1    that you recall?

2        A.    I don't remember.

3        Q.    Did somebody else respond to the email?

4        A.    I believe so.

5        Q.    Who responded?

6        A.    Janelle.

7        Q.    What did she say?

8        A.    She was basically saying that it wasn't her

9    fault.  She was saying that it was the professor.

10            MR. SANTIAGO:  We're going to mark the next

11   email as Exhibit No. 15.

12            (Thereupon, the Email Dated 5/9/07 from

13            Janelle Jackson to Randall Forbes referred

14            to was marked as Defendant's Exhibit No. 15

15            for Identification.)

16       Q.    (BY MR. SANTIAGO)  And I'm going to ask you

17   to review it and tell me if you recognize it.

18       A.    Yes.

19       Q.    Is this the email that you were just

20   referring to?

21       A.    Yes.

22       Q.    What is her explanation as to why the exam

23   ended earlier than what was initially scheduled?

24       A.    That the professor changed it.

25       Q.    The professor changed the amount of time

PORTER,  WALKER & ASSOCIATES,  INC.

Page 224

1    that was allotted to complete the exam?

2        A.    Yes.

3        Q.    So originally the professor had provided

4    that the exam had to be completed in three hours;

5    correct?

6        A.    I don't know that.

7        Q.    Well, what does the email say?  You can just

8    refer to the email.

9        A.    Yes, it says the professor said three hours

10   at first, but then it was changed to two-and-a-half

11   hours.

12       Q.    So if you were originally being provided

13   time and a half, and the exam was three hours, time

14   and a half would be four-and-a-half hours; correct?

15       A.    Your math is as good as mine, I guess.

16       Q.    So if the exam was then reduced to

17   two-and-a-half hours, then certainly you would be

18   provided with less time to complete the exam; right?

19       A.    Less time than what?

20       Q.    Than what was originally provided by the

21   professor.

22       A.    Correct.

23       Q.    I mean, the professor is the one that

24   determines how much time the student has to complete

25   an exam; correct?

Page 225

1    A.   I don't know that.

2    Q.   If you look at this email, certainly it

3  appears that the professor was the one that changed

4  the time; correct?

5    A.   It would appear that way.

6    Q.   Did this at all convince you that perhaps

7  Dean Hernandez wasn't lying?

8    A.   No.

9    Q.   Why not?

10    A.   Because he lied about the other stuff.

11    Q.   If you read at the bottom of the e-mail, it

12  is an email from Dean Hernandez to Janelle Jackson;

13  correct?  And it's an email that's in response to your

14  email, asking her if she knows anything about it;

15  correct?

16    A.   Correct.  It's to her, but not to me.

17    Q.   Right.  It's to her?

18    A.   Yes.

19    Q.   So that would indicate that he didn't know

20  anything about the time change; correct?

21          MS. PHILLIPS:  Objection.  Calls for

22  speculation.

23          THE WITNESS:  That would mean he wrote an

24  email saying, "Do you know about this?"  I don't know

25  what he was thinking.

1    Q.    (BY MR. SANTIAGO)   Can I see that, please.

2    Thanks.

3         I think earlier you testified that the

4    reason why or one of the reasons why you didn't email

5    Dean Hernandez that you weren't being provided with

6    the accommodations that you had requested was because

7    you were too busy studying and Dean Hernandez wasn't

8    being very honest; correct?

9    A.    Yes.   Correct.

10   Q.    But certainly you had enough time to write

11   this email and voice your concern about the fact that

12   you weren't getting the four-and-a-half hours that you

13   were promised; correct?

14   A.    Yes.   At this point we only had one more

15   exam, I think.

16   Q.    But, again, you certainly had time to write

17   an email to Dean Hernandez and tell him that you

18   weren't being provided the four-and-a-half hours that

19   you were promised; correct?

20   A.    Sure.

21   Q.    Your last exam was a Property II exam;

22   correct?

23   A.    Correct.

24   Q.    And that was May 11, 2007; is that correct?

25   A.    I believe.

Page 227

1      Q.   Do you recall if it was in the same

2   classroom as your other exams?

3      A.   It wasn't.

4      Q.   It was not?

5      A.   No.

6      Q.   Where was it?

7      A.   It was in the library.

8      Q.   How many other students were taking the exam

9   in the library at that time?

10      A.   In that room of the library?

11      Q.   Yes.

12      A.   Because you said, "The library."  So I don't

13   know how many in the library.

14      Q.   In the room where you were taking the exam

15   in the library.

16      A.   There were, I believe, two or three other

17   people.

18      Q.   You were provided the time and a half;

19   correct?

20      A.   I believe so, yes.

21      Q.   Do you recall what time the exam started?

22      A.   I don't remember.

23      Q.   According to Defense Exhibit No. 12,

24   provides that the exam was to commence at 1 p.m. and

25   end at 5:30 p.m.?

Page 228

1        A.    Correct.

2        Q.    And you were being allocated four-and-a-half

3    hours to complete the exam; correct?

4        A.    Correct.

5        Q.    Was there a proctor in the classroom where

6    you took the exam?

7        A.    Yes.

8        Q.    Do you remember, was it a male or female?

9        A.    It was a female.

10       Q.    Was it the same female that had previously

11   been in your other exams, or just different people?

12       A.    This is different.

13       Q.    Did you experience any distractions while

14   you took the exam?

15       A.    Yes.

16       Q.    Tell me about those distractions.

17       A.    The students getting up.  But this time we

18   were closer in proximity, so I was actually kicked by

19   another student by accident.

20       Q.    Do you remember the name of the person that

21   kicked you?

22       A.    Andrew.

23       Q.    Andrew's last name?

24       A.    Ketterer, I guess.

25       Q.    And ---

Page 229

1      A.   It was, also, they were talking.  It was

2   another distraction.

3      Q.   Who was talking?

4      A.   The students to the proctor, and the proctor

5   to the students.

6      Q.   During the examination?

7      A.   Yes.

8      Q.   Did you ---

9      A.   Because she was deaf in one ear?

10     Q.   Who was deaf?

11     A.   The proctor.

12     Q.   At any point in time during the examination,

13  when the students were talking to the proctor, did you

14  tell them to be quiet or shush them or anything like

15  that?

16     A.   I shushed them.

17     Q.   And did they oblige?

18     A.   No.

19     Q.   They continued to talk?

20     A.   Yes.

21     Q.   Did they talk throughout the whole exam?

22     A.   Not the whole exam, no.

23     Q.   Do you know what they were talking about?

24     A.   They were talking about the exam itself.

25          They were talking about they went to the

Page 230

1    wrong room.

2        Q.    This was during the exam?

3        A.    Yes.  Because I was already there.  I think

4    another student walked in late.  I think that was

5    Andrew but I'm now not sure.

6              But I think that was Andrew who walked in

7    late, and he was explaining why he was late.

8        Q.    So he was explaining why he was late while

9    everyone was taking an examination?

10       A.    Correct.

11       Q.    And this was Andrew?

12       A.    Yes.  I think so.

13       Q.    Any other distractions?

14       A.    Yes.  Andrew was looking for a pen and was

15   narrating the fact that he was looking for a pen while

16   he was looking for a pen.  It might have been a

17   pencil.  I'm not sure.

18       Q.    What else?

19       A.    She got up a few times.

20       Q.    "She" being who?

21       A.    The proctor.

22       Q.    Did she walk around?

23       A.    Not all the way around.

24       Q.    That was a distraction for you?

25       A.    Yes, especially since this room was smaller

PORTER, WALKER & ASSOCIATES, INC.

Page 231

1    than the last room.

2        Q.   Comparison, how small was it?  Was it half

3    the size?  A fourth of the size?

4        A.   The room we're in now, it's even smaller.

5    It feels like -- it's about this size, but it's

6    differently shaped.

7        Q.   So but if we were comparing it to the room

8    that you had previously taken the exam, was it half

9    that size?

10       A.   It could have been a third of that size.

11       Q.   Any other distractions?

12       A.   Those are the main ones.

13       Q.   Any minor ones you can think of?

14       A.   Not at this time, no.

15       Q.   Did you experience any panic attacks during

16   the exam?

17       A.   Yes.

18       Q.   How many panic attacks?

19       A.   I think there was two.

20       Q.   When did you experience the first panic

21   attack?  How far into the exam were you?

22       A.   I'm not sure.

23       Q.   Is there anything specifically that caused

24   the panic attack?

25       A.   The kick.

Page 232

1     Q.   So after Andrew kicked you, that's when you

2  got the first panic attack?

3     A.   Yes.

4     Q.   Did you tell the proctor that you were

5  having a panic attack?

6     A.   I'm not sure if I told her on that one.

7     Q.   How long did that first one last for,

8  approximately?

9     A.   That one lasted longer than the other ones

10  from the other exam.

11     Q.   So would you say it lasted 15 minutes?

12     A.   I'm not good with time, but that might be

13  fair.

14     Q.   Okay.  When did you have the second panic

15  attack?

16     A.   It was toward the end of the exam.

17     Q.   Tell me about that one.

18     A.   Someone got up.  It wasn't Andrew.

19     Q.   And what happened?

20     A.   I just wasn't expecting the door to kind of

21  slam like that.  And it's marble.  And I jumped up.

22     Q.   So when the door slammed, that's what would

23  cause the second panic attack?

24     A.   Yes.  It was also hard getting up,

25  struggling with the door and then slamming it.

Page 233

1      Q.   Were they leaving the examination room?

2      A.   I'm not sure about that.

3      Q.   Do you know who it was that slammed the

4  door?

5      A.   I don't know her name.

6      Q.   It's a female?

7      A.   Yes.

8      Q.   How long did that panic attack last for?

9      A.   That lasted for the rest of the exam.

10     Q.   Do you know how much time you had left in

11  the exam?

12     A.   I don't.

13     Q.   Were you able to resume the examination

14  after that second panic attack?

15     A.   I went to the bathroom and came back.  After

16  I got my heart rate down a little bit, there was only

17  two minutes left for the exam.

18     Q.   At what point in time did you tell the

19  proctor about the panic attack?

20     A.   I told her right around when I went to the

21  bathroom.

22          I'm not sure if it was before or after.

23     Q.   What exactly did you tell her?

24     A.   That I had -- that I'm having one.

25     Q.   What did she say, if anything?

PORTER, WALKER & ASSOCIATES, INC.

1   A. She didn't say anything.  She just said --

2 no, she didn't say anything.

3   Q. Were you able to answer all the questions on

4 the exam?

5   A. I don't remember.

6   Q. Do you know if you left any questions blank?

7   A. I might have.

8   Q. Did I already ask you what format this exam

9 was?

10   A. I don't remember if you asked me or not.

11   Q. Well, I don't think I did.  What was the

12 format of this exam?

13   A. It was both essay and multiple choice.

14   Q. Do you know if you answered all the multiple

15 choice questions?

16   A. Didn't you ask me that?

17   Q. I asked you all the questions.  I'm now

18 being more specific.

19   A. I'm not sure, but probably.

20   Q. What about the essay questions, do you

21 specifically remember answering all the questions in

22 the essays, with the essay portion on the exam?

23   A. I left a huge portion out of it.

24   Q. Did you use all the time that was provided

25 to you?

Page 235

1      A.   Yes.

2      Q.   Do you remember what grade you got on that

3   exam?

4      A.   I think it was a C.

5           MS. PHILLIPS:  Can we take a break?

6           (Thereupon, a brief recess was taken.)

7      Q.   (BY MR. SANTIAGO)  After you completed your

8   Property II examination, and before you got your

9   grades, did you ever talk to Dean Hernandez about the

10  fact that you weren't provided the accommodations that

11  you had requested?

12     A.   I don't think so.

13     Q.   Did you ever send him an email telling Dean

14  Hernandez that he didn't provide you with the

15  accommodations that you had requested?

16     A.   I'm not sure about that.  I don't remember.

17     Q.   Did you ask anyone else or voice your

18  concerns to anyone else about the fact that you

19  weren't provided the accommodations that you had

20  requested?

21     A.   Yes.

22     Q.   Before you got your grades?

23     A.   Before I got my grades?

24     Q.   Yes.

25     A.   I'm not sure about that, if it was before or

Page 236

1    after.

2         Q.   Who did you voice your concerns to?

3         A.   I spoke to Janelle about it.  I spoke to my

4    Property professor.

5         Q.   Property professor is who?

6         A.   Barbara Singer.  I spoke to my Contracts

7    professor.

8         Q.   Who was that?

9         A.   Professor Makdisi.

10        Q.   Who else did you voice your concerns about?

11        A.   I also told my Torts professor.

12        Q.   That is who?

13        A.   Professor Silver.  But, again, I'm not sure

14   at what point.

15        Q.   Okay.  So you definitely voiced your

16   concerns about the fact that you weren't being

17   provided the accommodations that you had requested?

18        A.   Yes.

19        Q.   And, specifically, what accommodations did

20   you inform them about that you weren't receiving?

21        A.   I mainly told them about not receiving the

22   isolated testing location.

23        Q.   Did you tell them about anything else that

24   you weren't receiving?

25        A.   I told them that I was supposed to have got

Page 237

```
 1    time and a half and the thing on the exam, but I also
 2    told them that I wanted more, the extra stuff.  And I
 3    never got that.
 4         Q.   What do you mean, "more, the extra stuff"?
 5         A.   I think we talked about that yesterday, the
 6    other stuff that I wanted, that I wanted to get
 7    accommodated.
 8              I wanted the extended break period.
 9         Q.   And you had discussed the extended break
10    period with Dean Hernandez?
11         A.   Yes.
12         Q.   And he had agreed that he would provide you
13    with that?
14         A.   No.
15         Q.   Did you ever get extended break periods when
16    you were at the University of Miami?
17         A.   No.
18         Q.   So this was something new that you were
19    requesting that hadn't been previously provided at the
20    University of Miami?
21         A.   Well, I wanted something to help me
22    specifically for law school.  Like I wanted to start
23    some sort of conversation.
24              Like I wasn't in there demanding, demanding,
25    demanding.  I was just kind of asking.
```

Page 238

1      Q.    By getting an extended break period, are you

2   talking about during examinations?

3      A.    Yes.

4      Q.    Would that mean, then, that instead of

5   getting time and a half, you would get double time or

6   something else?

7      A.    I'm not sure exactly what you mean, but what

8   I'm saying is that time would stop when I took the

9   break.  It wouldn't keep going.

10      Q.    Do you have break periods during the exams?

11      A.    (No response.)

12      Q.    Let me rephrase the question.

13            During your second semester exams, were you

14   provided a break period during your examinations of

15   any kind?

16      A.    No.

17      Q.    So the fact that you were requesting an

18   extended break period, what does that mean?

19            I mean, that assumes that you already have a

20   break period, but you just wanted an extended break

21   period?

22      A.    I didn't mean it that way.  I meant it as

23   that it would stop the time, like the time wouldn't

24   keep going.

25      Q.    So you just wanted to be able to take a

Page 239

1  break during the exam and not count towards whatever

2  time you had allotted to take the exam?

3      A.   Yes.

4      Q.   When did you ultimately get your grades?

5      A.   It was in May, after summer school started.

6      Q.   Your last exam was May 11.  So you got your

7  results at the end of May at some point?

8      A.   It was sometime in May.

9      Q.   And how did you receive your grades, or how

10  did you learn about your grades?

11      A.   I'm not sure exactly, but they were online.

12      Q.   What happened after you got your grades?

13      A.   I had to go before the committee.

14      Q.   Were you sent a letter or an email advising

15  you that you were going to be suspended for failing to

16  maintain a GPA of 3.0?

17      A.   They said that I had to appear before the

18  committee first.

19      Q.   Okay.  And how did they notify you of this?

20      A.   I'm not really sure.  It might have been by

21  email or by letter.

22      Q.   What happened after you received that or

23  that you gained that knowledge that you had to appear

24  before the committee?

25      A.   What do you mean, what happened?

1      Q.   In other words, did you request a meeting

2  with Dean Hernandez to discuss this?

3           I mean, what did you do in preparation for

4  that meeting?

5      A.   I spoke to my professors.  My fiancé

6  actually spoke to Hernandez.

7      Q.   When you spoke to your professors, what was

8  the purpose of speaking to them?

9      A.   Well, it was first to ascertain like what

10 exactly was my problem.  Well, first it was to see if

11 the grades were accurate.

12     Q.   So you reviewed the exams with your

13 professors?

14     A.   Not all of them.

15     Q.   Tell me which professors you were able to

16 review the exams with.

17     A.   Like I couldn't -- I didn't review it with

18 my Tort professor.

19          And I didn't review it with my Civil

20 Procedure professor.  The Civ Pro professor was out of

21 town.

22          The Torts professor thought it better to

23 pick his brain about what I should put in my petition,

24 since he was on the committee.

25     Q.   So you didn't review your examination, your

Page 241

1    Torts exam with the professor?

2         A.    No.

3         Q.    So did you meet with him at some point after

4    you got your grades?

5         A.    Yes, we met.

6         Q.    And that was only to discuss the committee

7    meeting?

8         A.    That wasn't my original intent but, that's

9    what we ended up doing.

10        Q.    And did you tell him, "I want to go over my

11   exam"?

12        A.    Yes.

13        Q.    And understanding that you ultimately went

14   over the hearing, why didn't you press him on that, to

15   review your exam?

16        A.    I did.  He said since it's so close to the

17   petition date, that it would be better to pick his

18   brain since he's on the committee.

19        Q.    In essence, he didn't want to go over the

20   exam with you?

21        A.    I don't know what he wanted.

22        Q.    Did he communicate with you that he was not

23   going to go over the exam with you?

24        A.    Yes.

25        Q.    Do you recall when you met with this

Page 242

 1    professor?  What is his name?

 2         A.    Silver.

 3         Q.    Do you recall when you met with Professor

 4    Silver?

 5         A.    I don't know the exact date.

 6         Q.    How many days before the hearing was it that

 7    you met with Professor Silver?

 8         A.    I'm really not sure.

 9         Q.    Did you review your Contracts exam with your

10    professor?

11         A.    Yes.

12         Q.    And how long did you meet with your

13    professor?

14         A.    "How long," you said?

15         Q.    Yes.

16         A.    I'm not sure.

17         Q.    Did you feel that you had spent sufficient

18    time with the professor in reviewing the exam?

19         A.    It was fair, I guess.

20         Q.    Did you communicate to your professor that

21    the reason you had done so poorly was because you were

22    distracted and you weren't provided the accommodations

23    that you had requested?

24         A.    I told him that, yes.

25         Q.    And you told him that during that meeting?

PORTER, WALKER & ASSOCIATES, INC.

Page 243

1        A.    Yes.

2        Q.    Did he ever change his grade?

3        A.    No, but he kept saying, "Oh, you did get

4    that issue," over and over again.

5        Q.    "Oh," what?

6        A.    "Oh, you did get that issue," like he was

7    surprised.

8        Q.    And what did that lead you to believe, if

9    anything?

10       A.    That he might not have read the entire

11   thing.

12       Q.    Did you bring that to his attention?

13       A.    Yes.

14       Q.    And what did he say?

15       A.    He said that -- because I asked him, "Could

16   you award more points then?"  He said, "No, because if

17   I awarded more points, you would have to go back into

18   every single exam over."

19       Q.    So you're saying that Professor Makdisi --

20   is that how you pronounce it?

21       A.    Makdisi.

22       Q.    (Continuing) -- Makdisi acknowledged that he

23   had failed to recognize that you had addressed certain

24   issues, but refused to make changes to your grade?

25       A.    That's what he indicated.

PORTER, WALKER & ASSOCIATES, INC.

Page 244

1    Q.   Other than going over your exam and

2  discussing the fact that you hadn't received the

3  accommodations that you had requested, did you discuss

4  anything else with Professor Makdisi?

5    A.   Yes.

6    Q.   What else?

7    A.   He thanked me for volunteering in class.

8  And he said that I'm a very nice person, and that he

9  hopes it works out for me.

10    Q.   Anything else?

11    A.   I mean, I explained why I needed

12  accommodations, but that was it.

13    Q.   When you explained why, what exactly did you

14  say?

15    A.   I said, "PTSD."

16    Q.   Did you get into the sexual assaults or the

17  rape?

18    A.   I'm not sure.  I don't think so.

19    Q.   What else did you discuss?

20    A.   That was it.

21    Q.   Did you ever tell him you were having panic

22  attacks during the exam?

23    A.   Yes.

24    Q.   Did he comment on that at all?

25    A.   I not sure if it was him or my other

Page 245

1    professor that said, "You write too well to have done

2    so poorly."  That's exactly what they said.

3         Q.   You don't recall if it was Professor Makdisi

4    that said that; correct?

5         A.   Either Makdisi or Silver.

6         Q.   Who was the other professor that you

7    reviewed the exam with?

8         A.   Wait.  Can you rephrase that a little bit?

9         Q.   Yes.  Sure.  Did you review your final exam

10   with Professor Singer?

11        A.   Yes.

12        Q.   Tell me about that meeting.  When did you

13   have that meeting?

14        A.   I'm not sure when, but it was during the

15   same period of time.

16        Q.   And ---

17             MS. PHILLIPS:  Which class was Dr. Singer?

18             MR. SANTIAGO:  That is Property, Property

19   II.

20             MS. PHILLIPS:  Okay.

21        Q.   (BY MR. SANTIAGO)  What did you discuss with

22   Professor Singer?

23        A.   We discussed the exam.  We also discussed

24   that she was a former member of the Academic Standing

25   Committee.

PORTER, WALKER & ASSOCIATES, INC.

Page 246

```
 1            She expressed that she didn't like the job.

 2   She said that they would probably condition it on my

 3   summer classes, since the GPA is so close, and that I

 4   did improve the second semester.

 5            And she said she didn't really see any

 6   reason why they wouldn't.

 7        Q.   Did you review your examination with her?

 8        A.   Yes.

 9        Q.   Did she give you additional points?

10        A.   I asked her to.  She said, "No."

11        Q.   Did she explain to you why?

12        A.   Yes.

13        Q.   What was her explanation?

14        A.   She said something similar, that she would

15   have to go back and give everybody extra points, like

16   Professor Makdisi said.

17            She also said that I didn't talk enough

18   about one issue.

19        Q.   What issue is that?

20        A.   When the government takes over things, what

21   is that?

22        Q.   Imminent domain?

23        A.   Yes.  She also said that she could award --

24   she could technically award more points for what I did

25   discuss.  I think I discussed nuisance.
```

Page 247

1          But she said that since other students

2     didn't have nuisance on there, that she couldn't go

3     back and award points for me.  Only five students had

4     nuisance on their exams.

5          Q.   Did you ever tell Professor Singer that you

6     weren't provided with all of your accommodations that

7     you had requested?

8          A.   Yes.

9          Q.   Specifically, what did you tell her?

10         A.   I told her -- I didn't go in to much detail.

11    I just told her that I didn't get the accommodations

12    that I was asking for.

13         Q.   You didn't specify that it was a room by

14    yourself?

15         A.   What I meant by not specifying, I didn't

16    specify why.  I didn't give the reasons.

17         Q.   Let me ask you this.  Did you tell Professor

18    Singer that you were not provided with the

19    accommodations that you had requested, specifically an

20    isolated room?

21         A.   I believe so, yes.

22         Q.   Did you tell Professor Singer that you had

23    experienced panic attacks?

24         A.   She already knew.

25         Q.   Okay.  But did you tell her during that

Page 248

1    meeting, or did you discuss it at all?

2         A.    I think we did, but I'm not sure.

3         Q.    How did she already know?

4         A.    She was the professor that pulled me out of

5    that hallway that time that I had a panic attack in

6    between classes, around Easter.

7         Q.    Okay.

8         A.    And she stayed with me for a few hours.

9         Q.    Was there anything else discussed during

10   that meeting?

11        A.    I'm not sure if it was that meeting, because

12   we met again.  But she told me at some point that I

13   need to talk directly to Dean Dykas -- well, that I

14   should.

15        Q.    Dean Dykas?

16        A.    Yes.

17        Q.    Anything else that was discussed?

18        A.    Not that I remember right now.

19        Q.    Ultimately you met with Professor Singer at

20   some point again before the hearing?

21        A.    Yes.

22        Q.    And how many days after this meeting that we

23   just talked about did you meet with her again?

24        A.    I'm not sure.  And I'm not sure if it was

25   before or after the hearing.

PORTER, WALKER & ASSOCIATES, INC.

Page 249

1    Q.   But you think ultimately you met with her

2  again?

3    A.   Yes.

4    Q.   And what did you discuss during that second

5  meeting?

6    A.   We discussed -- well, we met actually twice

7  after that, I think.

8    Q.   Okay.

9    A.   We met in her office again once.

10    Q.   And what did you discuss during that

11  meeting?

12    A.   She was still telling me to talk to Dean

13  Dykas again.

14    Q.   Did you meet at your request?

15    A.   With Dean Dykas?

16    Q.   No.  With Professor Singer that second time?

17    A.   I think so.

18    Q.   Did you email her asking her to meet with

19  you?

20    A.   I think I just jumped in there.

21    Q.   And other than talking about meeting with

22  Dean Dykas, what was your purpose of meeting with her

23  at that time?

24    A.   I'm not sure.  I think we were just

25  discussing what options I had left.

PORTER, WALKER & ASSOCIATES, INC.

Page 250

1    Q.   So at this point had the hearing already

2    occurred, or no?

3    A.   I'm not sure.

4    Q.   And then you met with her again after that;

5    correct?

6    A.   Yes.

7    Q.   What happened during this third meeting?

8    A.   That was the June 12th meeting.

9    Q.   Okay.  And tell me what happened during the

10   June 12th meeting?

11   A.   Well, she was saying that she knows people

12   who got kicked out and came back.  She knows this one

13   particular guy that was going to be before the

14   committee, that got his MBA or something.

15        She said that I should go and work for a

16   bit, save up money to come back to law school.

17   Q.   Was this after you were already dismissed?

18   A.   Yes.

19   Q.   So this was after the hearing?

20   A.   Yes.

21   Q.   So you were going over some of your options?

22   A.   Yes.

23   Q.   And what else did she say?

24   A.   She said that I had been through trauma in

25   my young life.  That's how she phrased it, which I

Page 251

1    found odd, because I never told her specifically

2    anything about my trauma.

3         Q.   Anything else that you discussed?

4         A.   I don't remember right now.

5         Q.   What was the procedure for going before the

6    Academic Standing Committee?

7         A.   You had to have a written petition, and then

8    you had to appear before the committee a few days

9    later.

10             They said it was optional, but the secretary

11   signed me up.

12        Q.   What was optional?

13        A.   The personal hearing.

14        Q.   Okay.  Did you request that at all?

15        A.   I didn't request it.  She just said that I

16   had to sign up for a time.

17        Q.   Did you want to appear in person?

18        A.   I wasn't sure if I did.

19        Q.   Now, you prepared the written petition;

20   correct?

21        A.   Correct.

22        Q.   And let me just show you what we'll mark as

23   Defendant's Exhibit No. 16.

24             (Thereupon, the Petition for Readmission

25             referred to was marked as Defendant's

Page 252

1          Composite Exhibit No. 16 for

2          Identification.)

3      Q.   (BY MR. SANTIAGO)   Let me know if this is

4   the petition that you prepared.

5      A.   I'm actually not sure if this the one I

6   submitted to the committee.

7      Q.   Why are you not sure?

8      A.   Well, in the header, I am not sure if I put

9   all that information there.  I think that was for

10  something else.

11     Q.   What about the writing that's within those

12  documents, do you recall writing that?

13     A.   Yes.  Some of it.

14     Q.   So other than the header, does it appear

15  that this document was prepared by you?

16     A.   Yes.  It looks similar to the one I did

17  prepare.

18     Q.   The only difference is?

19     A.   I'm not sure if that's the only difference,

20  but -- yes, it's substantially the same.

21     Q.   Is there something that you see that you

22  don't recognize?

23     A.   Not right now.  I'm just skimming it.

24     Q.   Okay.

25     A.   I don't think I had the dashes there in the

PORTER, WALKER & ASSOCIATES, INC.

Page 253

1    one I submitted.  When I say, "EMDR," I think I

2    actually put what it stood for, because I remember

3    going back and actually putting it in.

4         Q.   Okay.  Do you have the one that you prepared

5    in your computer somewhere or in your house?

6         A.   I might.  I would have to look.

7         Q.   Thank you.

8              In your petition for readmission that we

9    have identified as Defendant's Exhibit No. 16, under

10   the heading "Academic Improvement," you have

11   identified some of the problems that you were having

12   as far as your testing ability; correct?

13        A.   Correct.

14        Q.   And you have identified, and I'm just going

15   to read it for the record, it states, and I quote, "My

16   main difficulty is with multiple choice sections of

17   final examinations."

18             Do you recall writing that?

19        A.   Yes.

20        Q.   Did you also state that you had difficulty

21   with the essay portions of the exams?

22        A.   I don't remember.

23        Q.   Let me just read this for the record.  It

24   states, "Certainly, the multiple choice section was

25   more difficult for me than the essay portion, but I

Page 254

1    also had difficulty with the essay portion."  This

2    you're referring to the Contracts exam.

3         It says, "The problem that I had first

4    semester was that in my enthusiasm to argue both

5    sides, I inadvertently canceled out both arguments.

6    The second semester I stopped short of arguing both

7    sides so as not to cancel out both arguments, and my

8    grade improved.  I believe in a contracts-type course

9    with multiple elements, I need to find a happy medium

10   to further improve."

11        Do you remember writing that?

12   A.   Yes.

13   Q.   So is it fair to say that you had recognized

14   certain aspects of your test-taking abilities that you

15   had difficulties with?

16   A.   It wasn't that I recognized that.  It was

17   that I was told that by the professor.

18   Q.   So, this, information that we have just read

19   for the record is information that you obtained from a

20   professor?

21   A.   Well, particularly the Contracts exam,

22   that's what he said.  He said about the canceling out

23   both sides when I argued both sides in the first exam.

24        He said that both arguments were good, but

25   it canceled out the other.  I need to make one side

Page 255

1    stronger.

2         Q.   In your petition for readmission, you also

3    talk about your post-traumatic stress disorder?

4         A.   Yes.

5         Q.   And you describe the sexual assaults;

6    correct?

7         A.   Correct.

8         Q.   And you talk about how it affected you; is

9    that correct?

10        A.   Correct.

11        Q.   You also talk about the fact that the

12   attorney that represented you in the civil action, you

13   were not pleased with; is that correct?

14        A.   Correct.

15        Q.   And why were you not pleased with your

16   attorney?

17        A.   He was a terrible attorney.  He let the

18   depositions go too long.

19             He agreed to everything the other side

20   wanted to do, never fought, never even obtained

21   evidence.  We actually got the evidence and gave it to

22   him.

23             We would -- he never called me.  He would

24   call my mother.

25             He never prepared me, never prepared me for

Case 1:07-cv-22502-WMH   Document 58-1   Entered on FLSD Docket 10/27/2009   Page 99 of 183

1    any deposition, never even said anything about a

2    deposition.

3         He would -- oh, yeah the big part, there was

4    one part that I didn't remember, whether something

5    occurred first or after something, and he told me that

6    I should lie and say that it happened after.  But I

7    didn't do that.

8         Q.   What was your point of bringing all that out

9    in your petition for readmission?

10        A.   I was trying to say that it kind of

11   revictimized me by having to talk about it over and

12   over again in the deposition.

13        Q.   In your petition for readmission, you also

14   state, "i was diagnosed with post-traumatic stress

15   disorder, and it has manifested itself as a difficulty

16   in focusing when I'm reading or studying."

17        Do you recall stating that?

18        A.   Yes.

19        Q.   And have you ever undergone any testing of

20   any kind to determine whether or not you suffer from a

21   learning disability?

22        A.   No.

23        Q.   Has any doctor ever recommended that you

24   undergo testing to determine whether or not you suffer

25   from a learning capability?

Page 257

1      A.    No.

2      Q.    How do you know you don't suffer from a

3  learning disability?

4      A.    Because my therapist tells me all this stuff

5  is consistent with post-traumatic stress disorder.

6      Q.    But your therapist is not a doctor; correct?

7      A.    I don't know.

8      Q.    A medical doctor?

9      A.    I assume, no.

10     Q.    Do you know that there are testing that are

11  available that can determine whether or not you suffer

12  from a learning disability?

13     A.    Am I aware that there's testing?

14     Q.    Yes.

15     A.    I guess.

16     Q.    I mean, it's either you do or you don't.

17  Not everyone is aware of that.  That's the reason why

18  I'm asking.

19     A.    I don't know if I ever thought that way.

20     Q.    You also make reference to a report that was

21  prepared by Liza Papazian; is that correct?

22     A.    Correct.

23     Q.    And what was the purpose of referencing that

24  report?

25     A.    To show that I had the PTSD.

PORTER, WALKER & ASSOCIATES, INC.

Page 258

1     Q.   She's the one that diagnosed you with that;

2  correct?

3     A.   At first, yes.

4     Q.   There have been other individuals that

5  diagnosed you with PTSD?

6     A.   Well, Kalsner.  Dr. Kalsner.

7     Q.   In your letter you state that the attacks

8  could have been prevented.

9          Do you still believe that?

10    A.   I really was -- with adequate

11 accommodations, not totally prevented, but most of it

12 would have been.

13    Q.   You also state during the examination

14 period, you were taking two prescriptions that helped,

15 but induced extreme fatigue.

16    A.   Yes.

17    Q.   Were you experiencing fatigue during the

18 examinations?

19    A.   I was actually told to see that.

20    Q.   Who told you to see that?

21    A.   Silver.  He said I had to blame it on

22 something other than not getting accommodations,

23 because Hernandez was a member of the committee.

24         I was tired.  I'm not sure if that was as a

25 result of the pills or the PTSD itself.

Page 259

1      Q.   So the statement that you had taken two

2  prescriptions that helped, but induced, quote, extreme

3  fatigue, was not a true statement?

4      A.   It wasn't totally accurate.

5      Q.   It says here you received a prescription for

6  sertraline and alprazolam.

7      A.   Those are the official names of it.

8      Q.   That's Zoloft and Xanax?

9      A.   Yes.  I think you said it reversed.

10 Alprazolam is Xanax.

11     Q.   Right.  Okay.  You also state, "I fell

12 asleep standing up while holding a dinner plate and

13 was awakened when the plate fell to the floor."

14          Do you recall saying that?

15     A.   Yes.

16     Q.   Did that actually happen?

17     A.   Yes.

18     Q.   Was anyone else there when that happened?

19     A.   Not immediately there, no.

20     Q.   Was your fiancé there or ex-fiancé rather?

21     A.   I'm not sure if he was home or not.

22     Q.   You also state, "I would often fall asleep

23 while studying which does not permit full mastery of

24 the material."

25          Is that a true statement?

PORTER, WALKER & ASSOCIATES, INC.

Page 260

1       A.    It was true more so in the first semester

2  than the second.

3       Q.    Okay.  You also outlined solutions; correct?

4       A.    Yes.

5       Q.    What were some of the solutions that you had

6  suggested may help you?

7       A.    I think I said I got a tutor.  I'm not sure

8  what else I said.

9       Q.    The tutor you're referring to is Jessica

10  Pacheco?

11       A.    Yes.

12       Q.    And that was during your summer classes;

13  correct?

14       A.    Correct.

15       Q.    Why didn't you get a tutor during your

16  second semester classes?

17       A.    I did.  She was my tutor.

18       Q.    So she also tutored you during the second

19  semester?

20       A.    Yes.  She was also the boss of the tutor.

21  She did Civil Procedures.

22       Q.    And you also then made a proposal for

23  conditional readmission; correct?

24       A.    Yes.

25       Q.    And what was the substance of that?

Page 261

1          A.    I was just saying if -- to allow me to

2    continue with my classes, since I already started my

3    summer classes, Evidence and Criminal Procedure, and

4    go from that grade, and then determine whether to kick

5    me out.

6          Like if I got the grade up, then don't kick

7    me out, obviously.

8          But if I didn't, then ---

9          Q.    Anywhere in this petition for readmission

10   did you ever advise the committee that you had

11   requested special accommodations for testing?

12         A.    No.  I was told not to.

13         Q.    Anywhere in this petition for readmission

14   did you state that you were not provided the

15   accommodations that you requested?

16         A.    No.  I was told not to.

17         Q.    Who told you not to?

18         A.    Silver.

19         Q.    Did you tell Professor Silver that you were

20   going to include it in your petition, and that's why

21   she made the recommendation for you not to include it?

22         A.    Could you repeat that?

23         Q.    Yes.  How did it come about that Professor

24   Silver told you not to include that in your petition

25   for readmission?

Page 262

1      A.   I told him during our meeting, when he has

2   the one who said, "Pick my brain since I'm a member of

3   the committee," I told him about not getting the

4   appropriate accommodations.  He says that I shouldn't

5   base it on that.

6      Q.   Did he explain why?

7      A.   Yes.

8      Q.   What was his explanation?

9      A.   He said that Hernandez was on the committee

10   and they thought it wouldn't be a good idea to blame

11   it on a member of the committee.

12      Q.   And when was your hearing held, what date?

13      A.   I think it was June 6th.

14      Q.   Tell me what happened that day.

15      A.   Well, you mean the whole day or ---

16      Q.   No.  At the hearing.

17      A.   Okay.  My hearing was scheduled for like

18   2:20.  So I got in there.  They asked me whether I

19   knew the format of the hearing.  I said no, that I

20   asked the office, but nobody told me.

21          So Dean Dykas informed me how it was

22   supposed to go.

23      Q.   How many people were at the hearing when you

24   got there?

25      A.   They told me five, but it was actually like

Page 263

1  ten.

2      Q.   So there were ten people as part of the

3  committee?

4      A.   I assume they were part of the committee.

5      Q.   Do you recall who was there?

6      A.   The only people that I recognized were the

7  librarian, the head librarian.

8      Q.   What's this person's name?

9      A.   I think it's Gruben, but don't quote me on

10 that.

11     Q.   Gruben?

12     A.   Gruben.  It's something with a G.

13     Q.   Okay.

14     A.   Professor Silver.

15     Q.   Who else?

16     A.   Dean Dykas.

17     Q.   What about Dean Hernandez, was he there?

18     A.   No.  He was in Spain, I think.

19     Q.   Do you know for a fact whether or not Dean

20 Hernandez is part of the committee?

21     A.   Silver told me he was.

22     Q.   Did you ever ask Dean Hernandez if he was

23 part of the committee, a member of the committee?

24     A.   I think he told me that he was a member.  I

25 didn't know when he was or if he was still currently a

PORTER, WALKER & ASSOCIATES, INC.

Page 264

1    member or not, but that was implied that he still was

2    current.

3        Q.   Prior to the hearing, did you seek

4    evaluation or treatment from either a therapist or

5    psychiatrist?

6        A.   Yes.

7        Q.   Why did you do that?

8        A.   Professor Silver said that it might be a

9    good idea.

10       Q.   What specific?

11       A.   I asked him first if I should get new

12   documentation.

13       Q.   And what did he say?

14       A.   He said, "Yes."

15       Q.   Specifically, did he make any representation

16   as to the type of documentation that you should get?

17       A.   No, he didn't tell me.

18       Q.   He just said, "Go see a therapist," and do

19   what?

20       A.   Well, he didn't say what type of

21   documentation.

22            I brought the actual directions for the

23   petition for readmission to the doctor.

24       Q.   And the doctor being who?

25       A.   Dr. Kalsner-Silver.

Page 265

1      Q.   Dr. Kalsner-Silver.  What kind of doctor is

2    she again?

3      A.   I'm not sure.

4      Q.   I will represent to you that she's a

5    licensed psychologist, according to her letterhead.

6      A.   Okay.

7      Q.   How did you find Dr. Kalsner-Silver?

8      A.   I sent out a whole bunch of emails to

9    people, to psychologists, psychiatrists, whoever.  I

10   requested somebody that specializes in PTSD.

11        And she wrote back saying that she thinks

12   she can help me.

13     Q.   How did you obtain this list of providers?

14     A.   I went online.

15     Q.   And so you did your own search.  Did you go

16   on yellow pages?

17        How did you go about getting these names?

18     A.   I'm not sure exactly what the site was, but

19   it was -- it had like a lot of psychologists on it.

20   It's not WebMD, but it's something like that.

21     Q.   At any point in time did you contact Dean

22   Hernandez as far as getting or obtaining psychologist

23   information or a list of psychologists?

24     A.   Yes.

25     Q.   Does that ring a bell?

Page 266

1        A.    Yes.

2        Q.    What did he say with respect to that?

3        A.    He said a few things.

4        Q.    Tell me what you recall.

5        A.    He said that he doesn't know if it goes by

6    the insurance.  He said that there's somebody at the

7    University of Miami.

8              He also finally told me about the handbook,

9    but this was after my first year.

10       Q.    Okay.  Let me show you what we're going to

11   mark as Defendant's Exhibit No. 17.

12             (Thereupon, the Email Dated 5/25/07 referred

13             to was marked as Defendant's Composite

14             Exhibit No. 17 for Identification.)

15       Q.    (BY MR. SANTIAGO)  It actually begins on the

16   second page, and it's a two-page exhibit.  The

17   earliest email is on the second page.

18             And just take the time and review both

19   pages.

20       A.    Okay.

21       Q.    Anywhere in those emails do you ask Dean

22   Hernandez why accommodations that you had requested

23   were not provided?

24       A.    No, but that's why I asked for the doctors.

25       Q.    I don't understand.  Explain.

Page 267

1    A.   Well, that's why I was writing him in the

2  first place, so that I could get the appropriate,

3  whatever, that I needed.

4    Q.   Did he tell you before that at some point in

5  time, either in the January or February or April

6  meeting, that you needed documentation in order to get

7  any type of special accommodations?

8    A.   No.  He never told me that I had --

9  specifically had to have documentation.

10    Q.   Ultimately, you provided him with

11  documentation that you had provided to the University

12  of Miami; correct?

13    A.   Correct.

14    Q.   Why did you do that?

15    A.   Because he was so worried about someone

16  finding out.

17    Q.   So that information you volunteered?

18    A.   Yes.

19    Q.   It's not because he had requested it?

20    A.   Yes.

21    Q.   Either way, he provided you with provisional

22  accommodations; right?

23    A.   I'm not sure about that.

24    Q.   He provided you with time and a half;

25  correct?

PORTER, WALKER & ASSOCIATES, INC.

Page 268

1       A.    Yes.

2       Q.    Accommodations of room with limited

3    distractions is a different issue, but he provided you

4    with professional accommodations despite the fact that

5    you hadn't, recently in any case, obtained any type of

6    report from a psychologist or psychiatrist or any

7    other provider; correct?

8       A.    Correct.  He never told me I had to.

9       Q.    Okay.  Now, ultimately, you saw

10   Dr. Kalsner-Silver on June 2, 2007; correct?

11      A.    Correct.

12      Q.    Do you recall where her office is located?

13      A.    Not really.

14      Q.    Was it in Miami Beach?

15      A.    It's a rich area.

16      Q.    What did you discuss with

17   Dr. Kalsner-Silver?

18      A.    The attack, the post-traumatic stress

19   disorder, why I needed an evaluation from her.

20      Q.    What was the reason that you explained?

21      A.    I told her that I was on academic probation,

22   that I got dismissed, and that I'm appearing before

23   the committee.

24            And I also gave her the directions for the

25   petition for readmission.

Page 269

1      Q.   You gave her directions?

2      A.   They have directions.  They're kind of

3  vague, but they're directions on the petition for

4  readmission.  And I just -- I coped it and gave it to

5  her.

6      Q.   Okay.  When you say "directions," I'm

7  assuming you mean instructions; right?

8      A.   Yes.

9      Q.   Now, the instructions are as far as if

10  you're going to provide a report of some sort from a

11  medical provider?

12      A.   Yes.

13      Q.   Okay.  And she also prepared a report for

14  you; correct?

15      A.   Yes.

16      Q.   And it's dated June 4, 2007; correct?

17      A.   Correct.

18      Q.   And this report was provided obviously

19  before your June 6, 2007 hearing; correct?

20      A.   Correct.

21      Q.   In this report, did Dr. Kalsner-Silver make

22  any recommendations as to the types of accommodations

23  that you would need?

24      A.   I don't think so.  I haven't read it in a

25  while.

Page 270

1       Q.   Well, take the time to read it.

2       A.   Okay.

3       Q.   Now, having reviewed her report, did she

4   make any recommendations as to the type of

5   accommodations that you would need for testing?

6       A.   No.

7       Q.   Did she make any recommendations as to the

8   kinds of accommodations that you may need for your

9   classroom?

10      A.   No.   That wasn't the directions.

11      Q.   Did Dr. Kalsner-Silver perform any type or

12  have you undergo any kind of testing?

13      A.   The testing or whatever she did was just

14  like a series of questions.

15      Q.   How many questions?

16      A.   A lot.

17      Q.   What's a lot?

18      A.   I'm not sure exactly.

19      Q.   Was it a written form that you had to fill

20  out?

21      A.   No.

22      Q.   It was just verbally you had to respond to?

23      A.   I just remember a lot of verbal questions.

24      Q.   When you went to see her, did you tell her

25  that you had already been diagnosed with PTSD?

Page 271

1      A.    Yes.

2      Q.    What exactly did she do to make her own

3   independent diagnosis of PTSD?

4      A.    Well, she asked me a whole bunch of the

5   questions.

6      Q.    Other than asking you questions, what else

7   did she do?

8      A.    Well, I don't really know exactly what she

9   did.

10      Q.    I mean, tell me what else happened during

11   this consultation, besides just asking questions about

12   your results and any other questions you may have?

13      A.    It was mainly just the questions.  I gave

14   her whatever documentation I had.  But that day, it

15   was mostly just the questions.

16           That was the only time I saw her.

17           MR. SANTIAGO:  We'll mark this as

18   Defendant's Exhibit No. 18.

19           (Thereupon, the Report to Academic Standing

20           Committee Dated 6/4/07, Dr. Lydia

21           Kalsner-Silver referred to was marked as

22           Defendant's Composite Exhibit No. 18 for

23           Identification.)

24      Q.    (BY MR. SANTIAGO)  Have you ever presented

25   this report to any other doctor or therapist that has

PORTER, WALKER & ASSOCIATES, INC.

Page 272

1    evaluated since this?

2         A.   I might have given it to Papazian.

3         Q.   How long did the hearing last?

4         A.   The hearing lasted 20 minutes or less.

5         Q.   And were you allowed to speak at the

6    hearing?

7         A.   Yes.

8         Q.   Did they ask you questions?

9         A.   Yes.

10        Q.   And what kind of questions did they ask?

11        A.   They asked if I was still seeing

12   Dr. Kalsner.  They asked me to repeat the name of the

13   tutor.

14             They asked if I was -- well, no.  What else

15   did they ask?  That's all I remember right now.

16        Q.   Okay.  And how did you respond when they

17   asked you if you were still treating with Dr.---

18        A.   Kalsner-Silver?

19        Q.   Yes.  Kalsner-Silver.

20        A.   I said that I would see her until I found

21   like a psychiatrist.

22        Q.   And did you ever see her again?

23        A.   No.

24        Q.   Did you ask them any questions?

25        A.   I'm not sure if I did.

PORTER, WALKER & ASSOCIATES, INC.

Page 273

1      Q.   Did you make an opening statement of any

2   kind?

3      A.   Yes.

4      Q.   What was your opening statement?

5      A.   I told them more about the EMDR stuff.

6           I also I gave them a breakdown of the

7   grades, like what I would need to achieve to get over

8   2.0 from then on.

9      Q.   Did you at all bring to their attention that

10  you had requested certain accommodations based on your

11  PTSD and that the set of accommodations were not

12  provided?

13     A.   Silver told me not to.

14     Q.   Your answer is "no"?

15     A.   No, because Silver told me not to.

16     Q.   He told you not to because Dean Hernandez

17  was on the committee; correct?

18     A.   Correct.

19     Q.   But Dean Hernandez wasn't there; correct?

20     A.   Correct.

21     Q.   So why not just bring it out at that point

22  if he's not there?

23     A.   Because Silver was there, and Silver told me

24  not no.

25     Q.   Did Silver know that Dean Hernandez would be

Page 274

1    going to Spain?

2        A.   I don't know what he knew.

3        Q.   I'm just trying to understand why you didn't

4    raise it at the hearing.

5        A.   I told you.  Silver told me not to.

6        Q.   Well, I know he told you not to, but it was

7    based on the fact that Dean Hernandez was going to be

8    on the committee.

9            And when you got there and you saw that Dean

10   Hernandez isn't there, because he's in Spain, why not

11   bring it up?

12       A.   Because Silver was a member of the

13   committee, and I didn't want him -- he said that he

14   would pull for me.

15           So I didn't want to alienate him.  I didn't

16   want to go against his advice.

17       Q.   When did you ultimately receive notice that

18   you were going to be dismissed?

19       A.   Not even 24 hours later.

20       Q.   So was it the same day?

21       A.   It was the next day, but it wasn't 24 hours

22   later.

23       Q.   How did you learn?

24       A.   Via email during class.

25       Q.   Who emailed you?

Page 275

1      A.   Well, the email was from Dean Dykas, I

2  believe.

3           I don't know who sent it.

4      Q.   Was anyone else CC'd on that email, that you

5  recall?

6      A.   I don't recall.

7      Q.   Let me show you what we're going to mark as

8  Defendant's Exhibit 18, and tell me if this is the

9  email you received.

10     A.   Yes.

11          (Thereupon, the Email Dated 6/4/07 referred

12          to was marked as Defendant's Exhibit No. 19

13          for Identification.)

14     Q.   (BY MR. SANTIAGO)  What did you do, if

15  anything, after you received that email?

16     A.   I left class.  I told the professor I had to

17  go.  He allowed me to sign the attendance sheet

18  anyway, and I left.

19     Q.   Where did you go?

20     A.   To the church.

21     Q.   Church where?

22     A.   On campus.

23     Q.   Is there more than one church or just one

24  church?

25     A.   There's just one church.

Page 276

1    Q.   What was your purpose for going to church?

2    A.   I wanted to ---

3         MR. SANTIAGO:   I want to make a correction.

4    The exhibit is actually Exhibit No. 19, not 18.

5    Q.   (BY MR. SANTIAGO)   I'm sorry.  Go ahead.

6    A.   Well, one, I wanted to pray about it.

7    Q.   Do you consider yourself religious?

8    A.   I was.

9    Q.   At that time?

10   A.   At that time.

11   Q.   So you went to pray.  Was anyone else there

12   at the church?

13   A.   I didn't see anybody there.

14   Q.   What happened while you were at the church?

15   A.   Well, on my way to the church, I was talking

16   to my ex-fiancé.

17   Q.   Mr. Holt?

18   A.   Correct.

19   Q.   And what did you talk about?

20   A.   I told him they kicked me out.  And I was

21   crying over the phone.

22   Q.   You started crying?

23   A.   Yes.

24   Q.   Okay.  And what happened after that?

25   A.   I told him I had to go, because I was at the

PORTER, WALKER & ASSOCIATES, INC.

Page 277

1    church already.

2        Q.   And tell me what happened while you were at

3    the church.

4        A.   Well, when I got to the church, I was just

5    praying.  And then a nun came, some guy came, and then

6    some cops came.

7        Q.   Why did some cops come?

8        A.   I didn't know then.

9        Q.   Well, you have since learned why; correct?

10       A.   Correct.

11       Q.   So tell me why the cops were summoned to the

12   scene.

13       A.   Well, your side is saying that Brandon told

14   them.  Mr. Holt told them that I was suicidal.

15            The cops came.  I told them I wasn't

16   suicidal, that I was just sad and just crying, and I

17   think that Brandon just misunderstood.  I was crying

18   hysterically over the phone.

19       Q.   Did he have cause for concern that you may

20   be suicidal?

21       A.   I didn't give him any cause for concern

22   then.

23       Q.   Well, let me ask you this.  Prior to that

24   incident at the church, had you ever attempted

25   suicide?

PORTER, WALKER & ASSOCIATES, INC.

Page 278

1    A.   Ever or then?

2    Q.   Before that incident at the church.

3    A.   Yes.

4    Q.   I think yesterday you testified that you

5    attempted suicide sometime in 2005; is that accurate?

6    A.   Yes.

7    Q.   And you were with Mr. Holt at that time.

8    A.   Was I dating him?

9    Q.   Yes.  Were you dating him?

10   A.   Yes.

11   Q.   So the fact that he heard you crying

12   hysterically, and the fact that you have a history at

13   least of suicide attempts, would you say it was

14   unreasonable for him to think that perhaps you might

15   attempt to commit suicide again?

16        MS. PHILLIPS:  Objection.  Leading.

17        THE WITNESS:  I don't know, but I didn't

18   give him any indication that I would.

19   Q.   (BY MR. SANTIAGO)  You didn't verbally tell

20   him that you were going to commit suicide?

21   A.   No.  I was just crying.

22   Q.   When the police got there, they asked you if

23   you were okay?

24   A.   They asked me a weird question, if I was

25   pregnant.

Page 279

1        Q.   Okay.

2        A.   I said, "No."  And I told them why I was

3   upset, that I got kicked out.

4             And then they left.  Brandon came to come

5   pick me up.  And then I left.

6        Q.   Were there any professors that went to the

7   church when the police officers got there?

8        A.   I don't remember that.

9        Q.   Or any deans or anyone else?

10       A.   There was a nun there.  Some guy, I'm not

11  remembering who that was.  And then the cops.

12       Q.   Okay.  And were you taken away by the cops?

13       A.   No.

14       Q.   Was the ambulance summoned to the scene?

15       A.   No.

16       Q.   So you left when Mr. Holt arrived at the

17  scene.

18       A.   Correct.

19       Q.   Do you know who called the police?

20       A.   I don't.

21       Q.   Did you ever ask Mr. Holt if he called the

22  police?

23       A.   I didn't talk about it with him.

24       Q.   Did you ever ask Mr. Holt if he contacted

25  somebody at the school after he spoke with you?

Page 280

1    A.    I didn't.

2    Q.    Tell me what happens after this.

3          I mean, did you talk to anyone, after you

4    were dismissed?  Did you email?

5    A.    Get into specifics?

6    Q.    I want to try and get a good idea as to what

7    transpired after the dismissal.  And I know that

8    there's plenty of emails, correspondence between

9    yourself and some of the other deans.

10         What, if anything, did you do to talk to

11   somebody about the hearing and your dismissal?

12   A.    Well, I came back to campus.  They actually

13   encouraged me to come back to campus and talk to more

14   people.

15   Q.    Who encouraged you?

16   A.    Well, everybody actually.  Everybody that I

17   had previously talked to said to come back and talk.

18         The deans were referring me back to the

19   professors.  The professors were referring me back to

20   the deans.

21         I -- also, I spoke to Peter Kelley.

22   Q.    Why did you talk to Peter Kelley?

23   A.    Because the letter -- the rejection letter

24   indicates that he's the person to talk to if you had

25   any questions.

Page 281

1    Q.   So you contacted Peter?

2    A.   Yes.

3    Q.   Do you recall what day it was you contacted

4  him?

5    A.   I don't know if I first contacted him, but

6  we were supposed to have an afternoon meeting in the

7  afternoon of June 12th.

8    Q.   Okay.  So you were scheduled to have a

9  meeting with him on June 12th?

10   A.   Correct.

11   Q.   Tell me, did that meeting take place?

12   A.   It took place earlier.

13   Q.   Earlier than June 12th?

14   A.   Earlier on June 12th than it was to.

15   Q.   Tell me what time it was supposed to take

16  place.

17   A.   It was supposed to take place, I think,

18  around 3:00.

19   Q.   And what time did it actually take place?

20   A.   Around 12:00.

21   Q.   How did you coordinate this meeting at 3:00?

22   A.   I called him, I think.

23   Q.   "Him" being Peter Kelley?

24   A.   Yes, Peter Kelley.

25   Q.   And what happened?  Why was it moved to

PORTER, WALKER & ASSOCIATES, INC.

Page 282

1   12:00?

2        A.    I actually went to class that day.  Since

3   the school told me they were going to give me back my

4   money and they didn't, I went to class.  I went to

5   Evidence.

6             After Evidence class, I called them, because

7   I was still upset and I wanted to know why the

8   committee rejected the decision.  I asked Dykas, and

9   she wouldn't tell me.

10       Q.    And so the meeting was moved to 12:00;

11  correct?

12       A.    Correct.

13       Q.    And where did you meet with Mr. Kelley?

14       A.    It was in Room 2-2.  It's upstairs.

15       Q.    Why do you remember that room?  Why do you

16  remember it's 2-2?

17       A.    Well, I was also the room where the Academic

18  Standing Committee was.  That's also the room where I

19  would study sometimes.

20       Q.    So you met with him in 2-2 on the second

21  floor.

22             Was one anyone else there during that

23  meeting?

24       A.    Not initially.

25       Q.    So when you got there, was he already there?

PORTER, WALKER & ASSOCIATES, INC.

Page 283

1      A.   No.  I was there first.

2      Q.   How long did you wait before he got there?

3      A.   Well, I was actually studying when I was up

4  there.

5      Q.   What class were you studying for?

6      A.   Evidence.

7      Q.   What other classes were you taking?

8      A.   Criminal Procedure.

9      Q.   Criminal Procedure II?  Oh, no.

10      A.   It's Criminal Procedure, period.

11      Q.   So you were studying for your Evidence

12  class; right?

13      A.   Uh-huh.

14      Q.   Is that a yes?

15      A.   Yes.

16      Q.   Then he gets there.  And tell me what

17  happens.

18      A.   He gets there.  Well, he first asked me how

19  I was doing.  And I said, "I have been better."

20           He said that he could imagine.  Eventually

21  he got into the conversation of what could he help me

22  with.

23           So I asked him, "Why was my petition

24  rejected?"

25           At first he said that I should ask Dean

PORTER, WALKER & ASSOCIATES, INC.

1    Dykas.  I told him that I got nowhere with Dean Dykas,

2    and that he was the person on the rejection letter to

3    contact.

4         Q.   What else happened?

5         A.   I kept asking about it.  And then finally he

6    blurted out, "Because of your disability."

7              Then he explained, "Because you were raped,

8    we think that you can't handle the course material.

9    And by you asking for accommodations, we think that

10   you're trying to make people feel sorry for you."

11        Q.   How long into your conversation did he make

12   that statement?

13        A.   I don't know, but it was -- we did the

14   pleasantries thing first, and then we got into that

15   conversation.

16             Then after that conversation, I asked him,

17   "Don't you know what my major is?"  And I was saying

18   like my major was criminology.

19             And he kept on talking about Latin, that he

20   totally missed the point of what I was trying to say.

21   He talked about his major.  He studied Latin.

22        Q.   What was the point you were trying to make?

23        A.   I was saying, like, rape is something I

24   don't live with.  And it was because of that, that I

25   did the third suicide attempt, because of the

Page 285

1   statement.

2       Q.   I just want to clarify this.  He said

3   because of your disability, because you were raped,

4   what?

5       A.   He said, "Because of your disability,

6   because you were raped, we think that you can't handle

7   classes like that."  He gave examples.

8       Q.   What examples did he give?

9       A.   Crim Pro, Crim Law.

10          Then he said, "By asking for accommodations,

11   we think that you're trying to get people to feel

12   sorry for you."

13          MS. PHILLIPS:  I do have to be downtown at

14   3: 30, Max.  We talked about it yesterday.

15          MR. SANTIAGO:  What do you want to do about

16   this?

17          I still have another couple ---

18          MS. PHILLIPS:  No, because tomorrow, I don't

19   think I would be able to come back tomorrow, because

20   of what I had today, I pushed back to tomorrow.  How

21   much longer?

22          MR. SANTIAGO:  Probably another hour a

23   least.

24          There's a lot of events that happened after

25   the fact, and quite frankly -- this is off the record.

Page 286

1          (Discussion held off the record.)

2          MR. SANTIAGO:  We're going to suspend the

3     deposition at this time.  Ms. Phillips has indicated

4     that she has a hearing at 3:30.

5          MS. PHILLIPS:  It's not a hearing, just a

6     meeting with a client.

7          MR. SANTIAGO:  A meeting with a client at

8     3:30.  I apologize.

9          And so we reserve the right to complete this

10    deposition.  And I think that's it.  Is there anything

11    else you want to say?

12          MS. PHILLIPS:  That's fine.

13          MR. SANTIAGO:  Transcribe it.

14          MS. PHILLIPS:  I will take a copy and mini.

15          (Whereupon, the deposition was adjourned at

16          3:15 p.m.)

17

18

19

20

21

22

23

24

25

PORTER, WALKER & ASSOCIATES, INC.

Page 287

1                        CERTIFICATE OF OATH

2       STATE OF FLORIDA  )
                          )
3       COUNTY OF BROWARD )

4                       I, the undersigned authority, certify

5       that RANDALL VANESSA FORBES personally appeared before

6       me and was duly sworn.

7                       WITNESS my hand and official seal

8       this 18th day of July 2009.

9

10

11       _____
         ESTELLE PREGEN
12       Court Reporter and Notary Public

13

14       My Commission Expires:
         March 3, 2012

15

16

17

18

19

20

21

22

23

24

25

Page 288

1                           CERTIFICATE

2      STATE OF FLORIDA  )
                         )
3      COUNTY OF BROWARD )

4

5              I, the undersigned authority, hereby

6      certify that the foregoing transcript, pages 1 to 286,

7      is a true and correct transcript of the Deposition of

8      RANDALL VANESSA FORBES, taken before me at the time

9      and place stated in the caption thereof.

10             I further certify that said witness was

11     duly sworn according to law.

12             I further certify that I am not of

13     counsel to either of the parties to said cause or

14     otherwise interested in the event thereof.

15             IN WITNESS WHEREOF I hereunto set my hand

16     and affix my official seal of office this

17     18th day of July 2009.

18

19                         

20     _____
       ESTELLE PREGEN
21     Court Reporter and Notary
       Public in and for the State
22     of Florida at Large

23

24     My Commission Expires:        
       March 3, 2012

25

PORTER, WALKER & ASSOCIATES, INC.

**A**

abilities 254:14
ability 253:12
able 180:4,25 196:19
   207:10 233:13 234:3
   238:25 240:15 285:19
Absolutely 165:7
academic 160:18
   217:19 218:11 245:24
   251:6 253:10 268:21
   271:19 282:17
accessibility 165:4
accident 228:19
accommodated 237:7
accommodation 166:25
accommodations
   163:10,23 164:1,3,4
   164:13 167:3,10
   168:14,18 169:21
   170:7,24 171:4,9,13
   171:16 174:21 182:8
   182:17,21 183:2
   184:6 199:4,12 200:2
   200:4 205:10,16
   220:1,11 226:6
   235:10,15,19 236:17
   236:19 242:22 244:3
   244:12 247:6,11,19
   258:11,22 261:11,15
   262:4 266:22 267:7
   267:22 268:2,4
   269:22 270:5,8
   273:10,11 284:9
   285:10
accurate 162:18,22,25
   179:5,6 194:17 218:4
   240:11 259:4 278:5
achieve 273:7
acknowledged 243:22
action 255:12
actual 264:22
additional 246:9
addressed 243:23
adequate 258:10
adjourned 286:15
advice 274:16
advise 261:10
advising 239:14
affix 288:16
African-American
   216:10
afternoon 281:6,7
agree 205:9 217:11,13
agreed 237:12 255:19
ahead 217:6 276:5
alienate 274:15
allocated 228:2
allocation 179:8 183:14

200:15
allotted 207:17 224:1
   239:2
allow 261:1
allowed 211:6 272:5
   275:17
alprazolam 259:6,10
ambulance 279:14
amount 183:25 198:10
   198:14 204:19 223:25
Andrew 221:7,9 228:22
   230:5,6,11,14 232:1
   232:18
Andrew's 228:23
angry 220:9
announced 202:21
answer 180:4,9,15,25
   181:4,6 184:19
   185:20 197:12 198:3
   207:24 234:3 273:14
answered 197:17
   234:14
answering 197:23
   198:1 234:21
answers 187:5
ANTONELLI 159:5
anxiety 213:20 214:14
   216:12,15,22 217:9
   217:20 218:3,7,8,10
   218:12
anxious 214:16
anybody 176:8 276:13
anymore 203:2 204:8
   204:22
anyway 275:18
apart 206:13,14,15,15
   206:16,20
apologize 166:3 286:8
appear 225:5 239:17
   239:23 251:8,17
   252:14
APPEARANCES
   159:1
appeared 287:5
appearing 268:22
appears 216:1 225:3
application 160:3
   161:14,22 162:4,9,11
   162:15
applied 161:12
applies 168:16 169:25
approach 170:13
appropriate 262:4
   267:2
approve 165:13
approximately 177:23
   183:25 193:25 194:1
   208:4 232:8

approximation 177:22
   194:22
April 167:23 169:14
   171:11 190:5,6 216:6
   218:16 267:5
AR 165:2,4,5
area 213:2 268:15
argue 254:4
argued 254:23
arguing 254:6
arguments 254:5,7,24
arrangements 165:14
arrived 279:16
ascertain 240:9
asked 166:2 167:8
   169:4 189:10 194:15
   205:18 211:17 212:9
   212:14 234:10,17
   243:15 246:10 262:18
   262:20 264:11 266:24
   271:4 272:11,12,14
   272:17 278:22,24
   282:8 283:18,23
   284:16
asking 171:20 185:6
   203:19 225:14 237:25
   247:12 249:18 257:18
   271:6,11 284:5,9
   285:10
asleep 259:12,22
aspects 254:14
assaults 244:16 255:5
assignments 164:16
associated 218:9
assume 196:2 257:9
   263:4
assumes 238:19
assuming 269:7
ate 205:19,19
attach 162:3
attached 162:24
attack 190:22,24
   191:12,24 192:3,14
   192:22,24 193:1,6,23
   195:1,15 196:4,11,15
   196:24 206:3,8 209:7
   210:4,8 231:21,24
   232:2,5,15,23 233:8
   233:14,19 248:5
   268:18
attacks 205:24 206:10
   206:24 207:3,6
   208:13 216:12,15,23
   231:15,18 244:22
   247:23 258:7
attempt 278:15 284:25
attempted 277:24
   278:5

attempts 278:13
attendance 275:17
attention 182:25
   193:10,16 195:7
   243:12 273:9
attorney 174:7,10
   255:12,16,17
August 164:13
authority 287:4 288:5
available 185:12
   257:11
Avenue 159:3
awakened 259:13
award 243:16 246:23
   246:24 247:3
awarded 243:17
aware 184:20,22
   257:13,17
a.m 158:19 221:1

**B**

B 160:1
back 164:24,25 177:16
   185:19 188:11 192:16
   192:17 193:3 199:19
   209:5 211:10 233:15
   243:17 246:15 247:3
   250:12,16 253:3
   265:11 280:12,13,17
   280:18,19 282:3
   285:19,20
bag 210:8 211:7
Barbara 236:6
base 262:5
based 180:1,20 273:10
   274:7
basically 172:2 191:2
   223:8
bathroom 176:25
   178:14 184:25 192:2
   195:12,12 196:5
   209:7 210:11 211:2,8
   211:10,20 233:15,21
Beach 268:14
beginning 206:5
begins 266:15
behalf 159:4,7
believe 171:22 175:4,9
   176:23 179:6,20
   181:18 182:1 183:19
   186:13 190:21 195:9
   195:22 198:12 202:5
   205:7 208:6 220:21
   223:4 226:25 227:16
   227:20 243:8 247:21
   254:8 258:9 275:2
bell 265:25
better 185:1,6 186:20

240:22 241:17 283:19
big 175:11 181:15
   256:3
bigger 204:3
bit 181:8 187:2,17
   188:7 191:18 194:11
   202:22 207:8 233:16
   245:8 250:16
blame 258:21 262:10
blank 198:7,8 208:2
   234:6
blood 219:8
blue 210:7,13
blurted 284:6
board 205:8
book 210:7,13
boss 214:1,3 260:20
bothered 178:10
bottom 179:7 200:14
   225:11
brain 240:23 241:18
   262:2
Brandon 277:13,17
   279:4
break 197:12 235:5
   237:8,9,15 238:1,9,10
   238:14,18,20,20
   239:1
breakdown 273:6
breathe 191:7,10
breathing 191:6
brief 199:18 235:6
briefly 162:14 166:19
bring 235:25 195:7
   243:12 273:9,21
   274:11
bringing 256:8
brought 264:22
BROWARD 287:3
   288:3
bunch 265:8 271:4
busy 182:18 226:7

**C**

C 182:1 198:22 208:10
   235:4
call 255:24
called 161:3 215:13
   255:23 279:19,21
   281:22 282:6
Calls 225:21
Campbell 221:7,9
campus 275:22 280:12
   280:13
cancel 254:7
canceled 254:5,25
canceling 254:22
capability 256:25

capacity 196:1
caption 288:9
case 158:3 222:13
    268:5
cause 193:3 232:23
    277:19,21 288:13
caused 192:25 231:23
causes 193:6
CC'd 275:4
certain 204:18 243:23
    254:14 273:10
certainly 167:16
    180:20 196:18 218:13
    224:17 225:2 226:10
    226:16 253:24
CERTIFICATE 287:1
    288:1
certify 287:4 288:6,10
    288:12
chance 217:25
change 200:19,21
    201:7 202:20,23
    204:11,17 205:2,6
    225:20 243:2
changed 171:15 200:7
    201:5 202:17 203:11
    223:24,25 224:10
    225:3
changes 243:24
chief 216:11,11
chocolate 209:5,8,9,13
    209:15,19,24 210:1
    211:11,12
chocolates 208:23,24
    209:2,3
choice 179:19 186:13
    186:14,20 187:4,14
    192:6 197:13,23
    198:6 202:5,7 234:13
    234:15 253:16,24
cholesterol 218:18,22
    219:1
church 275:20,21,23,24
    275:25 276:1,12,14
    276:15 277:1,3,4,24
    278:2 279:7
Civ 160:7 168:1 182:2
    182:6 183:5,9,11
    186:12 187:19 190:18
    190:23 191:12 192:3
    197:20,24 198:2,21
    240:20
civil 168:16 173:2
    240:19 255:12 260:21
clarification 170:15
    171:20
clarify 285:2
class 164:16 173:1,10

176:23 244:7 245:17
    274:24 275:16 282:2
    282:4,6 283:5,12
classes 175:15,18 246:3
    248:6 260:12,16
    261:2,3 283:7 285:7
classroom 163:10
    175:13,14,14,16,17
    176:2,2,18 177:17,25
    183:18,19,22 189:2
    199:24 200:1 210:16
    227:2 228:5 270:9
clear 182:15
client 286:6,7
close 177:13 178:9
    193:3 241:16 246:3
closer 228:18
combination 179:19
combined 207:3
come 250:16 261:23
    277:7 279:4 280:13
    280:17 285:19
comfortably 177:25
    178:1
coming 193:2
commence 227:24
commencing 158:18
comment 244:24
Commission 287:14
    288:23
commit 278:15,20
committee 160:19
    239:13,18,24 240:24
    241:6,18 245:25
    250:14 251:6,8 252:6
    258:23 261:10 262:3
    262:9,11 263:3,4,20
    263:23,23 268:23
    271:20 273:17 274:8
    274:13 282:8,18
communicate 182:16
    241:22 242:20
comparing 231:7
Comparison 231:2
complain 182:25
complaining 216:14
complaint 222:8
complaints 214:8
    216:11,11
complete 179:15
    207:17 224:1,18,24
    228:3 286:9
completed 181:16
    219:23 224:4 235:7
completely 175:16,17
    180:24
Composite 160:3,11,16
    160:17,18 162:13

219:19 252:1 266:13
    271:22
composure 196:7,12,18
computer 166:23
    174:13 253:5
concentrating 193:16
concern 222:9 226:11
    277:19,21
concerned 171:8
    218:14,18
concerns 177:8,11
    189:23 190:1,3,11
    221:21 235:18 236:2
    236:10,16
condition 246:2
conditional 260:23
consider 276:7
consistent 216:17 257:5
constantly 204:5
construction 164:25
consultation 271:11
contact 165:13 219:24
    265:21 284:3
contacted 279:24 281:1
    281:3,5
continue 196:8,19
    197:1 207:10 261:2
continued 158:13
    207:15 229:19
continuing 161:8
    198:18 214:14 243:22
continuously 188:18
contracts 160:5 166:13
    166:22 172:19 174:20
    175:22,24 179:16,20
    182:6 183:4,9 191:3
    199:1,8 236:6 242:9
    254:2,21
contracts-type 254:8
contributed 218:2
contributing 218:7
control 164:24
conversation 237:23
    283:21 284:11,15,16
convince 225:6
coordinate 281:21
coped 269:4
cops 277:6,7,11,15
    279:11,12
copy 286:14
Coral 158:17 159:6
correct 164:16,17,19
    164:20 165:14,15,23
    165:25 166:1,7,8
    167:17,20,21 168:6,7
    168:15,16,19,20,22
    168:23 169:2,3,21,22
    170:7,8,10,11 171:1,5

171:6,9,10,13,14,17
    171:18 172:25 173:7
    173:21,23,24 175:20
    176:19,20 179:13,14
    180:2,18,19,21,22
    181:2 182:3,4,23
    183:15,16 184:14
    185:23,24 186:2,3,11
    186:25 190:7,10
    193:7,17,18 195:6
    197:5,6,8,9 198:24,25
    199:14,21,22 200:16
    200:17 203:6,9,10,14
    205:3,11,12 206:25
    213:14,15 216:18,19
    219:4,5 224:5,14,22
    224:25 225:4,13,15
    225:16,20 226:8,9,13
    226:19,22,23,24
    227:19 228:1,3,4
    230:10 245:4 250:5
    251:20,21 253:12,13
    255:6,7,9,10,13,14
    257:6,21,22 258:2
    260:3,13,14,23
    267:12,13,25 268:7,8
    268:10,11 269:14,16
    269:17,19,20 273:17
    273:18,19,20 276:18
    277:9,10 279:18
    281:10 282:11,12
    288:7
correction 276:3
correspondence 280:8
counsel 288:13
count 239:1
COUNTY 287:3 288:3
couple 285:17
course 254:8 284:8
courses 170:13
Court 158:1,15 287:12
    288:21
Covington 221:7,9
Crim 285:9,9
Criminal 261:3 283:8,9
    283:10
criminology 284:18
CROSS 159:14
crying 276:21,22
    277:16,17 278:11,21
current 217:9 264:2
currently 263:25

242:5 262:12
dated 160:4,5,6,8,9,11
    160:12,14,17,19,20
    163:15 164:12 166:12
    167:22,25 169:8,14
    169:24 170:2 216:6
    220:14 223:12 266:12
    269:16 271:20 275:11
dates 172:14
dating 278:8,9
day 171:24 196:15
    203:1 221:1 262:14
    262:15 271:14 274:20
    274:21 281:3 282:2
    287:8 288:17
days 172:24 173:6,10
    242:6 248:22 251:8
deaf 229:9,10
dealt 162:2
dean 161:10 170:14,14
    170:17,25 171:3,19
    173:16 174:2,3,4
    182:7,16,20,25 199:3
    199:10,11 219:24
    220:19 222:4,25
    225:7,12 226:5,7,17
    235:9,13 237:10
    240:2 248:13,15
    249:12,15,22 262:21
    263:16,17,19,22
    265:21 266:21 273:16
    273:19,25 274:7,9
    275:1 283:25 284:1
deans 279:9 280:9,18
    280:20
decision 171:4,7 282:8
decrease 217:20
Deepa 213:4
Defendant 158:9 159:7
    161:3
Defendants 169:23
Defendant's 160:2
    162:10,12,17,25
    163:13,16 166:5,10
    166:14 167:23 168:2
    168:15 169:10 170:4
    179:1 183:12 200:12
    203:5 219:16,19
    220:13,16 223:14
    251:23,25 253:9
    266:11,13 271:18,22
    275:8,12
Defense 227:23
definitely 184:20,22
    236:15
demanding 237:24,24
    237:25
deposition 158:13,19

─────────
**D**
─────────
D 159:12
dashes 252:25
date 165:12 169:25
    172:10,16,22 241:17

161:8 256:1,2,12
286:3,10,15 288:7
**depositions** 255:18
**depressed** 214:17
**depression** 214:12
**describe** 166:19 175:12
176:4 188:20 255:5
**described** 214:15
**desk** 178:2
**desks** 188:12
**despite** 268:4
**detail** 247:10
**determination** 185:7
**determine** 256:20,24
257:11 261:4
**determines** 224:24
**diagnosed** 218:21
256:14 258:1,5
270:25
**diagnosis** 271:3
**difference** 252:18,19
**different** 174:8 175:16
175:17 177:15 180:24
198:5 201:21 202:22
203:1 228:11,12
268:3
**differently** 231:6
**difficult** 187:13 253:25
**difficulties** 254:15
**difficulty** 253:16,20
254:1 256:15
**DIMATTEO** 159:5
**dinner** 259:12
**DIRECT** 159:14 161:6
**directions** 264:22
268:24 269:1,2,3,6
270:10
**directly** 248:13
**disability** 256:21 257:3
257:12 284:6 285:3,5
**disagree** 217:11,13
219:1
**discuss** 240:2 241:6
244:3,19 245:21
246:25 248:1 249:4
249:10 268:16
**discussed** 168:14 237:9
245:23,23 246:25
248:9,17 249:6 251:3
**discussing** 244:2
249:25
**Discussion** 286:1
**dismissal** 280:7,11
**dismissed** 250:17
268:22 274:18 280:4
**disorder** 194:16 204:1
255:3 256:15 257:5
268:19

**distracted** 176:5,7,17
176:21 180:9 242:22
**distraction** 167:1,19
171:21 172:3 175:25
178:12,13 188:16
202:17 203:20,21,24
204:14 208:14 229:2
230:24
**distractions** 167:12,14
168:22 170:16 173:20
177:5 184:8,13,16
187:18,21,22,23
202:13,16 205:20
208:11 228:13,16
230:13 231:11 268:3
**distraction-reduced**
164:18,22 165:21
**DISTRICT** 158:1,1
**Dixie** 158:17 159:6
**doctor** 212:4,5,20
215:18 256:23 257:6
257:8 264:23,24
265:1 271:25
**doctors** 266:24
**document** 166:17,19,21
252:15
**documentation** 264:12
264:16,21 267:6,9,11
271:14
**documents** 174:13
252:12
**doing** 180:17 192:13,15
207:15 241:9 283:19
**domain** 246:22
**door** 209:4 232:20,22
232:25 233:4
**double** 238:5
**downstairs** 175:5
**downtown** 285:13
**Dr** 160:11,19 213:4,17
214:7,11 215:15
216:1,2,7,8 217:1
218:15,24 219:3,18
245:17 258:6 264:25
265:1,7 268:10,17
269:21 270:11 271:20
272:12,17
**drafted** 161:10
**drive** 213:1
**due** 217:9
**duly** 161:4 287:6
288:11
**Dykas** 248:13,15
249:13,15,22 262:21
263:16 275:1 282:8
284:1,1

___

**E**

**E** 159:12 160:1
**ear** 229:9
**earlier** 166:5 198:13
202:19 203:3 223:23
226:3 281:12,13,14
**earliest** 266:17
**early** 198:13 207:19
214:8
**ears** 191:4
**easier** 187:2
**Easter** 248:6
**eat** 209:13,24
**either** 163:9 179:20
188:13 198:6 201:18
210:23 217:18 218:17
245:5 257:16 264:4
267:5,21 288:13
**EKG** 219:10
**electronically** 216:8
**elementary** 189:11
**elements** 254:9
**email** 160:12,14,17,20
166:4,7 171:19,22,24
172:7 173:16 174:1,5
174:9 182:7 190:12
199:10 219:25 220:6
220:7,14,19,22
221:24 222:7,21,23
222:25 223:3,11,12
223:19 224:7,8 225:2
225:12,13,14,24
226:4,11,17 235:13
239:14,21 249:18
266:12,17 274:24
275:1,4,9,11,15 280:4
**emailed** 274:25
**emailing** 220:24
**emails** 161:10 174:8,12
265:8 266:21 280:8
**EMDR** 253:1 273:5
**EMILY** 159:2
**employed** 195:25 196:3
**enclosed** 176:9,14
**encounter** 202:13,16
**encouraged** 280:13,15
**ended** 208:7 223:23
241:9
**enthusiasm** 254:4
**entire** 243:10
**equally** 186:6
**ESCO** 159:5
**especially** 230:25
**essay** 161:16,20 179:19
179:21,21 180:2,13
180:14,15 181:1
186:13,17,21,24
187:2 192:7,11
197:18 198:1,6 202:6

202:10 207:24 234:13
234:20,22 253:21,25
254:1
**essays** 234:22
**essence** 241:19
**Estelle** 158:15 287:11
288:20
**evaluated** 272:1
**evaluation** 264:4
268:19
**event** 288:14
**events** 285:24
**Eventually** 283:20
**everybody** 246:15
280:16,16
**evidence** 255:21,21
261:3 282:5,6 283:6
283:11
**exact** 168:13 169:20
170:7 187:10 194:19
242:5
**exactly** 168:18 180:3
186:9 197:16 216:16
217:18 233:23 238:7
239:11 240:10 244:13
245:2 265:18 270:18
271:2,8
**exam** 166:22 170:1
172:11,14,16,17,18
172:22,23 173:3,4,8
173:23 174:19,22,23
175:3,21,22,24
176:11 177:7,10
178:21,24 179:2,16
179:16,18,20,23
180:5,17 181:2,17,20
181:25 182:2,2,6,6
183:4,5,9,9,11,11,12
183:17 184:7,16
185:2,3,10,13,13,25
186:12 187:19 188:10
189:1 190:18,23
191:3,11,13,15,17
192:4,5,7,8,15 193:6
193:11,16 195:5
196:16,17,23 197:2,4
197:10,19,20,24
198:2,21,23,24 199:2
199:2,9,20,21,24
200:9,20 201:14,17
202:3,8,11,14,25
203:6,15 204:25
205:3,14,15,17,21,25
206:2,11 207:9,17
208:5,9,24 209:13,16
215:5 221:1 223:22
224:1,4,13,16,18,25
226:15,21,21 227:8

227:14,21,24 228:3,6
228:14 229:21,22,24
230:2 231:8,16,21
232:10,16 233:9,11
233:17 234:4,8,12,22
235:3 237:1 239:1,2,6
241:1,11,15,20,23
242:9,18 243:18
244:1,22 245:7,9,23
254:2,21,23
**examination** 161:6
169:15 196:8,19
199:8 206:22 207:2
207:11 208:15,18
219:24 229:6,12
230:9 233:1,13 235:8
240:25 246:7 258:13
**examinations** 164:15
166:17 170:10,13
190:9 213:14 215:3
238:2,14 253:17
258:18
**examined** 161:4
**examples** 285:7,8
**exams** 172:8 173:13
177:11 185:22 187:12
189:5,14,18 205:11
227:2 228:11 238:10
238:13 240:12,16
247:4 253:21
**Excuse** 217:5
**exhausting** 194:6
**exhibit** 162:9,10,13,18
162:25 163:13,17
166:5,10,14 167:24
168:2,15 169:6,7,10
169:24 170:4 179:1
183:12 200:12 203:5
219:16,19 220:13,16
223:11,14 227:23
251:23 252:1 253:9
266:11,14,16 271:18
271:22 275:8,12
276:4,4
**expecting** 188:17
232:20
**experience** 187:18
194:22 228:13 231:15
231:20
**experienced** 176:4
247:23
**experiencing** 175:25
214:11 218:4 258:17
**Expires** 287:14 288:23
**explain** 178:5 184:19
203:22 204:20 217:14
246:11 262:6 266:25
**explained** 244:11,13

268:20 284:7
**explaining** 230:7,8
**explanation** 195:13
223:22 246:13 262:8
**expressed** 246:1
**extended** 164:14 237:8
237:9,15 238:1,18,20
**extent** 218:3 222:14
**extra** 179:8 200:15
237:2,4 246:15
**extreme** 258:15 259:2
**ex-fiancé** 259:20
276:16
**ex-fiancé's** 214:1,2
**e-mail** 225:11

**F**

**fact** 176:18 178:11
181:11 182:16,20
183:1 190:15 193:15
203:24 218:11 221:22
222:9 226:11 230:15
235:10,18 236:16
238:17 244:2 255:11
263:19 268:4 274:7
278:11,12 285:25
**factors** 218:6
**failed** 219:25 243:23
**failing** 239:15
**fair** 181:13 191:19,20
194:14 196:20,21
218:12 232:13 242:19
254:13
**fall** 259:22
**familiar** 163:18
**far** 165:20 167:3 171:7
179:4 191:11,14
206:2,13,14,16
231:21 253:12 265:22
269:9
**fast** 191:5
**fatigue** 238:15,17 259:3
**fault** 223:9
**fear** 217:9,18
**fearful** 217:15 218:1
**February** 190:4,6
267:5
**feel** 194:5 207:24
211:19 242:17 284:10
285:11
**feelings** 195:2
**feels** 165:10 231:5
**fell** 259:11,13
**felt** 182:12,13 191:6
222:11
**female** 195:17 201:24
201:25 216:10 228:8
228:9,10 233:6

**fewer** 184:24
**fiancé** 214:1 240:5
259:20
**fill** 270:19
**filled** 162:18
**final** 172:8,11,16 195:4
222:17 245:9 253:17
**finally** 266:8 284:5
**find** 187:2,4 254:9
265:7
**finding** 267:16
**fine** 286:12
**finish** 181:8 197:10,11
203:8 207:19
**finished** 179:2 181:12
183:3 208:5
**finishing** 203:13
**first** 161:4 163:25
164:2 172:11,16,17
173:23 174:19 176:7
176:17 185:21 191:3
191:12,24 192:7,11
196:5 202:17 212:21
216:5 224:10 231:20
232:2,7 239:18 240:9
240:10 254:3,23
256:5 258:3 260:1
264:11 266:9 267:2
281:5 283:1,18,25
284:14
**fit** 177:24
**five** 173:6 177:19 247:3
262:25
**floor** 158:17 159:3,6
175:6 259:13 282:21
**Florida** 158:1,16,18
159:3,6 287:2 288:2
288:22
**focus** 191:8 193:11
195:4 214:18
**focusing** 256:16
**following** 166:9 216:22
**follows** 161:5
**follow-up** 219:12
**Forbes** 158:5,13 159:15
160:13,15 161:2
169:13 220:15 223:13
287:5 288:8
**foregoing** 288:6
**forgive** 204:2
**form** 270:19
**format** 186:12 187:12
187:14 192:8 202:3
234:8,12 262:19
**former** 245:24
**forth** 204:11
**fought** 255:20
**found** 251:1 272:20

**four** 173:14 175:9
184:2,3,4,12 185:3,14
186:1 201:18
**fourth** 231:3
**four-and-a-half** 179:9
179:13 181:8 200:15
205:13 224:14 226:12
226:18 228:2
**four-and-a-half-hour**
181:13 183:14
**frankly** 285:25
**Friday** 172:23 183:13
**full** 181:7,10,11 184:16
198:10 207:16 259:23
**fully** 180:6,7 196:14
207:25
**funny** 193:2
**furious** 222:17
**further** 216:20 217:8
217:14 254:10 288:10
288:12

**G**

**G** 263:12
**Gables** 158:17 159:6
**GAEBE** 159:5
**gained** 239:23
**gauge** 197:14
**General** 213:2
**getting** 167:7 183:2
184:24 187:24 199:11
201:10 205:23 208:12
226:12 228:17 232:24
238:1,5 258:22 262:3
265:17,22
**gist** 172:1
**give** 162:6 172:1
173:25 176:11 177:14
206:16 246:9,15
247:16 277:21 278:18
282:3 285:8
**given** 220:25 272:2
**glass** 176:10,15
**go** 161:9 169:6 176:25
178:14 184:25 185:19
188:8 190:18 209:1
210:8,25 211:4,8
215:19 217:6 222:13
239:13 241:10,19,23
243:17 246:15 247:2
247:10 250:15 255:18
261:4 262:22 264:18
265:15,17 274:16
275:17,19 276:5,25
**goes** 266:5
**going** 161:9 162:9
163:12 164:14 165:17
167:11 168:25 169:23

171:12 176:8,23
179:25 183:5 188:3,5
188:15 189:4 191:5
194:18,23 195:11,12
200:19,23 202:22
204:3,24 217:24
219:15,22 220:12,22
223:10,16 238:9,24
239:15 241:23 244:1
250:13,21 251:5
253:3,14 261:20
266:10 269:10 274:1
274:7,18 275:7 276:1
278:20 282:3 286:2
**good** 206:18 224:15
232:12 254:24 262:10
264:9 280:6
**government** 246:20
**GPA** 239:16 246:3
**grade** 180:20 181:25
198:20 208:8 235:2
243:2,24 254:8 261:4
261:6
**grades** 235:9,22,23
239:4,9,10,12 240:11
241:4 273:7
**Gruben** 263:9,11,12
**guess** 197:14,15 224:15
228:24 242:19 257:15
**guessing** 177:23 192:12
**guy** 250:13 277:5
279:10

**H**

**H** 160:1
**half** 164:5,15 167:11,15
167:15 168:21 174:23
184:7,9 200:5 201:10
205:10 220:25 224:13
224:14 227:18 231:2
231:8 237:1 238:5
267:24
**hallway** 248:5
**hand** 211:5 287:7
288:15
**handbook** 266:8
**handed** 210:15
**handle** 284:8 285:6
**happen** 259:16
**happened** 191:1,2
232:19 239:12,22,25
250:7,9 256:6 259:18
262:14 271:10 276:14
276:24 277:2 281:25
284:4 285:24
**happens** 280:2 283:17
**happy** 254:9
**hard** 187:17 204:15

232:24
**head** 200:11 263:7
**header** 252:8,14
**heading** 253:10
**health** 216:21,24 217:2
**heard** 278:11
**hearing** 241:14 242:6
248:20,25 250:1,19
251:13 262:12,16,17
262:19,23 264:3
269:19 272:3,4,6
274:4 280:11 286:4,5
**heart** 233:16
**heartbeat** 191:4
**held** 183:13 262:12
286:1
**help** 179:4 218:13
237:21 260:6 265:12
283:21
**helped** 258:14 259:2
**hereunto** 288:15
**Hernandez** 160:13
161:10 170:14,25
171:19 173:16 174:2
174:4 182:7,16,20
190:2 199:3,10
219:24 220:15,19
222:3,5,25 225:7,12
226:5,7,17 235:9,14
237:10 240:2,6
258:23 262:9 263:17
263:20,22 265:22
266:22 273:16,19,25
274:7,10
**Hernandez's** 171:3
**he/she** 165:11
**Hi** 220:24
**high** 189:11 218:21,25
**Highway** 158:17 159:6
**history** 278:12
**HOEVELER** 158:3
**hold** 194:18,23
**holding** 259:12
**Holt** 276:17 277:14
278:7 279:16,21,24
**home** 259:21
**honest** 182:20 226:8
**honestly** 185:19
**hopes** 244:9
**hour** 191:15 194:13,14
206:15 285:22
**hours** 179:9,13 181:8
200:15 205:14 224:4
224:9,11,13,14,17
226:12,18 228:3
248:8 274:19,21
**house** 253:5
**huge** 234:23

hurts 191:9 194:7,9
hypothetical 185:16,17
hysterically 277:18
  278:12

_____

**I**

idea 177:14 185:20
  188:22 194:21 262:10
  264:9 280:6
Identification 160:2
  162:13 163:17 166:15
  168:3 169:11 170:5
  219:20 220:17 223:15
  252:2 266:14 271:23
  275:13
identified 180:11,23
  253:9,11,14
identify 180:21
identifying 180:18
II 160:5,7,8,10 166:13
  168:1 169:9,14,25
  170:3 172:19 173:2,4
  173:12 182:2,6 183:5
  183:9,9,11 186:12
  187:19 190:18,23
  191:12 192:4 197:20
  197:24 198:2,21,24
  199:2,9,21 201:17
  202:14 203:5 208:9
  219:23 226:21 235:8
  245:19 283:9
imagine 283:20
immediate 196:6
immediately 196:4
  259:19
Imminent 246:22
implied 264:1
improve 246:4 254:10
improved 254:8
Improvement 253:10
inadvertently 254:5
incapacitated 195:2
  196:11,23,25
incident 277:24 278:2
include 221:16 261:20
  261:21,24
included 164:14
includes 216:21 221:7
incorrect 217:1
increase 217:20
increased 217:22
  218:11
independent 271:3
Indian 211:22,24,25
  212:20
indicate 225:19
indicated 172:5 243:25
  286:3

indicates 280:24
indication 206:16
  278:18
individuals 258:4
induced 258:15 259:2
inform 236:20
information 162:15
  252:9 254:18,19
  265:23 267:17
informed 209:6 210:3
  210:10,12 262:21
initially 171:11,12
  223:23 282:24
inside 176:12
instructions 267:7,9
insurance 266:6
intent 241:8
interested 288:14
Interruption 162:7
  199:17 217:7
introduce 177:4
introduced 195:20
isolated 236:22 247:20
issue 180:10,12 243:4,6
  246:18,19 268:3
issues 180:18,21,24
  216:21,24 217:2
  243:24

_____

**J**

Jackson 160:15 167:6
  168:5 169:13 170:18
  223:13 225:12
Janelle 160:15 167:6
  168:5 169:13 170:17
  170:18 183:7 201:4
  205:7 222:2,19 223:6
  223:13 225:12 236:3
January 161:13 171:6
  213:13 214:7 267:5
Jessica 260:9
job 246:1
John 160:13 220:15
JOYCE 159:2
July 158:18 287:8
  288:17
jumped 232:21 249:20
June 250:8,10 262:13
  268:10 269:16,19
  281:7,9,13,14

_____

**K**

Kalsner 258:6,6 272:12
Kalsner-Silver 160:19
  264:25 265:1,7
  268:10,17 269:21
  270:11 271:21 272:18
  272:19

keep 238:9,24
Kelley 280:21,22
  281:23,24 282:13
kept 243:3 284:5,19
Ketterer 221:8,10
  228:24
kick 231:25 261:4,6
kicked 217:9,15,24
  218:2 228:18,21
  232:1 250:12 276:20
  279:3
kind 179:18 191:9
  222:19 232:20 237:25
  238:15 256:10,20
  265:1 269:2 270:12
  272:10 273:2
kinds 270:8
knew 204:23 221:18
  247:24 262:19 274:2
know 178:16,19,20
  174:5,9 178:1 185:18
  193:19 194:21 195:25
  196:2 200:24,25
  201:8,9,12,13 202:1,9
  205:17,19 208:22
  211:14 212:5 213:1,3
  214:22,23 215:15
  219:14 220:24 224:6
  225:1,19,24,24
  227:13 229:23 233:3
  233:5,10 234:6,14
  241:21 242:5 248:3
  252:3 257:2,7,10,19
  263:19,25 266:5
  271:8 273:25 274:2,6
  275:3 277:8 278:17
  279:19 280:7 281:5
  282:7 284:13,17
knowledge 170:24
  239:23
known 204:23
knows 225:14 250:11
  250:12

_____

**L**

LANIER 159:2
Large 158:16 288:22
lasted 193:24 207:8
  232:9,11 233:9 272:4
lasts 194:11
late 230:4,7,7,8
Latin 284:19,21
law 160:3 162:11 163:3
  163:8 180:17 187:7
  187:12 189:4,10,20
  217:10 218:2 237:22
  250:16 285:9 288:11
LCR 221:1

lead 243:8
Leading 181:3 182:22
  199:5 278:16
learn 201:1 239:10
  274:23
learned 277:9
learning 256:21,25
  257:3,12
leave 198:8
leaving 233:1
left 162:8 181:17 198:7
  198:13 208:1 211:8
  233:10,17 234:6,23
  249:25 275:16,18
  279:4,5,16
letter 163:22 190:12
  239:14,21 258:7
  280:23,23 284:2
letterhead 265:5
let's 167:22 169:6
  180:14 189:12 197:12
  200:12
level 218:12,19
levels 217:20
librarian 263:7,7
library 166:23 227:7,9
  227:10,12,13,15
licensed 265:5
lie 182:12 204:6,9,16
  204:19,20,21 220:10
  222:11,17 256:6
lied 182:12 203:24
  225:10
life 250:25
limited 167:1,12,13,19
  168:21 170:15 171:20
  172:2 173:20 184:8
  184:13 268:2
line 216:5
list 265:13,23
little 181:8 187:2,17
  188:7 191:18 193:2
  194:11 204:2 207:8
  233:16 245:8
live 284:24
Liza 257:21
located 212:23 268:12
location 164:18,22
  165:11,20,22 236:22
long 178:21 179:15
  193:23 194:9,12,22
  196:10,22 207:6
  208:21 232:7 233:8
  242:12,14 255:18
  272:3 283:2 284:11
longer 194:11 202:25
  207:8,9 232:9 285:21
look 162:20 163:18

164:9 165:6 167:22
  172:15 174:6,11
  179:7 200:12,14
  219:21 225:2 253:6
looking 193:9 230:14
  230:15,16
looks 252:16
lot 164:25 174:8 265:19
  270:16,17,23 285:24
Lydia 160:19 271:20
lying 225:7

_____

**M**

main 177:6 178:13
  231:12 253:16
maintain 239:16
major 284:17,18,21
Makdisi 236:9 243:19
  243:21,22 244:4
  245:3,5 246:16
male 201:24 228:8
manifestation 195:1
manifested 256:15
marble 232:21
March 287:14 288:24
mark 162:9 163:12
  167:23 169:6,23
  181:13 219:15 220:12
  223:10 251:22 266:11
  271:17 275:7
marked 162:12 163:16
  166:13 168:1 169:9
  170:3 219:18 220:16
  223:14 251:25 266:13
  271:21 275:12
mastery 259:23
material 259:24 284:8
math 224:15
matter 170:14
Max 285:14
MAXIMO 159:5
MBA 250:14
mean 171:11 180:8
  188:6 196:25 197:11
  199:13 202:24 203:12
  224:23 225:23 237:4
  238:4,7,18,19,22
  239:25 240:3 244:11
  257:16 262:15 269:7
  271:10 280:3
meaning 165:4 167:11
means 165:8 181:12
meant 164:22,23 165:5
  167:3,12,14 170:16
  171:21,23 238:22
  247:15
medical 160:11 212:10
  219:17 257:8 269:11

medication 215:21
medicine 215:4,7
medium 254:9
meet 241:3 242:12
    248:23 249:14,18
    282:13
meeting 240:1,4 241:7
    242:25 245:12,13
    248:1,10,11,22 249:5
    249:11,21,22 250:7,8
    250:10 262:1 267:6
    281:6,9,11,21 282:10
    282:23 286:6,7
member 245:24 258:23
    262:2,11 263:23,24
    264:1 274:12
memo 183:15
memorandum 160:4,5
    160:6,8,9 163:15
    164:12 165:16,24
    166:10,12 167:16,22
    167:25 168:5,9,11,13
    168:15,24 169:8,13
    169:16,18,24 170:2,6
    170:9
memorandums 169:21
memorialize 190:11
memos 172:14,14
met 167:4 190:4,4
    241:5,25 242:3,7
    248:12,19 249:1,6,9
    250:4 282:20
Miami 159:3 163:23
    164:1,3,12 187:8,9
    189:9,12 212:6,24,25
    213:2,2 215:18
    237:16,20 266:7
    267:12 268:14
middle 206:6
milligrams 211:15
mind 171:16
mine 224:15
mini 286:14
minor 231:13
minute 181:14 200:8
    208:23
minutes 191:17,21,23
    192:4 193:24,25
    194:2,12,12,14 197:3
    204:25 206:15,20
    207:5 210:11 232:11
    233:17 272:4
misled 176:22
missed 284:20
misunderstood 277:17
money 250:16 282:4
morning 200:16 203:6
mother 255:24

move 178:12 194:7,9
    203:1
moved 281:25 282:10
MULLEN 159:5
multiple 179:18 186:13
    186:14,20 187:4,14
    192:6 197:13,23
    198:6 202:5,7 234:13
    234:14 253:16,24
    254:9

**N**

N 159:12
name 195:19 202:1
    211:22,24,25 228:20
    228:23 233:5 242:1
    263:8 272:12
names 221:18,19 259:7
    265:17
narrating 230:15
narrow 187:5
need 163:9 248:13
    254:9,25 269:23
    270:5,8 273:7
needed 164:19 165:11
    165:22 190:13 211:19
    244:11 267:3,6
    268:19
neither 185:8
never 195:20 196:12,14
    219:6 237:3 251:1
    255:20,20,23,25,25
    256:1 267:8 268:8
new 216:10,21,22,24
    217:2,16,17,18
    237:18 264:11
nice 244:8
noise 164:24
North 213:2
Northeast 159:3
Notary 158:15 287:12
    288:21
notice 158:19 163:4
    200:18 274:17
notified 204:18 205:2,5
notify 239:19
nuisance 246:25 247:2
    247:4
number 181:1
nun 277:5 279:10

**O**

oath 161:5 287:1
Objection 181:3 182:22
    199:5 225:21 278:16
oblige 229:17
obtain 265:13
obtained 254:19 255:20

268:5
obtaining 265:22
obviously 184:24 261:7
    269:18
occasion 188:19,21
    189:15
occurred 207:14 250:2
    256:5
occurs 204:5
odd 251:1
offered 208:23,24
    209:4,7 210:1 211:11
    214:4,5
offering 209:2,3
offhand 172:12
office 212:23 215:23
    216:2,3 249:9 262:20
    268:12 288:16
officers 279:7
official 164:2,4 183:1
    196:1 259:7 287:7
    288:16
oh 243:3,5,6 256:3
    283:9
okay 162:3,16 163:14
    169:5 173:10 176:17
    177:13,21 178:4,9
    179:7,11 180:1,4,24
    183:8 184:11 185:1
    188:2 189:13 194:9
    194:18,20,24 197:21
    198:23 199:16 201:16
    203:19 205:5 210:24
    212:4 221:13,21
    222:6 232:14 236:15
    239:19 245:20 247:25
    248:7 249:8 250:9
    251:14 252:24 253:4
    259:11 260:3 262:17
    263:13 265:6 266:10
    266:20 268:9 269:6
    269:13 270:2 272:16
    276:24 278:23 279:1
    279:12 281:8
once 182:12 211:19
    212:22 249:9
ones 177:6 231:12,13
    232:9
one-half 166:25
online 239:11 265:14
opening 273:1,4
opportunity 207:22
opposed 175:4
opposite 187:10,10
option 185:11,14,19
optional 251:10,12
options 185:12 249:25
    250:21

order 267:6
original 201:14 241:8
originally 200:10
    205:14 224:3,12,20
outlined 260:3
outside 164:24 176:10
    176:13 210:25 211:4
overcame 162:2
overweight 218:25
o'clock 203:2,4,18
    204:21,24

**P**

paced 177:1
Pacheco 260:10
pacing 184:22 188:3
page 160:2 266:16,17
pages 265:16 266:19
    288:6
pain 191:9
palpitations 216:12,15
    216:23
panic 190:21,24 191:7
    191:12,24 192:3,14
    192:22,24 193:1,6,23
    194:25 195:15 196:4
    196:11,14,24 205:24
    206:3,8,10,23 207:2,6
    208:13 209:6 210:4,8
    216:12,15,23 231:15
    231:18,20,24 232:2,5
    232:14,23 233:8,14
    233:19 244:21 247:23
    248:5
Papazian 257:21 272:2
paper 210:7,13
part 167:14 180:17
    194:3,4,5,16 204:1
    256:3,4 263:2,4,20,23
partially 217:13,13
particular 175:19
    187:16 250:13
particularly 254:21
parties 288:13
patient 216:9,10,22
paying 193:10,16
pen 230:14,15,16
pencil 230:17
people 176:18 184:21
    184:24 187:24 221:18
    221:19 227:17 228:11
    250:11 262:23 263:2
    263:6 265:9 280:14
    284:10 285:11
perform 186:20 270:11
period 196:16,17,23
    215:6 218:8 222:1
    237:8,10 238:1,14,18

238:20,21 245:15
    258:14 283:10
periods 237:15 238:10
permit 259:23
person 193:8 212:2
    228:20 244:8 251:17
    280:24 284:2
personal 251:13
personally 287:5
person's 263:8
pertains 187:13
Peter 280:21,22 281:1
    281:23,24
petition 160:16 240:23
    241:17 251:7,19,24
    252:4 253:8 255:2
    256:9,13 261:9,13,20
    261:24 264:23 268:25
    269:3 283:23
Phillips 159:2,2,17
    164:8 174:14 181:3,5
    182:22 199:5 217:4
    225:21 235:5 245:17
    245:20 278:16 285:13
    285:18 286:3,5,12,14
phone 276:21 277:18
phrase 172:3
phrased 250:25
pick 240:23 241:17
    262:2 279:5
piece 210:6,12
pill 215:12,13
pills 214:21,24 258:25
place 267:2 281:11,12
    281:16,17,19 288:9
placed 217:19
Plaintiff 158:6 159:4
plate 259:12,13
pleasantries 284:14
please 226:1
pleased 255:13,15
plenty 280:8
plus 175:10 208:10
pocket 209:10 211:12
point 170:23 173:22
    177:7 183:4,6 190:17
    192:14 197:4,7
    213:13 214:8 226:14
    229:12 233:18 236:14
    239:7 241:3 248:12
    248:20 250:1 256:8
    265:21 267:4 273:21
    284:20,22
points 243:16,17 246:9
    246:15,24 247:3
police 278:22 279:7,19
    279:22
poorly 242:21 245:2

**portion** 192:6,7,11
207:25 234:22,23
253:25 254:1
**portions** 253:21
**position** 167:5
**possibility** 209:19,22
**possible** 209:15
**post-traumatic** 161:23
163:5 194:16 204:1
255:3 256:14 257:5
268:18
**pray** 276:6,11
**praying** 277:5
**prefer** 185:9,15 186:4
186:23
**preference** 186:5,23
**Pregen** 158:15 287:11
288:20
**pregnant** 278:25
**preparation** 240:3
**prepare** 161:14 252:17
**prepared** 216:7 251:19
252:4,15 253:4
255:25,25 257:21
269:13
**prescribe** 214:21
215:21 219:8,10
**prescribed** 211:21
212:2,7 213:23
214:19,25 219:3
**prescription** 215:3,7
259:5
**prescriptions** 258:14
259:2
**present** 214:10
**presented** 271:24
**presents** 216:10,22
**press** 241:14
**presumably** 178:15
**presume** 178:2
**pretty** 173:19 220:9
**prevented** 258:8,11
**previously** 200:5
201:22 228:10 231:8
237:19 280:17
**print** 174:16
**prior** 163:3,8 165:12
189:4,4,10 264:3
277:23
**Pro** 160:7 168:1 182:2
182:6 183:5,9,11
186:12 187:19 190:18
190:23 191:12 192:4
197:20,24 198:2,21
240:20 285:9
**probably** 174:4 192:10
204:23 206:19 209:20
219:9 234:19 246:2

285:22
**probation** 217:20
218:11 268:21
**problem** 217:17 240:10
254:3
**problems** 253:11
**procedure** 173:2
240:20 251:5 261:3
283:8,9,10
**Procedures** 168:17
260:21
**proceeded** 210:25
**proctor** 165:3 175:10
176:2,5,10,25 177:3,8
177:9 178:11,13
184:12,17,22 185:3,4
186:1 188:3,18,22
192:15,17,21,25
195:8,16,21 196:3
201:5,19,21,22 202:1
205:22 208:12,16
210:3 211:4,6 228:5
229:4,4,11,13 230:21
232:4 233:19
**proctored** 174:25
**proctors** 189:5,15,21
190:15
**professional** 268:4
**professor** 201:5,7,13
204:12 223:9,24,25
224:3,9,21,23 225:3
236:4,5,7,9,11,13
240:18,20,20,22
241:1 242:1,3,7,10,13
242:18,20 243:19
244:4 245:1,3,6,10,22
246:16 247:5,17,22
248:4,19 249:16
254:17,20 261:19,23
263:14 264:8 275:16
**professors** 163:22
180:20 240:5,7,13,15
279:6 280:19,19
**promised** 226:13,19
**pronounce** 243:20
**Property** 160:10
169:25 170:3 173:12
226:21 235:8 236:4,5
245:18,18
**proposal** 260:22
**provide** 165:17 168:24
168:25 172:14 174:17
182:17 220:1 235:14
237:12 269:10
**provided** 164:14
165:24 167:11 170:7
171:16 174:7,10,21
182:8 184:6 198:11

198:14 199:4 200:2
205:13 221:22 222:9
224:3,12,18,20 226:5
226:18 227:18 234:24
235:10,19 236:17
237:19 238:14 242:22
247:6,18 261:14
266:23 267:10,11,21
267:24 268:3 269:18
273:12
**provider** 268:7 269:11
**providers** 212:10
265:13
**provides** 164:13 168:13
169:20 227:24
**providing** 165:20
182:21
**provisional** 267:21
**proximity** 177:13
178:10 193:5 228:18
**psychiatrist** 264:5
268:6 272:21
**psychiatrists** 265:9
**psychologist** 265:5,22
268:6
**psychologists** 265:9,19
265:23
**PTSD** 214:15 218:9,10
244:15 257:25 258:5
258:25 265:10 270:25
271:3 273:11
**Public** 158:16 287:12
288:21
**pull** 178:4 274:14
**pulled** 248:4
**purpose** 220:8 240:8
249:22 257:23 276:1
**pursuant** 158:19
**pushed** 285:20
**put** 163:4 182:19 198:3
209:9 211:11,12
222:7 240:23 252:8
253:2
**putting** 253:3
**p.m** 166:24 179:9,10
183:14 200:16 203:8
203:11 221:2 227:24
227:25 286:16

**Q**

**question** 167:9 169:4
174:17 180:12,13,24
185:11,20 197:22
238:12 278:24
**questions** 179:22 180:2
180:5,14,15,15 181:1
186:15,17,21,21,24
187:2,14,16 197:13

197:18,23 198:2,6
202:8,10 207:21
208:1 219:22 234:3,6
234:15,17,20,21
270:14,15,23 271:5,6
271:11,12,13,15
272:8,10,24 280:25
**quiet** 229:14
**quite** 285:25
**quote** 170:15 253:15
259:2 263:9

**R**

**raise** 274:4
**Randall** 158:5,13
159:15 160:13,15
161:2 169:13 220:15
223:13 287:5 288:8
**rape** 161:21 244:17
284:23
**raped** 284:7 285:3,6
**rate** 233:16
**read** 216:16,18 216:5
220:23 225:11 243:10
253:15,23 254:18
269:24 270:1
**reading** 256:16
**readmission** 160:16
251:24 253:8 255:2
256:9,13 260:23
261:9,13,25 264:23
268:25 269:4
**really** 187:11 191:4,6,8
194:17 204:4 206:4
206:18 214:16,16,17
215:20 239:20 242:8
246:5 258:10 268:13
271:8
**reason** 171:15 197:2
198:7 203:19 213:16
226:4 242:21 246:6
257:17 268:20
**reasons** 226:4 247:16
**recall** 161:11 166:2,6,9
166:16 168:8,11
169:16 172:10,12
175:21,25 178:22,23
178:25 181:24 183:8
186:17 188:9 192:9
192:13 195:19 197:23
198:16 200:11,22
202:4 203:17 208:8
216:3,14,16 223:1
227:1,21 241:25
242:3 245:3 252:12
253:18 256:17 259:14
263:5 266:4 268:12
275:5,6 281:3

197:18,23 198:2,6
202:8,10 207:21
**receive** 200:18 239:9
274:17
**received** 163:25 239:22
244:2 259:5 279:9,15
**receiving** 166:6,9 168:8
169:16 170:25 171:5
171:9 236:20,21,24
**recess** 199:18 235:6
**recognize** 223:17
243:23 252:22
**recognized** 254:13,16
263:6
**recollection** 180:1
**recommendation**
261:21
**recommendations**
269:22 270:4,7
**recommended** 256:23
**record** 162:7 199:17,19
217:7 220:23 253:15
253:23 254:19 285:25
286:1
**Records** 160:11 219:17
**recovered** 196:14
**RECROSS** 159:14
**REDIRECT** 159:14
**reduced** 201:13 224:16
**refer** 224:8
**reference** 257:20
**referenced** 166:4
**referencing** 257:23
**referred** 162:12 163:16
166:13 168:1 169:9
170:3 172:2 219:18
220:15 223:13 251:25
266:12 271:21 275:11
**referring** 220:20
223:20 254:2 260:9
280:18,19
**refused** 211:12 243:24
**regain** 196:7
**regained** 196:12,18
**regarding** 169:14
216:21
**rejected** 282:8 283:24
**rejection** 280:23 284:2
**related** 218:10
**relation** 175:2
**religious** 276:7
**remember** 161:19
177:3 178:24 179:22
179:24 181:23 183:17
183:21 186:14 187:11
197:16,17 198:1,10
198:13,20 199:23
200:1,9 202:7,10
208:4 212:12,14
213:8 215:13,20

218:17 219:9 223:2
227:22 228:8,20
234:5,10,21 235:2,16
248:18 251:4 253:2
253:22 254:11 256:4
270:23 272:15 279:8
282:15,16
**remembering** 179:4
279:11
**repeat** 261:22 272:12
**rephrase** 238:12 245:8
**report** 160:18 216:5,7
217:8 219:16 257:20
257:24 268:6 269:10
269:13,18,21 270:3
271:19,25
**Reporter** 158:15
287:12 288:21
**represent** 265:4
**representation** 264:15
**represented** 255:12
**request** 240:1 249:14
251:14,15
**requested** 182:9,18
183:3 199:4,12
205:10 220:2 226:6
235:11,15,20 236:17
242:23 244:3 247:7
247:19 261:11,15
265:10 266:22 267:19
273:10
**requesting** 237:19
238:17
**reserve** 286:9
**resources** 165:4
**respect** 204:6 266:2
**respond** 222:25 223:3
270:22 272:16
**responded** 223:5
**response** 225:13 238:11
**rest** 233:9
**restroom** 178:17
190:18 197:7 208:13
**result** 176:1 196:11,23
207:2 258:25
**results** 239:7 271:12
**resume** 197:4 233:13
**resumé** 162:3,20,22,23
**return** 219:12
**returned** 219:6
**reversed** 259:9
**revictimized** 256:11
**review** 162:15 163:13
223:17 240:16,17,19
240:25 241:15 242:9
245:9 246:7 266:18
**reviewed** 169:18 170:9
240:12 245:7 270:3

**reviewing** 166:16
168:11 242:18
**rich** 268:15
**right** 179:11 192:20,22
193:7,12,22 196:17
200:20 203:7 205:4
222:21 224:18 225:17
233:20 248:18 251:4
252:23 259:11 267:22
269:7 272:15 283:12
286:9
**right-hand** 193:20
**ring** 265:25
**ripped** 210:6,13
**roaming** 189:1
**role** 170:20
**room** 164:5,23,25
165:2,17 166:23
167:14,17 168:21,25
169:1 170:15 172:6
174:24 175:1,2,2,4,8
175:11,13,19 176:8
176:10,14 177:1
179:12 184:7,10,11
184:13,16,23 185:2,4
185:10,13,14 186:1
188:3 189:6,15
199:25 200:5 221:12
221:22 222:10 227:10
227:14 230:1,25
231:1,4,7 233:1
247:13,20 268:2
282:14,15,17,18
**Ross** 160:11 215:15
216:2 219:18
**row** 177:16,21 188:8
**rows** 177:15,17,19
188:14
**ruminate** 204:5

**S**

**S** 160:1
**sad** 277:16
**SANTIAGO** 159:5,16
161:7 162:8,14
163:18 164:10,11
166:16 168:4 169:12
169:23 170:6 174:12
174:15,19 181:7
182:24 199:7,19,20
217:6,8 219:15,21
220:18 223:10,16
226:1 235:7 245:18
245:21 252:3 266:15
271:17,24 275:14
276:3,5 278:19
285:15,22 286:2,7,13
**sat** 188:21

**satisfactory** 187:5
**save** 250:16
**saw** 213:6,8 268:9
271:16 274:9
**saying** 166:22 179:24
182:7 184:11 185:1
186:7,8 192:25
203:11,13,20 204:17
223:8,9 225:24 238:8
243:3,19 250:11
259:14 261:1 265:11
277:13 284:17,23
**says** 165:2 166:25
179:8,8,9 216:20
220:23 224:9 254:3
259:5 262:4
**scene** 277:12 279:14,17
**schedule** 204:18
**scheduled** 200:10
223:23 262:17 281:8
**school** 160:3 162:11
163:3,8 180:17 183:1
187:7,12 189:4,10,11
189:11,20,24 217:10
218:2 237:22 239:5
250:16 279:25 282:3
**seal** 287:7 288:16
**search** 265:15
**seat** 178:2
**seated** 188:9
**seats** 177:21
**second** 162:6 166:22
173:25 175:6 185:19
185:25 190:8 217:4
232:14,23 233:14
238:13 246:4 249:4
249:16 254:6 260:2
260:16,18 266:16,17
282:20
**secretary** 167:4 251:10
**section** 220:25 253:24
**sections** 253:16
**see** 164:7,8 195:23
213:16 215:19 219:6
226:1 240:10 246:5
252:21 258:19,20
264:18 270:24 272:20
272:22 276:13
**seeing** 272:11
**seek** 264:3
**seen** 195:21 212:15
**semester** 166:23 185:22
185:25 190:8 191:3
238:13 246:4 254:4,6
260:1,16,19
**send** 171:19,22 222:21
235:13
**sensation** 194:10

**sense** 187:3 194:6,7
**sent** 163:22 168:5
172:7 173:16 174:2
174:13 222:8,23
239:14 265:8 275:3
**sentence** 221:6
**separate** 165:11 174:24
175:1 180:12
**series** 270:14
**sertraline** 259:6
**set** 204:11 273:11
288:15
**sexual** 244:16 255:5
**shaped** 231:6
**shaved** 200:22 222:15
**shaving** 220:3
**sheet** 275:17
**short** 191:6 207:22
220:23 254:6
**shorter** 202:25
**show** 163:12 220:12
251:22 257:25 266:10
275:7
**shrugged** 222:20
**shush** 229:14
**shushed** 229:16
**side** 192:18,19,20,22
193:20 254:25 255:19
277:13
**sides** 254:5,7,23,23
**sign** 251:16 275:17
**signed** 216:8 251:11
**Silver** 236:13 242:2,4,7
245:5 258:21 261:18
261:19,24 263:14,21
264:8 273:13,15,23
273:23,25 274:5,12
**similar** 246:14 252:16
**simply** 167:19 180:13
**Singer** 236:6 245:10,17
245:22 247:5,18,22
248:19 249:16
**single** 180:10 243:18
**sit** 188:19
**site** 265:18
**size** 231:3,3,5,9,10
**skimming** 252:23
**slam** 232:21
**slammed** 232:22 233:3
**slamming** 232:25
**slightly** 207:9 217:22
**small** 175:13,14 231:2
**smaller** 185:2 230:25
231:4
**solitary** 167:17 169:1
**solutions** 260:3,5
**somebody** 223:3
265:10 266:6 279:25

280:11
**Somewhat** 218:5
**sorry** 188:1 201:5
276:5 284:10 285:12
**sort** 161:17 175:12
220:10 237:23 269:10
**sound** 209:21
**sounds** 209:18
**South** 158:17 159:6
213:2
**SOUTHERN** 158:1
**space** 188:7
**Spain** 263:18 274:1,10
**spare** 181:15
**speak** 165:11 272:5
**speaking** 240:8
**special** 261:11 267:7
**specializes** 265:10
**specific** 234:18 264:10
**specifically** 165:19
190:14 198:16 212:25
222:4 231:23 234:21
236:19 237:22 247:9
247:19 251:1 264:15
267:9
**specifics** 280:5
**specify** 247:13,16
**specifying** 247:15
**speculation** 225:22
**spent** 242:17
**spoke** 236:3,3,6 240:5,6
240:7 279:25 280:21
**St** 158:8 161:12 163:3,4
163:9 165:25 166:21
168:25 170:21 195:25
**Standards** 160:18
**standing** 245:24 251:6
259:12 271:19 282:18
**start** 202:19 205:1
237:22
**started** 161:9 172:7
178:24 179:2 188:25
205:3 227:21 239:5
261:2 276:22
**starting** 163:3,8 221:1
**startled** 193:13,20
**state** 158:16 161:22
165:16 167:16 220:22
253:20 256:14 258:7
258:13 259:11,22
261:14 287:2 288:2
288:21
**stated** 288:9
**statement** 217:12 218:1
218:12,24 219:1
259:1,3,25 273:1,4
284:12 285:1
**states** 158:1 165:10,21

167:19 179:2 200:14
216:9,12,20 217:9
218:24,25 221:6
253:15,24
**stating** 217:1 256:17
**stay** 217:21
**stayed** 248:8
**stood** 253:2
**stop** 197:2 238:8,23
**stopped** 254:6
**straw** 222:16
**stress** 161:23 163:5
194:16 204:1 255:3
256:14 257:5 268:18
**stronger** 255:1
**struggling** 232:25
**student** 165:10 176:24
178:14 224:24 228:19
230:4
**students** 175:3,5,8,9
176:1 177:2,14,15,24
178:9 181:16,19,22
183:21,24 184:2,3,5,9
184:12,17,23 185:3,4
185:14,22 186:1
187:25 188:1 200:6
201:14,16,18 205:15
205:22 208:12,17,20
209:1 221:11,13
227:8 228:17 229:4,5
229:13 247:1,3
**studied** 284:21
**study** 182:14 282:19
**studying** 182:18 226:7
256:16 259:23 283:3
283:5,11
**stuff** 225:10 237:2,4,6
257:4 273:5
**submit** 161:16
**submitted** 162:23 163:1
252:6 253:1
**subparts** 180:2
**subsequent** 195:1
**substance** 208:22
260:25
**substantially** 252:20
**sudden** 193:11
**suffer** 256:20,24 257:2
257:11
**suffered** 161:23
**suffering** 163:5 214:11
**sufficient** 242:17
**suggested** 260:6
**suicidal** 277:14,16,20
**suicide** 277:25 278:5,13
278:15,20 284:25
**summarizing** 173:19
**summer** 239:5 246:3

260:12 261:3
**summoned** 277:11
279:14
**supposed** 203:8,15
204:25 236:25 262:22
281:6,15,17
**sure** 164:10 165:8
171:25 173:25 174:2
174:16 177:9,12,18
180:3 181:14 183:6
183:10 186:16,18
190:16 191:22 192:10
195:24 196:2 197:25
198:9 201:15,23
202:9 206:4,7 207:4
207:12,13,14 209:18
209:21 211:22 212:17
212:18 215:10,14,22
221:19 222:1,23
226:20 230:5,17
231:22 232:6 233:2
233:22 234:19 235:16
235:25 236:13 238:7
239:11,20 242:8,16
244:18,25 245:9,14
248:2,11,24,24
249:24 250:3 251:18
252:5,7,8,19 258:24
259:21 260:7 265:3
265:18 267:23 270:18
272:25
**surprised** 243:7
**surroundings** 184:21
**suspend** 286:2
**suspended** 239:15
**sweaty** 191:4
**sworn** 161:4 287:6
288:11
**symptoms** 216:14
**syndrome** 161:23 163:6

---

**T**

**T** 160:1
**table** 178:6,7
**tables** 188:12
**take** 176:11 179:15
183:5 185:2,9,12,13
192:6 200:12 205:11
205:14,16 211:18
214:24 217:5 219:21
235:5 238:25 239:2
266:18 270:1 281:11
281:15,17,19 286:14
**taken** 158:15 189:5
199:18 213:21 231:8
235:6 259:1 279:12
288:8
**takes** 246:20

**talk** 171:2 182:7 183:7
189:12 222:24 229:19
229:21 235:9 246:17
248:13 249:12 255:3
255:8,11 256:11
276:19 279:23 280:3
280:10,13,17,22,24
**talked** 161:19,21
170:17 212:11,12
222:18,19,22 237:5
248:23 280:17 284:21
285:14
**talking** 190:14 197:19
197:20 208:16,20,21
212:20 214:5 222:4
229:1,3,13,23,24,25
238:2 249:21 276:15
284:19
**technically** 246:24
**tell** 163:9 172:15
174:21 187:21,23
188:25 191:1 192:8
194:12 195:10,14
199:3 212:7,15
214:10 220:5,18
223:17 226:17 228:16
229:14 232:4,17
233:18,23 236:23
240:15 241:10 244:21
245:12 247:5,9,17,22
247:25 250:9 261:19
262:14 264:17 266:4
267:4 270:24 271:10
275:8 277:2,11
278:19 280:2 281:11
281:15 282:9 283:16
**telling** 199:11 219:25
222:14 235:13 249:12
**tells** 257:4
**ten** 177:23 194:1,2
210:11 212:16 263:1
263:2
**terrible** 255:17
**test** 165:12
**testified** 161:4 166:6
216:18 226:3 278:4
**testing** 163:10 165:2,11
236:22 253:12 256:19
256:24 257:10,13
261:11 270:5,12,13
**test-taking** 254:14
**Thank** 253:7
**thanked** 244:7
**Thanks** 226:2
**therapist** 257:4,6 264:4
264:18 271:25
**thereof** 288:9,14
**thing** 191:2 193:19

196:3 217:16 237:1
243:11 284:14
**things** 204:2 246:20
266:3
**think** 161:13 162:8
165:8 166:5 176:8
177:24 178:20 185:7
187:10 191:14 195:11
198:8,15,22 204:3
205:18 206:12 208:3
208:10 209:9,14,17
210:20,21,22 211:16
214:4,4 215:25 216:4
219:11 221:5 226:3
226:15 230:3,4,6,12
231:13,19 234:11
235:4,12 237:5
244:18 246:25 248:2
249:1,7,17,20,24
252:9,25 253:1 259:9
260:7 262:13 263:9
263:18,24 269:24
277:17 278:4,14
281:17,22 284:8,9
285:6,11,19 286:10
**thinking** 176:22 225:25
**thinks** 265:11
**third** 158:17 159:6
231:10 250:7 284:25
**Thomas** 158:8 161:12
163:3,4,9 165:25
166:21 168:25 170:21
195:25
**thought** 171:23 176:9
240:22 257:19 262:10
**three** 179:25 180:2,13
180:14,15 184:3,4,12
185:2,14 186:1
188:14 200:6 201:18
224:4,9,13 227:16
**threw** 202:22 204:4
**Thursday** 158:18
**time** 163:1,25 164:2,4
164:15,15 166:25
167:11,15,15 168:21
169:25 170:12 174:23
178:24 179:8,17
181:10,12 182:5,13
183:3,4,14 184:1,7,9
190:17 194:19,25
196:5 198:11,14
199:1,2,7,8 200:5,7,9
200:15,18,21,23
201:6,7,10,14 202:18
202:20,21,23 203:1,3
203:12,13,15 204:7,8
204:11,13,15,19
205:2,6,10,14,16

206:18,23 207:1,16
207:23 208:4,6 213:6
214:9 215:2,4,6,24
218:4,7,15 220:4,25
222:14,18 223:25
224:13,13,18,19,24
225:4,20 226:10,16
227:9,18,21 228:17
229:12 231:14 232:12
233:10,18 234:24
237:1 238:5,5,8,23,23
239:2 242:18 245:15
248:5 249:16,23
251:16 265:21 266:18
267:5,24 270:1
271:16 276:9,10
278:7 281:15,19
286:3 288:8
**times** 176:25 178:19
190:20 194:15 230:19
**timing** 194:17
**tired** 194:7 258:24
**title** 170:19
**today** 285:20
**told** 167:7 169:3 171:2
171:11,23 195:11,16
203:17 204:13 210:7
214:15,16 220:3
221:2 232:6 233:20
236:11,21,25 237:2
242:24,25 247:10,11
248:12 251:1 254:17
256:5 258:19,20
261:12,16,17,24
262:1,3,20,25 263:21
263:24 266:8 267:8
268:8,21 273:5,13,15
273:16,23 274:5,5,6
275:16 276:20,25
277:13,14,15 279:2
282:3 284:1
**tomorrow** 285:18,19
285:20
**top** 200:11
**topic** 162:1
**Tort** 240:18
**Torts** 160:8 169:9,14
173:4 198:24 199:2,9
199:13,21 201:17
202:14 203:5 208:9
219:23 221:1 236:11
240:22 241:1
**total** 196:12
**totally** 185:16 196:25
222:12 258:11 259:4
284:20
**town** 240:21
**Transcribe** 286:13

transcript 288:6,7
transpired 280:7
trauma 250:24 251:2
treat 212:21 213:20
treated 212:15,22
   218:15
treating 272:17
treatment 219:13 264:4
true 165:21 187:7,8
   259:3,25 260:1 288:7
truthful 222:12
try 182:24 183:7 214:6
   280:6
trying 193:11 203:20
   256:10 274:3 284:10
   284:20,22 285:11
tutor 260:7,9,15,17,20
   272:13
tutored 260:18
twice 178:15,20 190:21
   192:2 249:6
two 172:24 173:10
   185:12 186:4,18,19
   187:4 190:8 204:25
   206:12 208:13 221:11
   227:16 231:19 233:17
   258:14 259:1
two-and-a-half 224:10
   224:17
two-page 266:16
type 187:18 264:16,20
   267:7 268:5 270:4,11
types 269:22

__U__
Uh-huh 283:13
ultimately 171:3,7
   181:24 196:7 197:10
   201:1 207:10 211:4
   214:19 219:3 239:4
   241:13 248:19 249:1
   267:10 268:9 274:17
unable 206:22 207:1
undergo 256:24 270:12
undergone 256:19
undersigned 287:4
   288:5
understand 185:10
   203:21 266:25 274:3
understanding 164:21
   167:2,10,13 172:5
   173:20 204:16 241:13
Understood 185:9
UNITED 158:1
University 158:8
   161:12 163:4,23
   164:1,3,12 165:25
   187:8,9 189:8,12

237:16,20 266:7
267:11
unreasonable 278:14
unsuitable 186:6,8,10
upset 279:3 282:7
upstairs 175:4 282:14
use 178:14,16 207:16
   208:13 234:24

__V__
vague 269:3
VANESSA 158:5,13
   159:15 161:2 287:5
   288:8
verbal 270:23
verbally 270:22 278:19
Verma 213:4,17 214:7
   214:11 216:1,7,8
   217:1 218:15,24
   219:3
versus 185:3 186:21
voice 177:8,11 189:23
   190:1,3 221:21 222:2
   226:11 235:17 236:2
   236:10
voiced 236:15
volunteered 267:17
volunteering 244:7
vs 158:7

__W__
wait 210:16 215:5
   245:8 283:2
waited 210:18
walk 188:8 189:17
   190:15 210:17 230:22
walked 192:15,17
   210:15 211:10 222:20
   230:4,6
walking 176:5 188:18
   188:23 189:6,21
   192:21 205:22 208:12
   209:3
want 173:25 174:16
   182:15,19 194:21
   203:22 213:19 214:17
   241:10,19 251:17
   274:13,15,16 276:3
   280:6 285:2,15
   286:11
wanted 213:18 237:2,6
   237:6,8,21,22 238:20
   238:25 241:21 255:20
   276:2,6 282:7
wants 216:12
wasn't 175:18 182:8,13
   182:20 188:17 193:8
   193:10 196:6 200:23

203:2,4 204:8,21,24
217:17,17 221:19
222:3,12 223:8 225:7
226:7 227:3 232:18
232:20 237:24 241:8
251:18 254:16 259:4
270:10 273:19 274:21
277:15
watching 176:12
way 187:16 198:5
   210:23 218:17 220:5
   225:5 230:23 238:22
   257:19 267:21 276:15
ways 184:18,18,19
wean 215:12
weaned 215:10
WebMD 265:20
week 165:12
weight 218:14
weird 278:24
went 189:14,20 192:2
   196:5 197:7 209:7
   211:2,20 213:16
   214:7 229:25 233:15
   233:20 241:13 265:14
   270:24 276:11 279:6
   282:2,4,4
weren't 171:12 183:2
   199:3,11 206:14,19
   221:22 222:9 226:5
   226:12,18 235:10,19
   236:16,20,24 242:22
   247:6
we'll 167:23 169:6
   251:22 271:17
we're 161:8 163:12
   223:10 231:4 266:10
   275:7 286:2
WHEREOF 288:15
witness 159:14 161:3
   181:4,6 182:23 199:6
   225:23 278:17 287:7
   288:10,15
worded 187:17 193:2
words 204:10 215:11
   240:1
work 195:4 206:22
   207:2 219:8 250:15
works 244:9
worried 267:15
worst 194:3,4,5
wouldn't 238:9,23
   246:6 262:10 282:9
write 182:7 196:13
   199:10 219:25 221:4
   226:10,16 245:1
writing 210:12 252:11
   252:12 253:18 254:11

267:1
written 251:7,19
   270:19
wrong 193:7 230:1
wrote 205:7 210:6
   220:19 225:23 265:11

__X__
X 159:12 160:1
Xanax 210:9 211:5,6
   211:14,17,21 212:7
   213:18,19,21,23
   214:3,17,19 215:9,10
   215:12 216:13 219:3
   259:8,10

__Y__
yeah 256:3
year 266:9
years 190:8 212:16
yellow 265:16
yesterday 161:9 162:8
   166:3,5 212:14 237:5
   278:4 285:14
young 250:25

__Z__
Zoloft 215:24 219:4
   259:8

__0__
06 161:13
07-22502-CIV 158:3

__1__
1 182:18 200:16 203:2
   203:4,8,11,18 204:21
   204:24 221:2 227:24
   288:6
1st 159:3
1:00 200:23
1:30 179:9 183:14
10 160:6 167:24 168:2
   183:12
11 160:8 169:7,10
   173:9 200:13 203:5
   226:24 239:6
11:05 158:19
12 160:9 169:24 170:4
   227:23
12th 250:8,10 281:7,9
   281:13,14
12:00 281:20 282:1,10
12:15 221:3
13 160:11 219:16,19
14 159:3 160:12 220:13
   220:16
15 160:14 191:21,23

192:4 223:11,14
232:11
16 158:18 160:16
   251:23 252:1 253:9
161 159:16
162 160:3
163 160:4
166 160:5
167 160:6
169 160:8
17 160:17 266:11,14
170 160:9
18 160:18 271:18,22
   275:8 276:4
18th 287:8 288:17
19 160:20 275:12 276:4

__2__
2 166:24 172:20 174:20
   182:19 268:10
2nd 159:3 172:17
   173:23 199:8
2-2 282:14,16,20
2.0 273:8
2:00 179:2
2:20 262:18
20 194:12,14 272:4
2004 164:13
2005 278:5
2007 167:23 169:14
   172:20 174:20 182:3
   190:6 198:24 199:23
   213:11 214:8 216:6
   218:16 222:8 226:24
   268:10 269:16,19
2009 158:18 287:8
   288:17
2012 287:14 288:24
219 160:11
220 160:12
223 160:14
23 167:23 169:14
24 274:19,21
25-year-old 216:9
251 160:16
26 216:6 218:16
266 160:17
271 160:18
275 160:20
286 288:6

__3__
3 285:14 287:14 288:24
3.0 239:16
3:00 281:18,21
3:15 286:16
3:30 286:4,8
30 191:17,21,23 192:4

194:12 197:3 206:15
206:19,20 207:5
285:14
**33132** 159:3
**33146** 159:6

---
**4**
---

**4** 172:23 182:3 269:16
**4/23/07** 160:5,6,8,9
166:12 167:25 169:8
170:2
**4/25/07** 160:11
**4/26/07** 219:17
**420** 158:17 159:6

---
**5**
---

**5** 166:5,24
**5/25/07** 160:17 266:12
**5/9/07** 160:12,14
220:14 223:12
**5:00** 179:3
**5:30** 227:25
**50** 177:24 185:4

---
**6**
---

**6** 179:10 183:14 269:19
**6th** 262:13
**6/14/07** 160:19
**6/4/07** 160:20 271:20
275:11
**60** 185:4

---
**7**
---

**7** 160:3 162:9,10,13,18
162:25

---
**8**
---

**8** 160:4 163:13,17
**8/9/04** 160:4 163:15
**8:30** 200:15 203:6
221:1

---
**9**
---

**9** 160:5 164:13 166:10
166:14 168:15 173:5
179:1 198:24 199:23
222:8
**9th** 199:9



**RECEIVED**

JAN 2 3 2006

Law School Admissions



**ST. THOMAS**
U N I V E R S I T Y

S C H O O L   O F   L A W
*Office of Admissions*

16401 NW 37th Avenue
Miami Gardens, Florida 33054
**(800) 245-4569, (305) 623-2310**
**Fax (305) 623-2357**
admitme@stu.edu
www.stu.edu/lawschool

*For Office Use Only*

---

*Instructions:* Please answer the questions below in a manner that will give the Admissions Committee a complete and accurate impression of your preparation and readiness for law school. Wherever more space is required to provide full information, you may attach additional pages or electronic attachments as needed (include your name and the question number for reference). Be sure to sign and date your application or Certification Letter before mailing it to the address above.

**APPLICANT TYPE:**   ☒ FIRST YEAR   ☐ TRANSFER   FALL YEAR 2006

## *BIOGRAPHICAL INFORMATION*

1. Name Forbes                           Randall                            Vanessa
   *Last*                                *First*                            *Middle*

2. Other name(s) that may appear on your records "Randi"

3. Social Security or Social Insuran.  _____  AC account number  L 2 5 2 7 9 3 7 1

4. Correspondence address (**valid until** _____ ) 122 North Brookside Avenue
                                          *MM/YY*                *Number/Street/Apartment*

   Freeport, NY                           11520-1931
   *City/State or Province*               *Zip or Postal Code*

5. Permanent address (if different) _____
                                          *Number/Street/Apartment*

   _____
   *City/State or Province*               *Zip or Postal Code*

6. Home telephone (516) 379-9219         Work telephone (516) 776-4089

   Cellular Telephone (516)776-4089      E-mail LaPrez00@aol.com

7. Supplemental contact person who knows your whereabouts

   Brandon Holt                          fiance                           (770) 324-0200
   *Name*                                *Relationship*                   *Telephone*

8. Are you a United States citizen?   ☒ Yes   ☐ No   If not a US citizen, please indicate:

   Country of citizenship _____   Current visa and status _____



**DEFENDANT'S EXHIBIT**
Comp 7
7/16/09 EP

## EDUCATIONAL BACKGROUND

9. Provide a complete list of all colleges, universities and graduate or professional schools you have *attended* to date, regardless of whether you received academic credit or graduated from these schools.

| School Name | City, State | Dates Attended MM/YY-MM/YY | Major | Degree Received/ Expected (MM/YY) |
|---|---|---|---|---|
| University Of Miami | Coral Gables, FL | 09/00 - 12/04 | BA, Criminology, 3.465 | 12/04 |
| Adelphi University | Garden City, NY | 06/01 - 08/01 | N/A; transfer GPA: 3.700 | Not applicable |

Official transcripts from all schools from which a degree(s) hereto has been confirmed must be submitted prior to matriculation or your acceptance to the School of Law will be canceled.

10. A) Have you ever registered at any law school? ☐ Yes ☒ No *If yes, please indicate:*

Name of law school: _____ , and

Dates of attendance: _____
MM/YY-MM/YY

B) Are you in good standing and eligible to return to that law school? ☐ Yes ☐ No

C) Have you ever attended a Summer Conditional Admission Program? ☐ Yes ☒ No *If yes, please indicate:*

Name of law school: _____ , and

Dates of attendance (MM/YY-MM/YY): _____

D) Are you in good standing and eligible to return to that law school? ☐ Yes ☐ No

*You must have all law schools provide St. Thomas with an official transcript and a letter of good standing.*

11. Has your college, university, graduate or professional school attendance been interrupted for one or more terms for any reason?

☒ Yes ☐ No    *If yes, please explain fully on a supplemental page or electronic attachment.*

12. Have you ever been dropped, suspended, warned, placed on academic or disciplinary probation, accused of an honor code or student conduct code violation, disciplined, expelled, or advised or required to withdraw, or otherwise been subject to discipline by any college, university, graduate or professional (including law) school?

☐ Yes ☒ No    *If yes, explain fully, including dates, on a supplemental page or electronic attachment.*

## HONORS, ACTIVITIES, AND EMPLOYMENT

13. List all academic honors, awards, scholarships, prizes, or other recognition you have received since secondary school.

National Society of Collegiate Scholars (since my freshman year). In 1999, I recieved the Daughters of American Revolution award for community service, courage, and honesty. I made the Deans List (fall 2000). I attended the National Youth Leadership Forum on Law in 1999.

14. Describe your most noteworthy volunteer community service work including any activities undertaken while in college that involved working for social justice.

I am a notary public and I provide my services to the public gratis  I have been a notary public since June of 2005.  I do the service for the public for free in the interests of justice.  I think that performing my notarial duties for free just expedites the process.  I am also an intern at the Midtown Community Court which is an innovate court system (which I explain fully elsewhere in my application)  that specializes in recommending community service to walk-ins and offenders in lieu of jail time.

15. List all paid or volunteer employment experience since graduation from high school or over the past 15 years, whichever period is shorter. You may substitute a complete résumé or *curriculum vitae* if you wish. If applying electronically, place résumé on an electronic attachment.

| Employer | Position | Dates (MM/YY-MM/YY) | Hours per week |
|---|---|---|---|
| | | | |

16. Have you ever served in the military on a full-time basis? ☐ Yes   ☐ No   *If yes, please indicate:*

A) Dates of service _____ to _____
   MM/YY            MM/YY
B) Branch of service _____

C) Rank _____
D) Type of discharge _____

## *OTHER APPLICANT INFORMATION*

17. Have you previously applied for admission to St. Thomas University School of Law? ☐ Yes   ☒ No
    *If yes, please indicate:*

_____          _____
Year          Final Decision          Year          Final Decision

18. When did you take or when do you plan to take the Law School Admission Test (LSAT)?

06/05 _____ 142 _____          02/05 _____ 140 _____
MM/YY          Score          MM/YY          Score

19. A) Have you ever been arrested for, charged with, or convicted of a crime? (Include juvenile offenses, alcohol offenses including driving under the influence of alcohol or drugs, and any adjudications withheld by the court.)  ☐ Yes  ☒ No

B) Are there any criminal charges pending against you?  ☐ Yes  ☒ No

C) Have you ever been, or are you presently, a defendant in a civil lawsuit?  ☐ Yes  ☒ No

*If you answered yes to 19A, 19B or 19C you must submit copies of all documents and provide details, including dates, on a separate page or electronic attachment. You must disclose the nature of the law violation irrespective of any advice from any source, including legal counsel.*

**Applicants are advised to contact the Board of Bar Examiners of each jurisdiction in which they intend to practice law to ascertain whether anything in their background may interfere with, or preclude their admission to the practice of law in that jurisdiction. Admission to, or graduation from, law school does not guarantee eligibility to sit for a bar examination and/or admission to the practice of law.**

## *PERSONAL STATEMENT/ESSAY*

20. Please prepare an essay of two to four pages in which you set forth your reasons for wanting to become a lawyer. Reflect upon your experiences, your values, activities, and the individuals who have influenced you. If applicable, describe any circumstances that adversely affected your academic performance in the past and indicate whether or not these circumstances are likely to affect your success in law school. The Admissions Committee will use your essay solely for the purpose of evaluating your candidacy for admission and will hold all statements in strict confidence. (If applying electronically, use an electronic attachment for your statement.)

## *OPTIONAL INFORMATION*

21. Date of Birth_____  _____
    MM/DD/YYYY

22. Gender  ☐ Male    ☒ Female

23. How do you describe yourself?

☐ Black/African American/Carribean          ☐ Hispanic
☐ American Indian/Alaskan Native            ☐ Puerto Rican
☐ Asian American/Pacific Islander           ☐ Mexican American
☐ White/Non-Hispanic                        ☐ Other: _____

24. How did you learn about St. Thomas University School of Law?

☐ Law student/alumnus                       ☐ College recruitment event
☐ Lawyer                                    ☐ *LSDAS Electronic Applications*
☐ College faculty member                    ☐ LSAC Law School Forum
☐ Pre-law advisor                           ☐ Website
☐ Publication: _____
☐ Other: _____

24. Do you plan to take the Florida Bar?   ☐ Yes   ☐ No

24. Please list all other states where you intend to practice _____

## *CERTIFICATION AND SIGNATURE*

By signing below or electronically transmitting, I certify that the information provided on this application form and all supplemental pages is complete and accurate. I understand that omission or misrepresentation of facts therein may be cause for denial of admission, revocation of admission, dismissal after enrollment, revocation of the *Juris Doctor* degree, or any other action necessary to protect the integrity of the program. I understand that I have a continuing responsibility to notify the School of Law of any and all changes in the information I have submitted that occur at any time after filing this application, including during my enrollment in the School of Law. By signing this application, I authorize St. Thomas University School of Law and it's agents to verify my statements as to their authenticity.

Signature_____   Date   January 11, 2006

### *POLICY ON NONDISCRIMINATION*

*St. Thomas University School of Law is an equal opportunity institution of higher education. The School of Law conforms to all applicable laws prohibiting discrimination and is committed to nondiscrimination on the basis of gender, sexual orientation, marital status, age, race, color, disability, religious affiliation, national origin, ancestry, or social condition in its educational programs, admissions policies, financial aid or other school-administered programs and activities. The Associate Dean for Student and Alumni Affairs (305) 623-2354, has been designated as the person to handle inquiries or complaints arising under this policy.*

January 12, 2006

To the Admissions Committee:

I withdrew from the University of Miami, for one semester only, in spring 2002. My reason for withdrawal was that I fell ill and feared that it may have been pneumonia. Fortunately, it was not. But, I was unable to eat and thus had lost a lot of weight. I felt too weak to attend classes. I then decided to withdraw for a semester, my grade point average still intact.

Sincerely,
Randall Vanessa Forbes

Randall Forbes
122 North Brookside Avenue Freeport, New York 11520-1931
Home: (516) 379-9219; Work: (516) 776-4089
LaPrez00@aol.com

I am utilizing my legal writing skills in my internship. As I have stated elsewhere in my application, one of my responsibilities as an intern is to research various social problems in the area and then brief the Project Director of those issues. The Project Director then recommends a solution to the local authorities, based upon my research. In briefing the Project Director, I have to first investigate the social crisis and make inquiries. Once I find enough information, I then provide a written synopsis of my findings to the Project Director. The synopsizes can be lengthy as I am usually asked to explore the topic in its entirety. I also take detailed notes at staff meetings and in the courtroom to keep the Project Director abreast of any important issues that may arise should any suggestions to the Judge are deemed necessary.

As an undergraduate at the University of Miami, I was fortunate enough to undergo an intensive writing program. At least five intensive writing courses were required to graduate. My cumulative grade point average for my writing intensive courses was a 3.60. I took the classes over the span of my undergraduate career and took a variety of courses. All of the courses I took required several papers averaging 8-10 pages in length. In the fall of 2001, I took African American Literature. Our assignments and exams were mostly in essay and short answer format and were to discuss some issue pertinent to the novel. I took Black Leadership in the autumn of 2002. It was by far my favorite writing course. The final assignment consisted of writing a biographical composition on each of at least twenty notable African Americans in history. I was really inspired by many of the people I researched for that project. In the second summer session of 2003, I opted to take the writing portion (the professor gave the students the option of taking the course for writing credit or not) of the Hebrew Bible Old Testament Course. The most creative of my writing courses was Educational Psychology which I took in the second summer session of 2004. In one optional assignment, the students could make up their own exam and answer their own questions. In my last semester, I took Survey of Western Art where the exams were in an essay format discussing the subtleties and larger social implications of the art viewed.

Randall Forbes
122 North Brookside Avenue Freeport, New York 11520-1931
Home: (516) 379-9219; Work: (516) 776-4089
LaPrez00@aol.com

## STRIPPED OF IDENTITY.

Challenge is a part of life. . Everyone has a story to tell.  It takes a certain type of character to overcome the hurdles set forth in one's life.  It is the struggles in one's life that create beautiful stories and happy endings. Obstacles make life more interesting.  To be human is to overcome.  People are entertained by stories and tales of heroic feats.  We even watch other people's stories on television, read about them in the newspaper, and even create new tales in novels.  Indeed, even our literature reflects our affinity to hear about struggle.  The hero of the tale usually experiences some sort of conflict and undertakes the archetypal journey of a separation, an initiation, and a return.  My story is one of inimitable struggle.  I have traveled my own unique journey.  I am my own heroine.

I was wrestling with my own identity.  I never knew how important that concept was until I had lost my own.  My name was STATISTIC.  One in four women my age will be sexually abused at least once in their lives and one third will be assaulted on high school or college campuses.  During my late teenage years, I was raped in school, a place where I should have been safe.  Afterwards, all I could think about was how 'dirty' I felt.  I could think of nothing else.  Everything that was once so important to me did not even matter anymore.  At first, I could not bring myself to tell anyone what had happened.  I dared not speak it; as if it was only a dream and a mere utterance would make it a reality.  I shielded myself with silence.  My innocence was lost; my inner voice was stolen.  Getting sexually assaulted killed my spirit.  I was at my lowest point and pushed beyond my breaking point.  In my paranoia, I felt I had become, in some way, aberrant.  I felt like people magically knew what I had endured just by looking at me- as though I was wearing a scarlet letter "R".  After some time, I told my family what happened and we collectively decided to press charges.  But the attack still affected everything that I thought and did.   It became my identity to others and sadly, to myself.  On top of everything else, the prosecutor was overworked, having had several cases at one time.  I had to do several depositions and read endless documents at the request of one side or the other.  Every time I re-read the documents it sent me spiraling further into depression.  I had become so consumed by my own personal tragedy that I had indeed just become another number – a statistic, a docket number, a case file.  Then something strange happened. . .

Instead of reliving the event through seemingly endless documents, I decided to re-write them.  In other words, where I saw my name I literally crossed it out and wrote in "client" and "survivor".    This simple change became symbolic.  I started to think more like a lawyer and less like a victim.  The floodgates were opened.  I was coming up with my own strategies to win the case.  I was then able to work in partnership with my lawyer instead of passively waiting to see what would happen in the case.  I finally became a person again.  In the process of changing the text, I had rediscovered myself and in so doing, I had developed a new sense of purpose.  The happing ending: my attackers were found guilty and I negotiated the terms of punishment with their lawyer to include some jail time, probation, and community service.

*Why do I want to be a lawyer?*

I wish to become an attorney for several reasons.  Pretending to be one was my saving grace.  I don't want anyone else to feel, in any aspect of their life, the way I felt.  I

Randall Forbes
122 North Brookside Avenue Freeport, New York 11520-1931
Home: (516) 379-9219; Work: (516) 776-4089
LaPrez00@aol.com

want to fight for people who cannot fight for themselves. By becoming a lawyer, I can fight for justice and use my being a lawyer as a platform for bringing about a change in the courts. I want to be an advocate for victim's rights and retribution. I am motivated to bring about change in the backlog in the court system and the way victims are treated by court officials. I want a chance to inspire others. Moreover, I deem every success I have had since my attack as a victory against my attackers. Getting into law school and becoming a lawyer is the ultimate poetic justice and reckoning.

### How I can be an asset to law school?

I possess qualities that can be assets to the law school community and the legal field at large. Lawyers and law school students need to be able to handle their responsibilities even when facing great adversity. Even when was at my breaking point, I still did not drop the charges. I had the courage to face my attackers and the wherewithal to negotiate their punishment with my adversary. Additionally, I feel that I could provide an invaluable contribution to class discussions and extracurricular activities having been involved in an actual case. I am also now an intern at Midtown Community Court, an alternative court system that deals with low level quality of life offenses. This innovative Court adopts the ideal of accountability. Midtown Community Court combines punishment and help. Court officials there believe that there are no victimless crimes; the community as a whole is the victim. Instead of automatically sentencing offenders to jail, the Court encourages community restitution, counseling, and drug treatment, if applicable. Due to noncompliance in some cases, the court still reserves the jail option. One of my responsibilities there is to perform research on various quality of life issues, human trafficking for example, and then brief the Project Director. The Project Director then informs the police of the issue and suggests solutions on how to remove that problem from the area.

2

Randall Forbes

122 North Brookside Avenue Freeport, NY 11520-1931

Home: (516) 379-9219; work: (516) 776-4089

LaPrez00@aol.com

**SUMMARY OF QUALIFICATIONS**
- College major and relevant coursework
- Computer literate
- Excellent drive and work ethic

**EDUCATION AND SPECIALIZED TRAINING**
➢ UNIVERSITY OF MIAMI      Coral Gables, Florida

     Bachelor of Arts in Criminology, December 2004     August 2000 -December 2004

     Deans List in Fall 2000. Final cumulative GPA: 3.465; Writing Requirement GPA: 3.60

➢ LONG ISLAND REAL ESTATE TRAINING      Commack, New York

     March 30 – May 12, 2005; Completed coursework to become Real Estate Salesperson in New York State
- Received a perfect score on class exam
- Perfect class attendance
- Passed state exam on first attempt

**COLLEGE EXTRACURRICULAR LEADERSHIP POSITIONS (also please see 'OTHER' section)**
➢ Hurricane Productions     Public Relations Chair     Fall 2001 – Spring 2002
- Group Responsible for student entertainment on campus
- Personally responsible for advertisements of events, acting as liaison between clientele, students, and the public

➢ Student Government Cabinet     Diversity committee Member    Spring 2001
- Responsible for acting in the interest of the students in ensuring the equal treatment and college experience of all students regardless of race, gender, color, creed, sexual orientation, or religion

**RELATED WORK EXPERIENCE**
➢ INTERNSHIP     Midtown Community Court NY, NY     Current
- Intern for Ms. Courtnaye Jackson-Chase, Project Director
- launched in 1993; deals with quality of life offenses (such as prostitution, illegal vending, graffiti, shoplifting, fare beating, and vandalism); arose as a response to judges at most urban courts having a lack of sentencing options, having to choose between a few days jail time and nothing ; viewing that there are no such things as "victimless crimes", that the community as a whole is a victim; encourages retribution back to the community harmed by offense; offers community services such as painting over graffiti, sweeping the streets, and stuffing envelopes for local nonprofits, painting affordable housing units, etc; Court offers onsite drug treatment, job training, education, and health care
- Personal responsibilities include: filing incidents of noncompliance to be entered in computer databases, observation of the courtroom process, legal research of social issues, briefing Project Director on social issues, etc

➢ NOTARY PUBLIC     New York State     Current
- Responsibilities include: swearing in politicians, authenticating legal documents
- Licensed from 2005- 2009

➢ REAL ESTATE SALESPERSON   New York State     Current

    Coldwell Banker Trevjon Realty     Baldwin, New York
- Responsibilities include: market analyses, building fiduciary client relationships, taking listings, devising personalized marketing strategies, working with contracts, upholding/informing the public of real estate laws, marketing strategies, etc.

**SKILLS**
➢ Sales experience; Computer literate: DOS, Windows, Microsoft Word, WordPerfect, Excel, Outlook, Dynakey System - POS Back Office, STRATUS-Multiple Listing Service, LEXIS, WESTLAW

**REFERENCES**
➢ Dr. Amie Nielsen     Academic advisor/ Sociology professor     (305) 284 -6158
➢ Ms. Melissa Kollen-Rice     Attorney/Real Estate trainer     (631) 543 -0770
➢ Ms. Courtnaye Jackson-Chase     Project Director     (646) 264 -1302

Randall Forbes
122 North Brookside Avenue Freeport, NY 11520-1931
Home: (516) 379-9219; work: (516) 776-4089
LaPrez00@aol.com

**OTHER**

- National Society of Collegiate Scholars                                    spring 2001-current
    - First time membership open to freshman or sophomores
    - Inducted into society for maintaining academic excellence; must have 3.4 GPA or above ; must be in top 20% of class
    - Members have benefits such as workshops to develop leadership skills and opportunities for involvement in community service
    - Personally inducted with a 3.675 GPA
- Awarded Daughters of the American Revolution medal                    1999
    - Rewarded for patriotism, citizenship, honesty, and courage
    - Recognized for achievements in service to fellow students
- Attended/Invited to  National Youth Leadership on Law                    1999
    - By invitation/recommendation only
    - Program takes young pupils interested in of law and familiarizes them with the many careers within the field, with the different types of law, how to debate issues of law, the Socratic method of law school classes



# UNIVERSITY OF Miami

*Accessibility Resources*
(305) 284-2374 (Voice) (305) 284-1999 (Fax)
(305) 284-3401 (TDD)

## MEMORANDUM

### August 9, 2004

**TO:**       Professors for Randall Forbes
              Fall Semester, 2004

**FROM:**   Judith Antinarella, Director
              Accessibility Resources (AR)

**SUBJECT:**   Class Accommodations

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

This letter applies to **Fall, 2004** only. Students registered with Accessibility Resources receive an updated Letter to Professors for each semester in which they are enrolled.

Please be aware that **Randall Forbes** is enrolled in your class and is registered with Accessibility Resources. The accommodations allowed to this student are:

- **Extended Time (up to time and a half) for examinations and in class-assignments**
- **A distraction-reduced location, as needed**
- **AR has a testing room with a proctor. If the student feels that a separate testing location is needed, he/she will speak to you at least one week prior to the test date. If you approve, we will contact you to make arrangements.**

All information regarding disability is **CONFIDENTIAL** and is not to be discussed with anyone without specific permission from the student.

Thank you for your help with this matter. Please contact our office at **(305) 284-2374** or jantinarella@miami.edu if you need additional information or we can assist in any way. You will find supplementary resources on our website, www.umarc.miami.edu.

*Didn't P/U*
*10/26/04 SB*



University Center, Suite N201 · P.O. Box 249003 · Coral Gables, FL 33124-6995
Telephone: 305.284.2800 · Fax: 305.284.1999
www.umarc.miami.edu



DEFENDANT'S
EXHIBIT
8



# ST. THOMAS
U N I V E R S I T Y

S C H O O L   O F   L A W

## MEMORANDUM

**TO:**    Forbes , Randall

**FROM:**   **Janelle L. Jackson**, Assistant Registrar

**RE:**    Spring 2007 Exam Schedule

**DATE:**   April 23, 2007

---

Your accommodation for your exam is listed below. Please report for your exam on the dates, times and rooms listed below.

| NO. | TITLE | PROF. | DAY | EXAM DATE | TIME | ROOM |
|---|---|---|---|---|---|---|
| 660-03 | Contracts II §3 | Makdisi, J | Wed | 05/02 | 2:00-5:00 | Lib. Comptn. Rm |

If you have any questions, please call me at (305) 623-2361.

Thank you.


**Accommodation:** Time 1/2, utd. Distraction

**Exam Length and Instruction:**   3hrs. Closed Book. Essay and Scantron. ExamSoft allowed.

**Xtra. Time Allocation: 41/2hrs (1:30p - 6:00p)**

---

Please Note: If you use ExamSoft for your exams, please be at the scheduled classroom a few minutes early to set up your laptop. All exams must start on time to avoid conflicts with other exams that may be scheduled during the day in your assigned room.





# ST. THOMAS
## U N I V E R S I T Y
### S C H O O L   O F   L A W

## MEMORANDUM

**TO:**        Forbes ; Randall

**FROM:**   **Janelle L. Jackson**, Assistant Registrar

**RE:**         Spring 2007 Exam Schedule

**DATE:**    April 23, 2007

Your accommodation for your exam is listed below. Please report for your exam on the dates, times and rooms listed below.

| NO. | TITLE | PROF. | DAY | EXAM DATE | TIME | ROOM |
|-----|-------|-------|-----|-----------|------|------|
| 615-03 | Civ. Pro. II §3 | **Gordon** | **Fri** | 05/04 | 2:00-5:00 | Lib. Comptn. Rm |

If you have any questions, please call me at (305) 623-2361.

Thank you.

**Accommodation:** Time 1/2, Ltd. Distraction

**Exam Length and Instruction:**   3hrs. Closed Book. Essay and Scantron. No ExamSoft.

**Xtra. Time Allocation:** 41/2hrs ( 1:30p - 6:00p)

**Please Note:** If you use ExamSoft for your exams, please be at the scheduled classroom a few minutes early to set-up your laptop. All exams must start on time to avoid conflicts with other exams that may be scheduled during the day in your assigned room.





**ST. THOMAS**
U N I V E R S I T Y
S C H O O L   O F   L A W

## MEMORANDUM

**TO:**     Forbes, Randall

**FROM:**   Janelle L. Jackson, Assistant Registrar

**RE:**     Spring 2007 Exam Schedule

**DATE:**   April 23, 2007

---

Your accommodation for your exam is listed below. Please report for your exam on the dates, times and rooms listed below.

| NO. | TITLE | PROF. | DAY | EXAM DATE | TIME | ROOM |
|-----|-------|-------|-----|-----------|------|------|
| 670-03 | Torts II §3 | Silver | Wed | 05/09 | 8:30-11:30 | Lib. Comptn. Rm. |

If you have any questions, please call me at (305) 623-2361.

Thank you.

**Accommodation:** Time 1/2, Ltd. Distraction.

**Exam Length and Instruction:**   3hrs. Closed Book. Essay and  Multiple Choice(on  Exam itself). ExamSoft allowed.

**Xtra. Time Allocation: 41/2hrs (8:30a – 1:00p)**

---

**Please Note:** If you use ExamSoft for your exams, please be at the scheduled classroom a few minutes early to set up your laptop. All exams must start on time to avoid conflicts with other exams that may be scheduled during the day in your assigned room.



DEFENDANT'S
EXHIBIT
1



**ST. THOMAS**
U N I V E R S I T Y
S C H O O L   O F   L A W

### MEMORANDUM

**TO:**     Forbes , Randall

**FROM:**   **Janelle L. Jackson**, Assistant Registrar

**RE:**     Spring 2007 Exam Schedule

**DATE:**   April 23, 2007

---

Your accommodation for your exam is listed below. Please report for your exam on the dates, times and rooms listed below.

| NO. | TITLE | PROF. | DAY | EXAM DATE | TIME | ROOM |
|-----|-------|-------|-----|-----------|------|------|
| 695-03 | Property II §3 | Singer | Fri | 05/11 | 2:00-5:00 | Lib. Seminar Rm. |

If you have any questions, please call me at (305) 623-2361.

Thank you.

**Accommodation:** Time 1/2. Ltd Distraction .

**Exam Length and Instruction:**   3hrs. Closed Book. Essay and Scantron. ExamSoft allowed.

**Xtra. Time Allocation:** 41/2hrs (1:00 – 5:30p)

---

**Please Note:** If you use ExamSoft for your exams, please be at the scheduled classroom a few minutes early to set up your laptop. All exams must start on time to avoid conflicts with other exams that may be scheduled during the day in your assigned room.



DEFENDANT'S
EXHIBIT

# Progress Note

| | | | |
|---|---|---|---|
| **Patient Name:** | Randall Forbes | **Visit Date:** | April 26, 2007 |
| **Patient ID:** | 18687 | **Provider:** | Michael L. Ross, DO |
| **Sex:** | Female | **Location:** | Michael L. Ross, D.O. |
| **Birthdate:** | | | |

## Chief Complaint
Anxiety, panic attacks, palpitations, wants Xanax

## History Of Present Illness
Patient is a 25 year old african american female who presents as a new patient with the above chief complaints. She states that she is here regarding new health issues and this includes the following: New patient prsents with anxiety, panic attacks, palpitations. States that she also wants Rx for Xanax, although has never been prescribed it. States she tried one of her friend's Xanax and believed it helped calm her down. Patient has hx of anxiety since high school, past 6 years. Never took any med. Current anxiety due to fear of being kicked out of law school. States she is currently on academic probation. States that over Easter at home and 2 days later at school, ambulance was called for her panic chest discomfort. Told by medics that she had anxiety attack on both occasions. States she also has a history of migraines for which she has never been treated. Probably related to her stress. Her mother is 57 and was adopted. States she is overweight and has very high cholesterol. Father is 60 and has angina. Has 3 half sisters and 1 half brother and 1 full brother. Never smoked cigarettes or used illicit drugs. Uses alcohol on social occasions. Denies surgical history. No known allergies to meds, foods or environment. Is currently a law student at St. Thomas University in Miami. Last pap was 03/24/07 in Atlanta, GA, and was WNL. Is G1 P0010 status with 1 miscarriage in 2004. Used to be on an OCP with iron, but they messed up her periods, so not currently using any OCP's. Menarche at age 13 and regular menses every 28 to 30 days. Takes Excedrin prn for HA's..

The patient denies dyspnea, syncope, left leg edema, right leg edema, coughing, wheezing, lightheadedness, fever, chills, and fatigue.

## Past Medical History

| Disease Name | Date Onset | Notes |
|---|---|---|
| Migraine Headaches | -- | -- |
| Racing heart | -- | -- |

## Past Surgical History

| Procedure Name | Date | Notes |
|---|---|---|
| No Pertinent Past Surgical History | -- | -- |

## Allergy List

| Allergen Name | Reaction | Notes |
|---|---|---|
| No Known Allergies | -- | -- |
| NO KNOWN DRUG ALLERGIES | -- | -- |
| No Known Food Allergies | -- | -- |

## Family Medical History

| Disease Name | Relative/Age | Notes |
|---|---|---|
| Heart Disease | Father/ | angina, currently age 60 |
| High Cholestrol | Mother/ | currently age 57 |

## Reproductive History

[Digital Signature Validated]



EXHIBIT
13 comp
7/16/09

**Menstrual**

Age Menarche: 13                  Cycle Interval(Days): 30        Menopause Status: Premenopausal
Method of Birth Control: None     Clots?: No                      Breakthrough Bleeding?: No
HRT?: No

**Pregnancy Summary**

Total Pregnancies: 1              Full Term: 0                    Premature: 0
Ab Induced: 0                     Ab Spontaneous: 1               Ectopics: 0
Multiples: 0                      Living: 0

## Social History

| Finding | Status | Start/Stop | Quantity | Notes |
|---|---|---|---|---|
| Denies illicit substance abuse | -- | --/-- | -- | -- |
| Has never smoked | -- | --/-- | -- | -- |
| Social drinker | -- | --/-- | -- | -- |
| Student | -- | --/-- | -- | law student at St. Thomas University in Miami |

## Review of Systems

**Constitutional**
- Denies : fatigue, fever, chills, malaise, body aches, night sweats, weight loss, weight gain, loss of appetite

**Eyes**
- Denies : discharge from eye, eye discomfort, eye pain, double vision, impaired vision, blurred vision, changes in vision

**HENT**
- Denies : headaches, vertigo, lightheadedness, sinus pain, nasal congestion, nasal discharge, postnasal drip, neck pain, sore throat

**Cardiovascular**
- Admits : rapid heart rate
- Denies : chest pain, irregular heart beats, syncope, dyspnea on exertion, paroxysmal nocturnal dyspnea, lower extremity edema

**Respiratory**
- Denies : shortness of breath, wheezing, cough, hoarseness, abnormal sputum production, hemoptysis, dry cough, productive cough

**Gastrointestinal**
- Denies : nausea, vomiting, diarrhea, constipation, obstipation, loss of appetite, dysphagia, heartburn, reflux

**Genitourinary**
- Denies : urgency, frequency, dysuria, nocturia, hematuria, oliguria

**Integument**
- Denies : rash, itching, pigmentation changes, skin dryness, hair growth change, nail changes, new skin lesions, changes to existing skin lesions or moles, hirsutism, acne

**Neurologic**
- Denies : altered mental status, muscular weakness, incoordination, memory difficulties

**Musculoskeletal**
- Denies : joint pain, joint swelling, muscle pain, limitation of motion, muscular weakness, muscle cramps, neck pain, back pain, shoulder pain, elbow pain, wrist pain, hip pain, knee pain, ankle pain, foot pain

**Psychiatric**
- Admits : anxiety
- Denies : depression, hallucinations, delusions, feeling confused, difficulty sleeping, compulsive behaviors, impulsive behaviors, suicidal ideation, homicidal ideation, excessive anger, withdrawn

**Allergic-Immunologic**
- Denies : sinus allergy symptoms, allergic dermatitis, frequent illnesses

## Physical Examination

**Constitutional**

[Digital Signature Validated]

- o **Appearance** : well-nourished, well developed, alert, in no acute distress

**Eyes**
- o **Vision** :
  - ■ **Acuity** : visual acuity grossly normal at distance O.U., near vision grossly intact O.U.
  - ■ **Visual Fields** : visual field testing intact to confrontation in all fields
- o **Conjunctiva** : conjunctiva normal
- o **Sclera** : sclera white
- o **Pupils and Irises** : pupils equal and round, pupils reactive to light bilaterally

**Ears, Nose, Mouth and Throat**
- o **Ears** :
  - ■ **External Ears** : appearance within normal limits, no lesions present
  - ■ **Otoscopic Examination** : tympanic membrane appearance within normal limits bilaterally without perforations, mobility normal
  - ■ **Hearing** : intact to conversational voice both ears
- o **Nose** :
  - ■ **External Nose** : appearance normal
  - ■ **Intranasal Exam** : mucosa within normal limits, vestibules normal, no intranasal lesions present, septum midline
  - ■ **Nasopharynx** : no lesions or inflammation
- o **Oral Cavity** :
  - ■ **Oral Mucosa** : oral mucosa normal
  - ■ **Lips** : lip appearance normal
  - ■ **Teeth** : normal dentition for age
  - ■ **Gums** : gums pink, non-swollen, no bleeding present
  - ■ **Tongue** : tongue appearance normal
  - ■ **Palate** : hard palate normal, soft palate appearance normal

**Respiratory**
- o **Respiratory Effort** : breathing unlabored
- o **Inspection of Chest** : normal appearance, no retractions
- o **Auscultation of Lungs** : normal breath sounds
- o **Percussion of Chest** : no dullness, flatness, or hyperresonance
- o **Palpation of Chest** : nontender, vocal fremitus normal

**Cardiovascular**
- o **Heart** :
  - ■ **Auscultation of Heart** : regular rate and rhythm, no murmurs present
  - ■ **Palpation of Heart** : normal apical impulse, no cardiac thrill present
- o **Peripheral Vascular System** :
  - ■ **Carotid Arteries** : normal pulses bilaterally
  - ■ **Abdominal Aorta** : aortic pulse normal without bruits
  - ■ **Femoral Arteries** : normal femoral pulses
  - ■ **Pedal Pulses** : pulses 2+ bilaterally
  - ■ **Extremities** : no edema or cyanosis

**Gastrointestinal**
- o **Abdominal Examination** : abdomen nontender to palpation, tone normal without rigidity or guarding, no masses present, abdominal contour scaphoid
- o **Liver and spleen** : no hepatomegaly present, liver nontender to palpation

**Musculoskeletal**
- o **Spine** :
  - ■ **Inspection/Palpation** : no spinal tenderness or misalignment
  - ■ **Stability** : no subluxations present
  - ■ **Range of Motion** : spine range of motion normal
  - ■ **Muscle Strength/Tone** : paracervical and neck muscle strength within normal limits
- o **Right Lower Extremity** :
  - ■ **Inspection/Palpation** : no joint or limb tenderness to palpation, no edema present, no ecchymosis
- o **Left Lower Extremity** :
  - ■ **Inspection/Palpation** : no joint or limb tenderness to palpation, no edema present, no ecchymosis

**Skin and Subcutaneous Tissue**
- o **General Inspection** : no rashes present, no lesions present, no areas of discoloration

[Digital Signature Validated]

    o **General Palpation** : no skin or subcutaneous tissue masses present, no tenderness to palpation

**Neurologic**

    o **Mental Status Examination :**
        ■ **Orientation** : grossly oriented to person, place and time
    o **Cranial Nerves** : cranial nerves intact bilaterally
    o **Motor Examination :**
        ■ **RUE Strength** : strength normal
        ■ **RUE Motor Function** : tone normal, muscle bulk normal, no abnormal movements
        ■ **LUE Strength** : strength normal
        ■ **LUE Motor Function** : tone normal, muscle bulk normal, no abnormal movements noted
        ■ **RLE Strength** : strength normal
        ■ **RLE Motor Function** : tone normal, no atrophy, no abnormal movements noted
        ■ **LLE Strength** : strength normal
        ■ **LLE Motor Function** : tone normal, no atrophy, no abnormal movements noted
    o **Reflexes** : DTR's 2+ bilaterally
    o **Sensation :**
        ■ **Light Touch** : sensation intact to light touch in extremities
        ■ **Pin Prick** : sensation intact to pin prick in extremities
        ■ **Position** : sensation intact in extremities
    o **Gait and Station** : normal gait, able to stand without difficulty

**Psychiatric**

    o **Judgement and Insight** : judgement and insight intact
    o **Thought Processes** : rate of thoughts normal, thought content logical, abstract reasoning within normal limits, computation intact for basic mathematical constructs including addition and subtraction
    o **Mood and Affect** : mood normal, affect appropriate
    o **Associations** : associations within normal limits
    o **Presence of Abnormal Thoughts** : no hallucinations, no delusions present, no psychotic thoughts

# Assessment

- Anxiety Disorder 300.00
- Racing heart 785.1
- Migraine 346.10
- Symptoms Involving Respiratory System And Chest 786.9
- Health Instruction V65.40

# Plan

  . **Orders**
    o CBC (85025) - 04/26/2007
    o COMP METABOLIC (80053) - 04/26/2007
    o LIPID (80061) - 04/26/2007
    o TSH (84443) - 04/26/2007
    o T3 (84479) - 04/26/2007
    o T4 (84436) - 04/26/2007
    o T7 (84482) - 04/26/2007
    o 24-hour Holter monitor (93224) - 04/26/2007
    o 2D echocardiography, transthoracic; complete (93307) - 04/26/2007
    o EKG (93000) - 04/26/2007

**Medications**

    o Xanax Oral Tablet 0.5 mg
       SIG: take 1 to 2 tablets BID prn
       DISP: (40) tablets with 0 refills
       **Prescribed on 04/26/2007**

    o Zoloft Oral Tablet 50 mg
       SIG: take 1 tablet (50mg) by oral route once daily for 30 days

[Digital Signature Validated]

DISP: (30) tablets with 1 refills
**Prescribed on 04/26/2007**

**Instructions**
- o  Patient instructed on low fat diet
- o  Patient instructed to exercise regularly
- o  Take blood pressure readings 3 times per week

**Disposition**
- o  RTC in/on 2 weeks +/- 2 days (1967).

Discussed with patient stress/anxiety reduction techniques. Explained that Xanax is short-acting, med for acute situations. Long-term use can have addictive potential. Rx'd Zoloft for maintenance, long-term use. Gave scripts for Holter and 2-D echo with dopplers. Schedule for next week. Bloodwork done as well as EKG.


**Electronically Signed by:** Deepa B. Verma, MD on April 26, 2007 02:54:17 PM


[Digital Signature Validated]

| NAME | | | | DATE | |
|------|---|---|---|------|---|
| DATE 4-26-07 ECGs | | ROOM # | | BP | |
| AGE 23 | RATE 76 | DOCTOR Verina | | | |
| SEX F | RHYTHM | PR | QRS | QT | |
| HGT | AXIS | P | T | ST | |
| WGT | DRUGS | | | | |

BURDICK

007909

This mount has been designed to accomodate the recording from a Burdick single-channel automatic electrocardiograph set in the CARD format.

**MOUNTING INSTRUCTIONS**

1. To remove this protective paper, bend card at arrow, lift corner and peel off to expose gummed surface.
2. Mount first leads of recording flush with top edge of gummed surface. Position so that CAL pulse is about 1 mm from the left edge and press recording to surface.
3. Cut or tear off extending portion of recording. Peel off next row of protective paper. Mount second recording strip flush with top edge of gummed surface.
4. Cut or tear off extending portion of recording strip and mount remaining strip. Cut off excess recording strip at left and right edges of mount.



M-309    P/N 10401-023    Made in U.S.A.



**Quest Diagnostics**

QUEST DIAGNOSTICS INCORPORATED
CLIENT SERVICE 800.800.1749

SPECIMEN INFORMATION
SPECIMEN: MI993787P
REQUISITION: 7095342

COLLECTED: 04/26/2007    NG
RECEIVED: 04/26/2007    23:39
REPORTED: 04/27/2007    08:14

PATIENT INFORMATION
**FORBES, RANDALL**

DOB: ,                    25
GENDER:   FASTING: U

ID:
PHONE:

REPORT STATUS **FINAL**

ORDERING PHYSICIAN
ROSS MICHAEL L
Verma

CLIENT INFORMATION
M18537                    6804000
MICHAEL ROSS MD
11401 SW 40TH ST STE 120
MIAMI, FL 33165-3338

| Test Name | In Range | Out of Range | Reference Range | Lab |
|---|---|---|---|---|
| **LIPID PANEL** | | | | |
| TRIGLYCERIDES | | 220 H | <150 mg/dL | MI |
| CHOLESTEROL, TOTAL | 143 | | 125-200 mg/dL | MI |
| HDL CHOLESTEROL | 50 | | > OR = 40 mg/dL | MI |
| LDL-CHOLESTEROL | 49 | | <130 mg/dL (calc) | MI |

DESIRABLE RANGE <100 MG/DL FOR PATIENTS WITH CHD OR
DIABETES AND <70 MG/DL FOR DIABETIC PATIENTS WITH
KNOWN HEART DISEASE.

| | | | | |
|---|---|---|---|---|
| CHOL/HDLC RATIO | 2.9 | | < OR = 5.0 (calc) | MI |
| **COMPREHENSIVE METABOLIC** | | | | MI |
| PANEL W/EGFR | | | | |
| GLUCOSE | 92 | | 65-99 mg/dL | |
| | | | FASTING REFERENCE INTERVAL | |
| UREA NITROGEN (BUN) | | 4 L | 7-25 mg/dL | |
| CREATININE | 0.8 | | 0.5-1.2 mg/dL | |
| GFR ESTIMATED | >60 | | > OR = 60 mL/min/1.73m2 | |

IF THE PATIENT IS AFRICAN-AMERICAN, PLEASE MULTIPLY
THIS RESULT BY 1.21. THIS RESULT HAS BEEN CALCULATED
ASSUMING THE PATIENT IS NON-AFRICAN AMERICAN.

| | | | | |
|---|---|---|---|---|
| BUN/CREATININE RATIO | | 5 L | 6-22 (calc) | |
| SODIUM | 141 | | 135-146 mmol/L | |
| POTASSIUM | 4.3 | | 3.5-5.3 mmol/L | |
| CHLORIDE | 106 | | 98-110 mmol/L | |
| CARBON DIOXIDE | 27 | | 21-33 mmol/L | |
| CALCIUM | 9.6 | | 8.6-10.2 mg/dL | |
| PROTEIN, TOTAL | 7.5 | | 6.2-8.3 g/dL | |
| ALBUMIN | 4.5 | | 3.6-5.1 g/dL | |
| GLOBULIN | 3.0 | | 2.2-3.9 g/dL (calc) | |
| ALBUMIN/GLOBULIN RATIO | 1.5 | | 1.0-2.1 (calc) | |
| BILIRUBIN, TOTAL | 0.3 | | 0.2-1.2 mg/dL | |
| ALKALINE PHOSPHATASE | 56 | | 33-115 U/L | |
| AST | 20 | | 10-30 U/L | |
| ALT | 18 | | 6-40 U/L | |

FORBES, RANDALL - MI993787P

Page 1 - Continued on Page 2

Quest, Quest Diagnostics, the associated logo and all associated Quest Diagnostics Marks are the trademarks of Quest Diagnostics. © Quest Diagnostics Incorporated All rights reserved.

**Quest Diagnostics**

QUEST DIAGNOSTICS INCORPORATED

PATIENT INFORMATION
**FORBES, RANDALL**

REPORT STATUS **FINAL**

ORDERING PHYSICIAN
**ROSS, MICHAEL L**

COLLECTED: 04/26/2007 NG
REPORTED: 04/27/2007 08:14

DOB: _____s
GENDER: F FASTING: U

| Test Name | In Range | Out of Range | Reference Range | Lab |
|---|---|---|---|---|
| | | | | MI |
| CBC (INCLUDES DIFF/PLT) | | | 3.8-10.8 Thousand/uL | |
| WHITE BLOOD CELL COUNT | 9.7 | | 3.80-5.10 Million/uL | |
| RED BLOOD CELL COUNT | 4.28 | | 11.7-15.5 g/dL | |
| HEMOGLOBIN | 13.6 | | 35.0-45.0 % | |
| HEMATOCRIT | 39.2 | | 80.0-100.0 fL | |
| MCV | 91.7 | | 27.0-33.0 pg | |
| MCH | 31.7 | | 32.0-36.0 g/dL | |
| MCHC | 34.6 | | 11.0-15.0 % | |
| RDW | 13.2 | | 140-400 Thousand/uL | |
| PLATELET COUNT- | | 138 L | 1500-7800 cells/uL | |
| ABSOLUTE NEUTROPHILS | 5849 | | 850-3900 cells/uL | |
| ABSOLUTE LYMPHOCYTES | 3056 | | 200-950 cells/uL | |
| ABSOLUTE MONOCYTES | 572 | | 15-500 cells/uL | |
| ABSOLUTE EOSINOPHILS | 184 | | 0-200 cells/uL | |
| ABSOLUTE BASOPHILS | 39 | | | |
| NEUTROPHILS | 60.3 | | % | |
| LYMPHOCYTES | 31.5 | | % | |
| MONOCYTES | 5.9 | | % | |
| EOSINOPHILS | 1.9 | | % | |
| BASOPHILS | 0.4 | | % | |
| | | | | |
| T3, TOTAL | 128 | | 60-181 ng/dL | MI |
| T-3 UPTAKE | 30 | | 22-35 % | MI |
| T-4, FREE | 1.2 | | 0.8-1.8 ng/dL | MI |
| T-4 (THYROXINE), TOTAL | 8.9 | | 4.5-12.5 mcg/dL | MI |
| FREE T4 INDEX (T7) | 2.7 | | 1.4-3.8 | |
| TSH | 2.85 | | mIU/L | MI |

> 20 YEARS: 0.40-5.50

FOR PREGNANT PATIENTS:
FIRST TRIMESTER 0.30-4.50
SECOND TRIMESTER 0.50-4.60
THIRD TRIMESTER 0.80-5.20

**PERFORMING LABORATORY INFORMATION**
MI QUEST DIAGNOSTICS-MIAMI, 10200 COMMERCE PARKWAY, MIRAMAR, FL 33025-3938, Laboratory Director: ANTHONY SIMONETTI, MD
CLIA: 10D0277334

FORBES, RANDALL - MI993787F

Page 2 - End of Report

Quest, Quest Diagnostics, the associated logo and all associated Quest Diagnostics marks are the trademarks of Quest Diagnostics. © Quest Diagnostics Incorporated. All rights reserved. DDKESN-MTL Revised USA SCIA - 1YSDG.



**MICHAEL ROSS, D.O.**

Phone: (305) 551-0122
Fax: (305) 221-0322

BOARD CERTIFIED FAMILY PRACTICE
SENIOR FAA MEDICAL EXAMINER ·

WESTBIRD OFFICE BUILDING
11401 S.W. 40TH STREET (BIRD RD.)
SUITE 120
MIAMI, FLORIDA 33185

## INVOICE
### Medical Record Release

DATE: _3/10/9._

TO: _Gaebe, Mullen, Antonelli, Esco & Dimatteo_

_Fx (3) 2349844   Ph (3) 6670223_

Statement of account for medical review of: _Randall V. Forbes_

D.O.B. _3-18-82_

TOTAL CHARGE FOR MEDICAL RECORDS/SERVICE: _75⁰⁰_

TOTAL CHARGE FOR SERVICES: _∅_

PLEASE PAY THIS AMOUNT: _75⁰⁰_

Should you have any question in regards to any charges above, please contact our office.

Thank You,

**INVOICES ARE DUE AND PAYABLE UPON PRESENTATION**

**MAKE CHECKS PAYABLE TO " DR. MICHAEL L. ROSS, D.O. P.A."**

**FAXED** By: _AG_
Date: _3/10/9_

# Progress Note

| | | | |
|---|---|---|---|
| **Patient Name:** | Randall Forbes | **Visit Date:** | April 26, 2007 |
| **Patient ID:** | 18687 | **Provider:** | Michael L. Ross, DO |
| **Sex:** | Female | **Location:** | Michael L. Ross, D.O. |
| **Birthdate:** | | | |

## Chief Complaint
Anxiety, panic attacks, palpitations, wants Xanax

## History Of Present Illness
Patient is a 25 year old african american female who presents as a new patient with the above chief complaints. She states that she is here regarding new health issues and this includes the following: New patient prsents with anxiety, panic attacks, palpitations. States that she also wants Rx for Xanax, although has never been prescribed it. States she tried one of her friend's Xanax and believed it helped calm her down. Patient has hx of anxiety since high school, past 6 years. Never took any med. Current anxiety due to fear of being kicked out of law school. States she is currently on academic probation. States that over Easter at home and 2 days later at school, ambulance was called for her panic chest discomfort. Told by medics that she had anxiety attack on both occasions. States she also has a history of migraines for which she has never been treated. Probably related to her stress. Her mother is 57 and was adopted. States she is overweight and has very high cholesterol. Father is 60 and has angina. Has 3 half sisters and 1 half brother and 1 full brother. Never smoked cigarettes or used illicit drugs. Uses alcohol on social occasions. Denies surgical history. No known allergies to meds, foods or environment. Is currently a law student at St. Thomas University in Miami. Last pap was 03/24/07 in Atlanta, GA, and was WNL. Is G1 P0010 status with 1 miscarriage in 2004. Used to be on an OCP with iron, but they messed up her periods, so not currently using any OCP's. Menarche at age 13 and regular menses every 28 to 30 days. Takes Excedrin prn for HA's..

The patient denies dyspnea, syncope, left leg edema, right leg edema, coughing, wheezing, lightheadedness, fever, chills, and fatigue.

## Past Medical History

| Disease Name | Date Onset | Notes |
|---|---|---|
| Migraine Headaches | -- | -- |
| Racing heart | -- | -- |

## Past Surgical History

| Procedure Name | Date | Notes |
|---|---|---|
| No Pertinent Past Surgical History | -- | -- |

## Allergy List

| Allergen Name | Reaction | Notes |
|---|---|---|
| No Known Allergies | -- | -- |
| NO KNOWN DRUG ALLERGIES | -- | -- |
| No Known Food Allergies | -- | -- |

## Family Medical History

| Disease Name | Relative/Age | Notes |
|---|---|---|
| Heart Disease | Father/ | angina, currently age 60 |
| High Cholestrol | Mother/ | currently age 57 |

## Reproductive History

[Digital Signature Validated]

**Menstrual**

**Age Menarche:** 13
**Method of Birth Control:** None
**HRT?:** No

**Cycle Interval(Days):** 30
**Clots?:** No

**Menopause Status:** Premenopausal
**Breakthrough Bleeding?:** No

**Pregnancy Summary**

**Total Pregnancies:** 1
**Ab Induced:** 0
**Multiples:** 0

**Full Term:** 0
**Ab Spontaneous:** 1
**Living:** 0

**Premature:** 0
**Ectopics:** 0

## Social History

| Finding | Status | Start/Stop | Quantity | Notes |
|---|---|---|---|---|
| Denies illicit substance abuse | -- | --/-- | -- | -- |
| Has never smoked | -- | --/-- | -- | -- |
| Social drinker | -- | --/-- | -- | -- |
| Student | -- | --/-- | -- | law student at St. Thomas University in Miami |

## Review of Systems

**Constitutional**
- o **Denies :** fatigue, fever, chills, malaise, body aches, night sweats, weight loss, weight gain, loss of appetite

**Eyes**
- o **Denies :** discharge from eye, eye discomfort, eye pain, double vision, impaired vision, blurred vision, changes in vision

**HENT**
- o **Denies :** headaches, vertigo, lightheadedness, sinus pain, nasal congestion, nasal discharge, postnasal drip, neck pain, sore throat

**Cardiovascular**
- o **Admits :** rapid heart rate
- o **Denies :** chest pain, irregular heart beats, syncope, dyspnea on exertion, paroxysmal nocturnal dyspnea, lower extremity edema

**Respiratory**
- o **Denies :** shortness of breath, wheezing, cough, hoarseness, abnormal sputum production, hemoptysis, dry cough, productive cough

**Gastrointestinal**
- o **Denies :** nausea, vomiting, diarrhea, constipation, obstipation, loss of appetite, dysphagia, heartburn, reflux

**Genitourinary**
- o **Denies :** urgency, frequency, dysuria, nocturia, hematuria, oliguria

**Integument**
- o **Denies :** rash, itching, pigmentation changes, skin dryness, hair growth change, nail changes, new skin lesions, changes to existing skin lesions or moles, hirsutism, acne

**Neurologic**
- o **Denies :** altered mental status, muscular weakness, incoordination, memory difficulties

**Musculoskeletal**
- o **Denies :** joint pain, joint swelling, muscle pain, limitation of motion, muscular weakness, muscle cramps, neck pain, back pain, shoulder pain, elbow pain, wrist pain, hip pain, knee pain, ankle pain, foot pain

**Psychiatric**
- o **Admits :** anxiety
- o **Denies :** depression, hallucinations, delusions, feeling confused, difficulty sleeping, compulsive behaviors, impulsive behaviors, suicidal ideation, homicidal ideation, excessive anger, withdrawn

**Allergic-Immunologic**
- o **Denies :** sinus allergy symptoms, allergic dermatitis, frequent illnesses

## Physical Examination

**Constitutional**

[Digital Signature Validated]

- o **Appearance** : well-nourished, well developed, alert, in no acute distress

**Eyes**
- o **Vision** :
    - ▪ **Acuity** : visual acuity grossly normal at distance O.U., near vision grossly intact O.U.
    - ▪ **Visual Fields** : visual field testing intact to confrontation in all fields
- o **Conjunctiva** : conjunctiva normal
- o **Sclera** : sclera white
- o **Pupils and Irises** : pupils equal and round, pupils reactive to light bilaterally

**Ears, Nose, Mouth and Throat**
- o **Ears** :
    - ▪ **External Ears** : appearance within normal limits, no lesions present
    - ▪ **Otoscopic Examination** : tympanic membrane appearance within normal limits bilaterally without perforations, mobility normal
    - ▪ **Hearing** : intact to conversational voice both ears
- o **Nose** :
    - ▪ **External Nose** : appearance normal
    - ▪ **Intranasal Exam** : mucosa within normal limits, vestibules normal, no intranasal lesions present, septum midline
    - ▪ **Nasopharynx** : no lesions or inflammation
- o **Oral Cavity** :
    - ▪ **Oral Mucosa** : oral mucosa normal
    - ▪ **Lips** : lip appearance normal
    - ▪ **Teeth** : normal dentition for age
    - ▪ **Gums** : gums pink, non-swollen, no bleeding present
    - ▪ **Tongue** : tongue appearance normal
    - ▪ **Palate** : hard palate normal, soft palate appearance normal

**Respiratory**
- o **Respiratory Effort** : breathing unlabored
- o **Inspection of Chest** : normal appearance, no retractions
- o **Auscultation of Lungs** : normal breath sounds
- o **Percussion of Chest** : no dullness, flatness, or hyperresonance
- o **Palpation of Chest** : nontender, vocal fremitus normal

**Cardiovascular**
- o **Heart** :
    - ▪ **Auscultation of Heart** : regular rate and rhythm, no murmurs present
    - ▪ **Palpation of Heart** : normal apical impulse, no cardiac thrill present
- o **Peripheral Vascular System** :
    - ▪ **Carotid Arteries** : normal pulses bilaterally
    - ▪ **Abdominal Aorta** : aortic pulse normal without bruits
    - ▪ **Femoral Arteries** : normal femoral pulses
    - ▪ **Pedal Pulses** : pulses 2+ bilaterally
    - ▪ **Extremities** : no edema or cyanosis

**Gastrointestinal**
- o **Abdominal Examination** : abdomen nontender to palpation, tone normal without rigidity or guarding, no masses present, abdominal contour scaphoid
- o **Liver and spleen** : no hepatomegaly present, liver nontender to palpation

**Musculoskeletal**
- o **Spine** :
    - ▪ **Inspection/Palpation** : no spinal tenderness or misalignment
    - ▪ **Stability** : no subluxations present
    - ▪ **Range of Motion** : spine range of motion normal
    - ▪ **Muscle Strength/Tone** : paracervical and neck muscle strength within normal limits
- o **Right Lower Extremity** :
    - ▪ **Inspection/Palpation** : no joint or limb tenderness to palpation, no edema present, no ecchymosis
- o **Left Lower Extremity** :
    - ▪ **Inspection/Palpation** : no joint or limb tenderness to palpation, no edema present, no ecchymosis

**Skin and Subcutaneous Tissue**
- o **General Inspection** : no rashes present, no lesions present, no areas of discoloration

[Digital Signature Validated]

- **General Palpation** : no skin or subcutaneous tissue masses present, no tenderness to palpation

**Neurologic**
- **Mental Status Examination** :
  - **Orientation** : grossly oriented to person, place and time
- **Cranial Nerves** : cranial nerves intact bilaterally
- **Motor Examination** :
  - **RUE Strength** : strength normal
  - **RUE Motor Function** : tone normal, muscle bulk normal, no abnormal movements
  - **LUE Strength** : strength normal
  - **LUE Motor Function** : tone normal, muscle bulk normal, no abnormal movements noted
  - **RLE Strength** : strength normal
  - **RLE Motor Function** : tone normal, no atrophy, no abnormal movements noted
  - **LLE Strength** : strength normal
  - **LLE Motor Function** : tone normal, no atrophy, no abnormal movements noted
- **Reflexes** : DTR's 2+ bilaterally
- **Sensation** :
  - **Light Touch** : sensation intact to light touch in extremities
  - **Pin Prick** : sensation intact to pin prick in extremities
  - **Position** : sensation intact in extremities
- **Gait and Station** : normal gait, able to stand without difficulty

**Psychiatric**
- **Judgement and Insight** : judgement and insight intact
- **Thought Processes** : rate of thoughts normal, thought content logical, abstract reasoning within normal limits, computation intact for basic mathematical constructs including addition and subtraction
- **Mood and Affect** : mood normal, affect appropriate
- **Associations** : associations within normal limits
- **Presence of Abnormal Thoughts** : no hallucinations, no delusions present, no psychotic thoughts

## Assessment

- Anxiety Disorder 300.00
- Racing heart 785.1
- Migraine 346.10
- Symptoms Involving Respiratory System And Chest 786.9
- Health Instruction V65.40

## Plan

- **Orders**
  - CBC (85025) - 04/26/2007
  - COMP METABOLIC (80053) - 04/26/2007
  - LIPID (80061) - 04/26/2007
  - TSH (84443) - 04/26/2007
  - T3 (84479) - 04/26/2007
  - T4 (84436) - 04/26/2007
  - T7 (84482) - 04/26/2007
  - 24-hour Holter monitor (93224) - 04/26/2007
  - 2D echocardiography, transthoracic; complete (93307) - 04/26/2007
  - EKG (93000) - 04/26/2007
- **Medications**
  - Xanax Oral Tablet 0.5 mg
    SIG: take 1 to 2 tablets BID prn
    DISP: (40) tablets with 0 refills
    **Prescribed on 04/26/2007**

  - Zoloft Oral Tablet 50 mg
    SIG: take 1 tablet (50mg) by oral route once daily for 30 days

[Digital Signature Validated]

DISP: (30) tablets with 1 refills
**Prescribed on 04/26/2007**

**Instructions**
- o Patient instructed on low fat diet
- o Patient instructed to exercise regularly
- o Take blood pressure readings 3 times per week

**Disposition**
- o RTC in/on 2 weeks +/- 2 days (1967).

Discussed with patient stress/anxiety reduction techniques. Explained that Xanax is short-acting, med for acute situations. Long-term use can have addictive potential. Rx'd Zoloft for maintenance, long-term use. Gave scripts for Holter and 2-D echo with dopplers. Schedule for next week. Bloodwork done as well as EKG.

**Electronically Signed by:** Deepa B. Verma, MD on April 26, 2007 02:54:17 PM

[Digital Signature Validated]



This mount has been designed to accomodate the recording from a Burdick single-channel automatic electrocardiograph set in the CARD format.

## MOUNTING INSTRUCTIONS

1. To remove this protective paper, bend card at arrow, lift corner and peel off to expose gummed surface.
2. Mount first leads of recording flush with top edge of gummed surface. Position so that CAL pulse is about 1 mm from the left edge and press recording to surface.
3. Cut or tear off extending portion of recording. Peel off next row of protective paper. Mount second recording strip flush with top edge of gummed surface.
4. Cut or tear off extending portion of recording strip and mount remaining strip. Cut off excess recording strip at left and right edges of mount.




**Quest Diagnostics**

QUEST DIAGNOSTICS INCORPORATED
CLIENT SERVICE 800.800.1749

SPECIMEN INFORMATION
SPECIMEN: MI993787F
REQUISITION: 7095342

PATIENT INFORMATION
**FORBES, RANDALL**

DOB:
GENDER: FASTING: U

ID:
PHONE:

REPORT STATUS **FINAL**

ORDERING PHYSICIAN
ROSS, MICHAEL L
Verma

CLIENT INFORMATION
M16837                                    6804000
MICHAEL ROSS MD
11401 SW 40TH ST STE 120
MIAMI, FL 33165-3338

COLLECTED: 04/26/2007   NG
RECEIVED: 04/26/2007   23:39
REPORTED: 04/27/2007   08:14

| Test Name | In Range | Out of Range | Reference Range | Lab |
|---|---|---|---|---|
| LIPID PANEL | | | | |
| TRIGLYCERIDES | | 220    H | <150 mg/dL | MI |
| CHOLESTEROL, TOTAL | 143 | | 125-200 mg/dL | MI |
| HDL CHOLESTEROL | 50 | | > OR = 40 mg/dL | MI |
| LDL-CHOLESTEROL | 49 | | <130 mg/dL (calc) | MI |

DESIRABLE RANGE <100 MG/DL FOR PATIENTS WITH CHD OR
DIABETES AND <70 MG/DL FOR DIABETIC PATIENTS WITH
KNOWN HEART DISEASE.

| | | | | |
|---|---|---|---|---|
| CHOL/HDLC RATIO | 2.9 | | < OR = 5.0 (calc) | MI |
| COMPREHENSIVE METABOLIC | | | | MI |
| PANEL W/EGFR | | | | |
| GLUCOSE | 92 | | 65-99 mg/dL | |
| | | | FASTING REFERENCE INTERVAL | |
| UREA NITROGEN (BUN) | | 4    L | 7-25 mg/dL | |
| CREATININE | 0.8 | | 0.5-1.2 mg/dL | |
| GFR ESTIMATED | >60 | | > OR = 60 mL/min/1.73m2 | |

IF THE PATIENT IS AFRICAN-AMERICAN, PLEASE MULTIPLY
THIS RESULT BY 1.21. THIS RESULT HAS BEEN CALCULATED
ASSUMING THE PATIENT IS NON-AFRICAN AMERICAN.

| | | | | |
|---|---|---|---|---|
| BUN/CREATININE RATIO | | 5    L | 6-22 (calc) | |
| SODIUM | 141 | | 135-146 mmol/L | |
| POTASSIUM | 4.3 | | 3.5-5.3 mmol/L | |
| CHLORIDE | 106 | | 98-110 mmol/L | |
| CARBON DIOXIDE | 27 | | 21-33 mmol/L | |
| CALCIUM | 9.6 | | 8.6-10.2 mg/dL | |
| PROTEIN, TOTAL | 7.5 | | 6.2-8.3 g/dL | |
| ALBUMIN | 4.5 | | 3.6-5.1 g/dL | |
| GLOBULIN | 3.0 | | 2.2-3.9 g/dL (calc) | |
| ALBUMIN/GLOBULIN RATIO | 1.5 | | 1.0-2.1 (calc) | |
| BILIRUBIN, TOTAL | 0.3 | | 0.2-1.2 mg/dL | |
| ALKALINE PHOSPHATASE | 56 | | 33-115 U/L | |
| AST | 20 | | 10-30 U/L | |
| ALT | 18 | | 6-40 U/L | |

FORBES,RANDALL - MI993787F

Page 1 - Continued on Page 2

Quest, Quest Diagnostics, the associated logo and all associated Quest Diagnostics marks are the trademarks of Quest Diagnostics. © Quest Diagnostics Incorporated. All rights reserved. OO92355-NTL Revised 1/06 SOHE - 110379

# Quest Diagnostics

QUEST DIAGNOSTICS INCORPORATED

**PATIENT INFORMATION**
**FORBES,RANDALL**

DOB:
GENDER: F FASTING: U

REPORT STATUS **FINAL**

ORDERING PHYSICIAN
**ROSS,MICHAEL L**

COLLECTED: 04/26/2007 NG
REPORTED: 04/27/2007 08:14

| Test Name | In Range | Out of Range | Reference Range | Lab |
|---|---|---|---|---|
| | | | | MI |
| CBC (INCLUDES DIFF/PLT) | | | | |
| WHITE BLOOD CELL COUNT | 9.7 | | 3.8-10.8 Thousand/uL | |
| RED BLOOD CELL COUNT | 4.28 | | 3.80-5.10 Million/uL | |
| HEMOGLOBIN | 13.6 | | 11.7-15.5 g/dL | |
| HEMATOCRIT | 39.2 | | 35.0-45.0 % | |
| MCV | 91.7 | | 80.0-100.0 fL | |
| MCH | 31.7 | | 27.0-33.0 pg | |
| MCHC | 34.6 | | 32.0-36.0 g/dL | |
| RDW | 13.2 | | 11.0-15.0 % | |
| PLATELET COUNT— | | 138 L | 140-400 Thousand/uL | |
| ABSOLUTE NEUTROPHILS | 5849 | | 1500-7800 cells/uL | |
| ABSOLUTE LYMPHOCYTES | 3056 | | 850-3900 cells/uL | |
| ABSOLUTE MONOCYTES | 572 | | 200-950 cells/uL | |
| ABSOLUTE EOSINOPHILS | 184 | | 15-500 cells/uL | |
| ABSOLUTE BASOPHILS | 39 | | 0-200 cells/uL | |
| NEUTROPHILS | 60.3 | | % | |
| LYMPHOCYTES | 31.5 | | % | |
| MONOCYTES | 5.9 | | % | |
| EOSINOPHILS | 1.9 | | % | |
| BASOPHILS | 0.4 | | % | |
| | | | | |
| T3, TOTAL | 128 | | 60-181 ng/dL | MI |
| T-3 UPTAKE | 30 | | 22-35 % | MI |
| T-4, FREE | 1.2 | | 0.8-1.8 ng/dL | MI |
| T-4 (THYROXINE), TOTAL | 8.9 | | 4.5-12.5 mcg/dL | MI |
| FREE T4 INDEX (T7) | 2.7 | | 1.4-3.8 | |
| TSH | 2.85 | | mIU/L | MI |

> 20 YEARS: 0.40-5.50

FOR PREGNANT PATIENTS:
FIRST TRIMESTER 0.30-4.50
SECOND TRIMESTER 0.50-4.60
THIRD TRIMESTER 0.80-5.20

**PERFORMING LABORATORY INFORMATION**
MI QUEST DIAGNOSTICS-MIAMI, 10200 COMMERCE PARKWAY, MIRAMAR, FL 33025-3938, Laboratory Director: ANTHONY SIMONETTI, MD
CLIA: 10D0277334

FORBES,RANDALL - MI993787P

Page 2 - End of Report

Quest, Quest Diagnostics, the associated logo and all associated Quest Diagnostics marks are the trademarks of Quest Diagnostics. © Quest Diagnostics Incorporated. All rights reserved. QD1EXD-HTL Revised 5/04 SCIX - 140DS.

**Hernandez, John F.**

---

**From:**     Forbes, Randall V.

**Sent:**     Wednesday, May 09, 2007 5:47 PM

**To:**       Hernandez, John F.

**Subject:** from Randi Forbes our section was not given time and a half

Hi, How are you?

I'm just emailing to let you know that our section was not given time and a half in our torts exam today in the LCR starting at 8:30. We should have been done at 1pm but we were told 12:15.

This includes myself, Covington Campbell, and Andrew Ketterer (Section 3- torts- Prof. Silver)

Randall "Randi" Forbes
St. Thomas University School of Law
Juris Doctor Candidate 2009
(516) 776-4089
LaPrez00@aol.com
rvforbes@stu.edu



# Hernandez, John F.

| | |
|---|---|
| **From:** | Jackson, Janelle Latoya |
| **Sent:** | Wednesday, May 09, 2007 6:18 PM |
| **To:** | Forbes, Randall V. |
| **Cc:** | Hernandez, John F. |
| **Subject:** | RE: from Randi Forbes our section was not given time and a half |

Randall,

## **You were not cheated of your time for Professor Silver's Torts Exam.**

You should have noticed that # 4 on the Instruction page of the Exam Booklet said:
"You will have a total of two and a half hours to complete the entire exam."

Originally, Professor Silver said 3 hours, but then he contacted @ last minute to let me know it was changed to 21/2 hours and **this is why the time was re-calculated.**

Please check with me in the future, if you are unsure about anything.

Regards,


*JANELLE L. JACKSON, MBA*

**Assistant Registrar**

St. Thomas University School of Law

16401 NW 37th Ave.

Miami Gardens, FL 33054

Direct Line: 305-623-2361

Fax: 305-623-2344

jjackson@stu.edu




**From:** Hernandez, John F.
**Sent:** Wednesday, May 09, 2007 5:49 PM
**To:** Jackson, Janelle Latoya
**Subject:** FW: from Randi Forbes our section was not given time and a half

Do you know about this?



*Forbes; 445 724*                                                                    *petition for readmission*

## PETITION FOR READMISSION TO ST. THOMAS UNIVERSITY SCHOOL OF LAW

THIS PETITION MUST BE TYPED. ALL ACTIVITIES IN SUPPORTING THIS PETITION MUST BE ATTACHED HERETO. ALL REQUIREMENTS SET FORTH IN THE POLICIES AND PROCEDURES FOR PETITIONS FOR REMISSION ARE A PART HERE ELSE. FIVE COPIES OF THIS PETITION AND SUPPORTING DOCUMENTATION MUST BE FILED WITH THE ASSOCIATE DEAN FOR STUDENT AFFAIRS BY THE APPROPRIATE DEADLINE. PLEASE NOTE THAT THE BURDEN OF PROOF WITH REGARD TO ALL MATTERS RELATING TO THIS PETITION IS ON THE STUDENT.

**1. Name:** Randall Vanessa Forbes                    SS No.:
**Address:** 8788 SW 12th Street Apt. #204F  Miami, FL 33174
**Home Phone:** N/A   **Business:** N/A   **Cell Phone:** 516-776-4089

**2. List the dates of your attendance at St. Thomas University School of Law:**

August 2006-May 2007

If you have attended any other law school, with the name of the institution and the dates attended:
N/A.

**3. During or subsequent to your attendance at St. Thomas University school of Law; (i) where you subject to any disciplinary action at any college or university; (ii), where you charged with, arrested or convicted of a crime (excluding minor traffic violations); or (iii) have there been other unfavorable incidents in your life that might be considered to have a bearing on your character or fitness to enter the legal profession?**

No.

**4. Taking into account the Policies and Procedures for Petitions for Readmission, please state fully all the reasons why the committee should bring your petition in attachment to the petition. It is your responsibility to document all the facts relevant to your case. All supporting documentation must accompany this petition.**

_____                    _____
(Signature)                                                                                   (Date)

Academic Standing Committee:

I wish to be readmitted to the St. Thomas University School of Law. I am disappointed with the dismissal, yet undeterred. I also humbly request a personal hearing with the Academic Standing Committee ("Committee").

### ACADEMIC IMPROVEMENT

I am very close to the 2.0. I have shown academic improvement in the second semester from the first semester. My two lowest grades in the first semester were in contracts and property. In Contracts, I advanced two letter grades. In Property, I improved one letter grade. In Torts, I went up a half letter grade.

I have met with three out of four core professors (one of my professors is out of town) and have identified one major problem in my test taking ability. My main difficulty is with the multiple-choice sections of the final examinations.

My problem with Contracts is unique to that of the other subjects. Certainly the multiple choice section was more difficult for me than the essay portion but I also had difficulty with the essay portion. The problem that I had first semester was that in my enthusiasm to argue both sides, I inadvertently canceled out both arguments. In the second semester, I stopped short of arguing both sides so as not to cancel out both arguments and my grade improved. I believe in a contracts-type course, with multiple elements, I need to have a happy medium to further improve.

### PSYCHOLOGICAL DISABILITY- POST TRAUMATIC STRESS DISORDER (PTSD)

I was sexually assaulted in high school and raped in college. Sexual assault has such a pervasive nature in that it affects everything that one does oftentimes for the rest of that person's life. There was no "downtime" to process everything that had occurred. I always had school or something related to school to deal with. Most the time, I had to bury my emotions just to get by but they always manifested themselves in a variety of ways. There was a criminal trial of the two boys (both minors at the time) in high school and a civil trial against my high school that continued even after I graduated college. There were also expulsion proceedings. All of the actions just reopened old wounds. During my first year in college, I was date-raped (force but no drug was used). I was not emotionally strong enough to press charges but I did see a doctor a few days after the attack who examined me. I buried all of the emotions and was visibly "fine" to all those around me for about a year and then it all came flooding back causing me to get so physically



_p. 1 of 3_
_p. 4 of_

*Forbes; 445 724*                                                    *petition for readmission*

sick that I was unable to attend classes and had to withdraw from school in my second year. During that time I saw a psychologist and I felt better- I still was not up to my potential and truthfully speaking, I have never been the same person that I was prior to the attacks. Currently, as much as I hate to admit it, my recovery process has plateaued.

    The civil action was the worst experience of my life- worse than all of the attacks combined. I know that I should not say this to the Committee, being that he is one of your "brethren" but suffice it to say my lawyer was not a good one. Indeed, in my opinion, he is the reason that people oftentimes bemoan this profession. Granted things take time but my lawyer was rather passive to say the least. The action lasted six years and "discovery" lasted all six of those years. He only took action when either I or my mother called him. For six years, I had to relive the attacks again and again as "discovery" was simply another way that the other side brought me down. So even now, the attacks do not seem that long ago. With the subsequent attack coming into evidence, my lawyer could not prove liability or damages. But the subsequent attack only came into evidence in the last year of "discovery". It should not have been allowed to have gone on as long as it did.     It was settled "out of court" and the monetary amount was substantially less than what anyone had expected.

    Law school actually has helped with my recovery. Although my grades may not reflect it, I am learning a lot about the law. I realize now that the outcome of the civil action was not my fault. I had internalized that I did not have the "big win" because something was wrong with me. I believed that I must have done something to deserve the attacks. I know now that it was not because I did not deserve more but it was because the law was limited and could not give me what I truly deserved. The law is not a time machine. The only real solution would be to have gone back in time and perhaps made it so that I was not in school the day that I was attacked. No monetary amount would have set things right. I do not know what the doctor will say in her report but I can tell you myself that at this stage separation from law school would be detrimental (see *infra* re: loss). I think it would send me into a downward spiral and that possibility frightens me.

    Although law school has affected my recovery it has also been affected ==by my experience. I was diagnosed with post-traumatic stress disorder and it has manifested itself as a difficulty in focusing when I am reading or studying.==   In the report done by Liza Papazian, it mentions something about "rumination" over the slightest infractions. I constantly obsessively think about any "wrong" that someone does to me. Any wrong. It could be from the attacks to my roommate grabbing the shower before I did in the morning. It is not that I am just an "angry" person. Oddly enough, when I think about those things, I am not angry at all. But I do constantly think about things, over and over again. I have an extreme fear of loss. I think, in hindsight, that ==the attacks could have been prevented== so even the slightest infraction, in my mind, could lead to an even bigger infraction which could then lead to a huge loss. A lot of the time, those types of thoughts are stirring around in my head as I am reading or studying for a course. Additionally, sometimes I just get hung up on one particular issue of my outline or of the reading assignment and do not even realize that quite a lot of time as passed and I was only on one issue. For example, I could be thinking about the parol evidence rule. The actual "thinking" is sound: *'...Corbin and Williston have different views on parol evidence. The outcome of this case reflects the Corbin view of parol evidence. But if the court took the Williston view, the outcome would be different...'*   But I would repetitively think about it. The same thoughts were being repeated over and over again. I look up by chance and an hour has passed by and I have only completed fifteen minutes worth of material.

    During the examination period I was taking two prescriptions that helped but ==induced extreme fatigue as== my body was adjusting to the medication. I received a prescription for Setraline and Aprazolam from Dr. Verma at the Office of Dr. Michael Ross.     The pills were great for nerves and helping me to concentrate. However, the fatigue was overwhelming. For instance, I fell asleep standing up while holding a dinner plate and was awakened when the plate fell to the floor. I would often fall asleep while studying which does not permit full mastery of the material.

## SOLUTIONS
So I have outlined the problem. But I also have derived ways to solve the problems.
*ACTIONS TAKEN IN THE INTERVAL*

    From the time the grades came out and I was notified of the dismissal, I could not obtain an appointment with a new psychiatrist/psychologist before the June 1 deadline when this petition was to be submitted. But I do have an appointment scheduled on Saturday, June 2 at 10 am. I was told that the doctor will be able to make a letter available by June 6. I emailed over fifty mental health professionals

*p. 2 of 3*
*p. 5 of 10*

*Forbes; 445 724*                                                        *petition for readmission*

and have included those e-mails, accompanied with this petition. I have spoken to many of them via phone as well. Others have left messages. To reiterate, I am currently taking Sertraline (equivalent of Zoloft) for Depression. During the final exam period, I was taking Setraline and Aprazolam (for nerves). I also could not obtain a proper release form in such a short amount of time.

I sought out and found a tutor for both of the summer classes that I am taking. She is an alumni of St. Thomas University: Jessica Pacheco. Her style of tutoring is extremely helpful. I have organized a study schedule for myself- I found it easier to study when I have a set routine. I have also set academic goals for myself. I have "due dates" set of when I will master a given section of the material. Additionally, I have found that I have to recite the material aloud to "test" myself.

While I was seeing Liza Papazian, she implemented a controversial method of treatment called---- ------ (EMDR). This treatment uses a variety of methods and she tried many of the methods on me. The first two methods (the first method was tapping the middle of my palms and the second method snapping around either side of my head) did not work. Then she tried a CD. It worked wonders. I went from being suicidal to functioning. I have bought some of these CDs to listen to when I study. I already have one that helped this semester. I do not understand it. I just know that it helps. I listen to the CD with my head phones and  there are different rhythms and sounds in each ear. It allows me to focus more on the task at hand without all the distraction of the unrelated thoughts.

*PROPOSAL FOR CONDITIONAL READMISSION*

One thing I learned in Civil Procedure was the concept of "pleading in the alternative". I have also learned in Contracts that terms of a contracts dispute are  construed against drafter/offeror in a court of law. What I am proposing to the Committee is that if there is something in my proposal that does not sit well with the Committee that the it is unable to reconcile with the positive aspects mentioned in this petition, then perhaps the Committee could grant me a conditional readmission. I am taking two classes this summer-Criminal Procedure and Evidence. What I am proposing is conditional readmission contingent upon my earning a C or above in both of those classes. A potential counterargument to the conditional readmission based on those terms may be "well, Randi, that is a real gutsy proposition and we admire you for your courage in suggesting it but what does that really prove; that you could do well in summer courses- what about during the regular school year?" It is my contention that the demands of law school increase during the summer months due to the large amount of material to be covered in such an obvious constraint of time. If I can prove myself in summer school, I have confidence that I can continue the overall upward trend in my grades. I wanted to point out that I am taking a three credit course and a four credit course, respectively, by design. I am confident that I can succeed.

I thank the Committee for reviewing my application and I sincerely hope to receive a favorable decision.

Sincerely,
Ms. Randall Vanessa Forbes
r0663578
8788 SW 12th Street #204F
Miami, FL 33174
(516) 776-4089
LaPrez00@aol.com
rvforbes@stu.edu

p. 3 of
p. 6

**Hernandez, John F.**

| | |
|---|---|
| **From:** | Hernandez, John F. |
| **Sent:** | Friday, May 25, 2007 11:38 AM |
| **To:** | Forbes, Randall V. |
| **Subject:** | RE: from Randall "Randi" Forbes - need psychiatrist/psychologist |

Randi:
You can contact Sheryl Montour at smontour@stu.edu, she found someone to do it for around $1,800. Although she didn't follow up on it. She authorized me to have you contact her. She said she didn't have the information readily available to give to me and I didn't tell her who you were, if you would rather she not know. Since I'm going to Spain I thought it might be easier if you contact her directly.
John F. Hernandez

**From:** Forbes, Randall V.
**Sent:** Thu 5/24/2007 5:33 PM
**To:** Hernandez, John F.
**Subject:** RE: from Randall "Randi" Forbes - need psychiatrist/psychologist

Thanks so much for all your help! I really do appreciate it.

Randall Forbes
St. Thomas University School of Law
Juris Doctor Candidate 2009
(516) 776-4089
LaPrez00@aol.com
rvforbes@stu.edu

**From:** Hernandez, John F.
**Sent:** Thu 5/24/2007 1:47 PM
**To:** Forbes, Randall V.
**Subject:** RE: from Randall "Randi" Forbes - need psychiatrist/psychologist

I don't know exactly who does it at UM. I don't think it's through the school I think its someone associated with the University Medical center. I'll see if I can find out.

**From:** Forbes, Randall V.
**Sent:** Thursday, May 24, 2007 12:51 PM
**To:** Hernandez, John F.
**Subject:** RE: from Randall "Randi" Forbes - need psychiatrist/psychologist

Okay, Is there anyway I can get the UM people to do my testing? I'm an alum! So the testing is not covered by insurance? Yikes. So total it would be around $2.5K? Well, it's worth it- if I can get the accomodations. I wonder if they would be flexible with payments.

Randall "Randi" Forbes
St. Thomas University School of Law
Juris Doctor Candidate 2009
(516) 776-4089
LaPrez00@aol.com
rvforbes@stu.edu



DEFENDANT'S
EXHIBIT

**From:** Hernandez, John F.
**Sent:** Thu 5/24/2007 9:34 AM
**To:** Forbes, Randall V.
**Cc:** Mountain, Toni
**Subject:** RE: from Randall "Randi" Forbes - need psychiatrist/psychologist

Randi:
I sent your request to the head of student services at the University. However, I don't believe disability accomodation testing is covered by insurance. If you are going to seek accomodations, you should read through the Disability Accomodations handbook (you can get a copy from my assistant Carrol Hartley) to make sure you get the right kind of documentation. A diagnosis and/or prescription from a physician is *not sufficient* to document a learning disability. The documentation must include a battery of tests, the results, the professional's opinion regarding the disability and the professional's recommendations regarding *specific* accomodations (not general statements like "more time would be helpful"). The testing is quite expensive (around $2,500). I know of one doctor that has done a number for the law school, his name is Dr. Barry Crown. I don't have his phone number with me because I'm working from home right now. I'm not necessarily recommending him, I'm just giving you his name as a place to start. I believe there are some doctors at the University of Miami that do the testing at reduced costs but I'm not sure who they are or where they are located.
Documentation has to be submitted *well before* finals period BEGINS in order to get accomodations in that testing cycle.
If you have any other questions look at the booklet or let me know.
Good luck
John F. Hernandez

**From:** Forbes, Randall V.
**Sent:** Thu 5/24/2007 9:09 AM
**To:** Melville, Brenda
**Cc:** Hernandez, John F.
**Subject:** from Randall "Randi" Forbes - need psychiatrist/psychologist

Hi, I need to find a psychiatrist or psychologist in the area that takes the school's insurance ASAP:
STUDENT INSURANCE PROGRAM
Mid-West National Life Insurance Company of Tennessee

 . I need someone who will be able to write up something to give the school about my psychological disability. Could you please email me a list of 5-10 names (and phone numbers) or so. I called the network but their numbers are obsolete. I called up people in the area individually but the receptionists' "don't know" if they take my insurance.

Ms. Randall "Randi" Forbes
St. Thomas University School of Law
Juris Doctor Candidate 2009
(516) 776-4089
LaPres00@aol.com
rforbes@stu.edu

**DR. LYDIA KALSNER-SILVER**   Licensed Psychologist   FL PY6376

5151 Collins Ave, #223-5, Miami Beach, FL 33140, (305) 866-3579

June 4, 2007

Academic Standing Committee
St. Thomas University School
Of Law
16401 NW 37th Avenue
Miami Gardens, FL

Dear Sir or Madame:

Randall Forbes was seen for an initial evaluation on 6/2/07. She reports a range of symptoms that are consistent with an ongoing diagnosis of Post Traumatic Stress Disorder. As a result of two sexual assaults in high school and a rape in college, Ms. Forbes was exposed to a series of traumatic events which involved actual or threatened death or serious injury, and was a threat to her personal integrity. She is experiencing a range of symptoms consistent with a diagnosis Post Traumatic Stress disorder including disturbing dreams, an exaggerated startle response, and persistent feelings of increased arousal. The increased arousal has manifested itself in a difficulty concentrating, hyper vigilance and an exaggerated startle response. She also reports excessive rumination and intrusive thoughts.

Ms. Forbes also reports symptoms of depression which include feelings of hopelessness, and a difficulty sleeping. She is currently prescribed Setraline (an antidepressant) and Aprazolam (for anxiety) by her primary care physician. While the medication has helped to reduce Ms. Forbes's anxiety level, it has left her feeling extremely fatigued. All of these symptoms have no doubt had an adverse impact on Ms. Forbes's academic performance. Despite her emotional distress, Ms. Forbes has not received mental health counseling since terminating therapy over a year ago with Ms. Liza Papazian. She also reports that she has never been evaluated by a psychiatrist, which is essential, in my opinion, for tailoring medication to a patient's needs.

Ms. Forbes reports that she will be devastated if she is terminated from law school. She is highly invested in earning her law degree and she reports that it is the major motivating factor in her life. It is my recommendation that Ms. Forbes resume weekly individual therapy and be evaluated by a psychiatrist for ongoing medication management. With proper psychiatric care and ongoing counseling, it is my opinion that Ms. Forbes could potentially function more effectively as a law student.



Exhibit "A"

*Forbes; 445 724*                                          *June 7 rejection letter*

**From:** Dykas, Cecile L.
**Sent:** Thu 6/7/2007 9:22 AM
**To:** Forbes, Randall V.
**Cc:** Acebo, Iraida; Kelly, Peter T.
**Subject:** Academic Standing Decision

I regret to inform you that the Academic Standing Committee, at its hearings on June 6, 2007, denied your petition for readmission. Pursuant to the Policies and Procedures for Petitions for Readmission, this decision is final and there is no appeal available. You will be allowed to petition the committee again in two years. A petition will be considered only if the petitioner can still graduate no later than five years from the time of initial matriculation.

I am sorry that you are unable to continue your studies at St. Thomas. If you are currently enrolled in Summer school courses you will be withdrawn from those courses and you will not be charged. If you have any questions, please feel free to contact Peter Kelly.

Cece Dykas

Associate Dean for Academic Affairs

St. Thomas University School of Law

16401 NW 37th Avenue

Miami Gardens, Florida 33054

(305)623-2381

(305)623-2397 Fax



EXHIBIT
19