UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

07-22502-CIV-HOEVELER

RANDALL VANESSA FORBES,

    Plaintiff,

v.

ST. THOMAS UNIVERSITY, INC.,

    Defendant.
_____/

## ORDER DENYING SUMMARY JUDGMENT

Before the Court is St. Thomas University's motion for summary judgment. The motion is fully briefed and the Court heard oral arguments in Chambers on June 18, 2010. For the reasons that follow, the motion is denied.

### Background

In her suit, the plaintiff, Randall Vanessa Forbes, claims that St. Thomas University Law School failed to make reasonable accommodations for her disability, in violation of Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, *et. seq.*, and Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. §§ 701, *et. seq.* The facts of the case are basically

1

undisputed.[1] Ms. Forbes was raped and sexually assaulted in high school and again at the University of Miami. She claims to suffer from post traumatic stress disorder (PTSD), which causes panic attacks, anxiety, depression, and other symptoms that affect her ability to study, concentrate, participate in classroom discussions, and take exams. Because of her disability, she was given test-taking accommodations at the University of Miami, including fifty percent extra time to finish exams ("time-and-a-half") and a private exam room. Forbes graduated college with a 3.4 grade point average and enrolled in St. Thomas University Law School in 2006. In November of her first semester, she claims she informally asked faculty members and secretaries within the student affairs office for information about disability accommodations. She eventually spoke with John Hernandez, assistant dean for student affairs, who said it was too late in the semester to discuss test-taking accommodations since it was nearly finals week. (Forbes does not deny that her efforts to obtain accommodations for the first semester were late and informal.) She took her exams and earned a 1.7 GPA. On January 4, 2007, Dean Hernandez advised Forbes that she was being placed on academic probation because of her grades, warning her that failure to achieve a cumulative GPA of 2.0 by the end of spring semester would result in her automatic expulsion from

---

[1] The entire factual record consists of the transcript and several exhibits from Ms. Forbes's deposition.

the law school.

In January and February of 2007, Forbes wrote emails and met with Dean Hernandez to discuss, among other things, test-taking accommodations for the second semester. At their meeting on February 2, the dean allegedly agreed "it would be fine" for Forbes to receive "time and a half and the separate isolated testing location because [Forbes] got [those] before [from the University of Miami]." Forbes Dep. Vol. I at 134, July 15, 2009, ECF No. 57-1. According to Forbes, their oral agreement was that (1) Forbes would be required to provide medical documentation of her learning disability only if she sought accommodations above and beyond what the University of Miami provided, (2) there was no deadline for her to submit this medical information, and (3) Dean Hernandez promised to accommodate Forbes in the second semester with time-and-a-half and a private exam room even without medical documentation. Forbes's deposition testimony about the February 2 meeting partially conflicts with her comments from an April 17, 2007 email to Dean Hernandez:

> Toward the beginning of the semester, if you recall, we met [on February 2] in your office and among other things we discussed the special accommodations that I received during my undergraduate experience at the University of Miami. You said that if you could see a document that details my accommodations that perhaps then you would allow me to temporarily have the same accommodations this semester and then we would later discuss how to make those accommodations becoming [sic] permanent later down the line. I was analyzed several years

3

> ago and getting a new test is extremely
> expensive, perhaps even more expensive than it
> was then. Well [the University of Miami]
> finally scanned and emailed the information
> [about the testing accommodations I received
> in college].

Forbes Dep. Vol I, Ex. 6, ECF No. 57-1. Thus, notwithstanding

Forbes's testimony to the contrary, the evidence shows that in

their first meeting Dean Hernandez did not promise to provide the

same accommodations Forbes received in college; rather, he said he

would consider it. In any event, in March 2007 Forbes met with Dr.

Gisondo (a St. Thomas University psychologist Dean Hernandez

recommended), but all he could offer at the time was a referral for

Forbes to see a specialist. Dr. Gisondo planned to email the

referral to Forbes in a few days but Forbes never heard back.

Forbes Dep. Vol. I at 137. She followed up with Dr. Gisondo's

office in April only to learn that he no longer worked at the

university. Id. at 138. When Forbes met with Dean Hernandez in

April to explain what happened, she claims he ultimately agreed to

unconditionally provide her with a private testing room and time-

and-a-half. On April 23, 2007, Forbes received several emails from

Janelle Jackson, the assistant registrar, stating that Forbes would

receive "Time ½" and a room with "Ltd. Distraction" for each exam.

Between May 2 and May 11, Forbes took examinations in contracts,

civil procedure, torts, and property. For each exam, she was given

fifty percent extra time and was allowed to take the exam in a

*semi-private* room along with a proctor and three or four other

4

students with disabilities.[2] Forbes's grades were all Cs and one C+, giving her a 2.1 GPA for the spring semester. Unfortunately the improvement was not enough to offset her first semester grades, and her overall GPA ended up at 1.87. As a result, Forbes was dismissed from the law school at the end of the spring semester for having a cumulative GPA below 2.0.

Forbes exercised her option to appeal the dismissal and requested a hearing before the Academic Standing Committee, which was scheduled for June 6. In her written submission to the Committee, Forbes asked to remain at the law school on the condition that she sufficiently raise her cumulative GPA during the summer semester, during which she was taking classes in evidence and criminal procedure. Additionally, on May 24 Forbes emailed Dean Hernandez asking for a referral to a "psychiatrist or psychologist

---

[2] Forbes claims she called Ms. Jackson before her first exam to confirm she would receive a private testing room, and Ms. Jackson responded that Forbes was "getting everything that [she] asked for." In fact, Forbes took the tests in a proctored, *semi-private* room with other students. She didn't complain until weeks later, when she received her grades. She submits that she didn't complain sooner because she was too busy studying and it would have been futile because Dean Hernandez had a history of lying and dishonesty. But in fact Forbes emailed Dean Hernandez during finals week after her torts exam, because she believed (incorrectly) she and two other students in her exam room were denied time-and-a-half. Why didn't Forbes object to the exam room conditions in the same email? She "felt like [the dean] would just lie again." Forbes Dep. Vol. II at 182, 222. In reality, there is no evidence that Dean Hernandez ever "lied" to Forbes. He seemed to take all of her requests seriously and make genuine efforts to keep her on track. So far as it appears, the reason Forbes did not complain about the exam room during finals is that she was complacent, until she got her grades.

in the area [who] takes the school's insurance" so that the doctor could "write up something to give to the school about my psychological disability." Ex. 7 to Forbes Dep. Vol. II, ECF No. 58-1. Dean Hernandez responded the same day:

> I don't believe disability accommodation testing is covered by insurance. If you are going to seek accommodations, you should read through the Disability Accommodations handbook (you can get a copy from my assistant Carroll Hartley) to make sure you get the right kind of documentation. A diagnosis and/or prescription from a physician is **not sufficient** to document a learning disability. The documentation must include a battery of tests, the results, the professional's opinion regarding the disability and the professional's recommendations regarding **specific** accommodations (not general statements like, "more time would be helpful"). The testing is quite expensive (around $2,500). Documentation has to be submitted **well before** finals period BEGINS in order to get accommodations in that testing cycle.

Id. (alterations in original). Forbes ultimately retained a psychologist, Dr. Kalsner-Silver, to evaluate her for PTSD. Dr. Kalsner-Silver met with Forbes one time and prepared a two-page report that Forbes submitted to the Committee. The report stated that Forbes showed signs of PTSD and with proper treatment she might function more effectively as a law student.[3] The report did

---

[3] Forbes admitted at her deposition that Dr. Kalsner-Silver did not test for learning disabilities and, in fact, Forbes had never been tested for learning disabilities. When Forbes was asked how she knew she suffered from a learning disability, she responded, "[b]ecause my therapist tells me all this stuff is consistent with post-traumatic stress disorder." Forbes Dep. Vol. II at 257.

not explain how Forbes's PTSD specifically related to her learning disabilities, nor did the report include recommendations for accommodations.

The Committee held the hearing on June 6, 2007 and denied Forbes's petition for readmission. Cece Dykas, the associate dean of academic affairs, notified Forbes of the decision by email the next day. The Committee never explained orally or in writing why Forbes's petition was denied, but Ms. Dykas's email indicated Forbes could contact Peter Kelly for further information, if she wished. Forbes had a meeting with Mr. Kelly at the law school on June 12, during which he allegedly "blurted out" that Forbes was dismissed: "[b]ecause of your disability, because you were raped, we think that you can't handle [course material] in classes like [criminal procedure and criminal law]." Forbes Dep. Vol. II at 285. Kelly added that "[b]y asking for accommodations, we think that you're trying to get people to feel sorry for you." Id.

Forbes filed suit September 24, 2007, and filed her third amended complaint on May 7, 2008. Viewing the allegations in the complaint in a light favorable to Forbes, she advances two theories as to how St. Thomas University failed to accommodate her PTSD: first, the law school did not provide her with a private exam room for the second semester, as Forbes allegedly requested; second, the Academic Standing Committee did not give Forbes an exception or reprieve from the 2.0 GPA requirement after her first year, even

7

though Forbes showed she was able to meet the law school's GPA requirement with reasonable testing accommodations.

## I. Legal standard

Rule 56(c) of the Federal Rules of Civil Procedure instructs that summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The burden of establishing the absence of a genuine issue of material fact lies with the moving party. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The Court should not grant summary judgment unless it is clear that a trial is unnecessary, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986), and any doubts in this regard should be resolved against the moving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).

## II. Analysis

Disability discrimination claims under the ADA and Section 504 are subject to a similar legal analysis, Wilborne v. Forsyth County Sch. Dist., 306 Fed. Appx. 473, 476 (11th Cir. 2009), because both statutes are generally construed to impose the same legal requirements. See Baird ex rel. Baird v. Rose, 192 F.3d 462, 468 (4th Cir. 1999). An ADA discrimination claim can be based on either a conventional "disparate treatment" theory, or a theory that the

defendant failed to make "reasonable accommodations," or both. Disparate treatment involves discriminatory intent and occurs when a disabled person is singled out for disadvantage because of her disability. By contrast, a failure to make reasonable accommodations claim requires no animus and occurs when a covered entity breaches its affirmative duty to reasonably accommodate the known physical or mental limitations of an otherwise qualified person. This is because the ADA not only protects against disparate treatment, "it also creates an affirmative duty in some circumstances to provide special, preferred treatment, or 'reasonable accommodation.'" Henrietta D. v. Bloomberg, 331 F.3d 261, 275-276 (2nd Cir. 2003) (quoting Dunlap v. Ass'n of Bay Area Gov'ts, 996 F. Supp. 962, 965 (N.D. Cal. 1998)). It is clear from Forbes's complaint and summary judgment submissions that her claim concerns St. Thomas's failure to reasonably accommodate her learning impairments.

To present a valid cause of action, Forbes must show that she: (1) is disabled; (2) is a "qualified individual"; and (3) was subjected to unlawful discrimination because of the disability. Holly v. Clairson Industries, L.L.C., 492 F.3d 1247, 1256 (11th Cir. 2007). The "qualified individual" aspect of Forbes's claim is not genuinely disputed.[4] Under the ADA a person is a qualified

---

[4]Title III of the ADA states that "[n]o individual shall be discriminated against on the basis of a disability in the full and equal enjoyment of the goods, services, facilities, privileges,

9

individual if she is "an individual who, with or without reasonable accommodation, can perform the essential functions or meet the essential requirements of the program in which [she] participates or in which [she] desires to participate.'" Meisenhelder v. Fla. Coastal Sch. of Law, Inc., 2010 WL 2028089 at *3 (M.D. Fla. 2010) (quoting Ellis v. Morehouse Sch. of Med., 925 F. Supp. 1529, 1540 (N.D. Ga. 1996)). Forbes took her second semester exams with the benefit of time-and-a-half and limited distraction, accommodations which St. Thomas viewed as reasonable.[5] With these accommodations, her spring semester GPA was above the law school's academic minimum. Forbes has made a prima facie case that she can indeed "meet the essential requirements required to remain a student in good standing despite her disability, or, can meet the essential functions as a student with a reasonable accommodation for her disability." Meisenhelder, 2010 WL 2028089 at *3 (internal

---

advantages, or accommodations of any place of public accommodation. . . ." 42 U.S.C. § 12182(a). Notably, Title III does not contain the phrase "otherwise qualified" or "qualified individual." However, such phrases are in Titles I and II, as well as in the Rehabilitation Act, and courts have read an equivalent requirement into Title III. See, e.g., Mershon v. St. Louis Univ., 442 F.3d 1069, 1076 (8th Cir. 2006); Bercovitch v. Baldwin Sch., Inc., 133 F.3d 141, 154 (1st Cir. 1998).

[5]The fact that St. Thomas allowed Forbes (along with several other law students) to take exams with these benefits demonstrates that the accommodations did not impose an undue burden to the law school or undermine the school's teaching goals. Further, it appears that Dean Hernandez was at least provisionally satisfied Forbes qualified for those testing accommodations.

quotations and alterations omitted); <u>see also</u> <u>Murphy v. Franklin</u> <u>Pierce Law Center</u>, 1995 WL 325791 at *3 (1st Cir. 1995) (unpublished) (to be "otherwise qualified" under Section 504, student must show "she was capable of satisfying the academic and technical requirements set by the Law Center with the help of reasonable accommodations") (<u>citing</u> <u>McGregor v. La. State Univ. Bd.</u> <u>of Supervisors</u>, 3 F.3d 850, 855 (5th Cir. 1993)). The issues, thus winnowed, are whether Forbes was disabled and, if so, whether St. Thomas reasonably accommodated her disability.

1. **Was Forbes disabled?**

Not all impairments automatically qualify individuals for protection under federal disabilities law. The ADA defines "disability" as: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1) (2009).[6] To prevail in her ADA claim, Forbes must show that her disability is one that is recognized under the statute and that the impairment restricts important life activities in comparison to most people. <u>Gonzales v. Nat. Bd. of Med. Exam'rs</u>, 225 F.3d 620,

---

[6] Before the ADA Amendments Act (ADAAA) became effective January 1, 2009, "disability" was defined in Subsection (2) of § 12102 instead of Subsection (1). Although the amended version of § 12102 adds new provisions clarifying the definition of "disability" in subsections (2), (3), and (4), the language quoted above was not affected. <u>See</u> footnote 7, <u>infra</u>.

11

627 (6th Cir. 2000). This analysis can be broken down into three parts. First, Forbes must show that she suffers from a physical or mental impairment. Second, the Court must evaluate the facts concerning Forbes's life activities affected by her impairment to determine if they constitute a "major" life activity. If so, the Court thirdly fuses the first two parts and asks whether the plaintiff's impairment substantially limits a major life activity. See Rossbach v. City of Miami, 371 F.3d 1354, 1357 (11th Cir. 2004); Singh v. Geo. Wash. Univ. Sch. of Med., 508 F.3d 1097, 1100 (D.C. Cir. 2007).

The fist part is not seriously contested because St. Thomas agrees that PTSD is a mental impairment. Under step two, however, St. Thomas submits that the only "life activity" affected by Forbes's PTSD is her ability to take tests, which is not a "major" life activity. See Singh, 508 F.3d at 1104. St. Thomas is correct that standing alone a diagnosis of PTSD is not enough; Forbes must go further and demonstrate that her PTSD substantially affects activities that are so fundamental they can be considered "major" life activities. See Hamilton v. Southwestern Bell Tel. Co., 136 F.3d 1047, 1050 (5th Cir. 1998) ("PTSD . . . standing alone, is not necessarily a disability contemplated by the ADA"); Adams v. Autozoners, Inc., 1999 WL 744039 at *3 (E.D. La. 1999) ("[p]laintiff must also show that [PTSD] limited one of his major life functions."). The phrase "major life activities" means

important functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working. Cash v. Smith, 231 F.3d 1301, 1305 (11th Cir. 2000).[7] St. Thomas argues that Forbes's PTSD only limits her ability to take exams (as opposed to classroom study or learning in general). Forbes has indeed expressed that test-taking is the activity most critically affected by PTSD. This is not surprising, nor fatal to her claim. Students with learning disabilities will often cite "test-taking" as one of their most problematic areas, in part because exams determine grades and grades disproportionally affect a student's perception of success or failure. In the exam room, the stakes are highest and the disadvantages associated with learning disabilities may be amplified. Concentration or reading problems in the library translate into longer hours toiling in the library; a

---

[7] All of the conduct alleged in the plaintiff's complaint occurred in 2007, well before the ADAAA. Under the ADAAA, Congress made it easier for plaintiffs to establish their disability by, among other things, adding examples of what constitutes a "major life activity" under the statute, such as "learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A) (2009). The plaintiff has not argued that the ADAAA applies retroactively and a number of courts have held that it does not. See EEOC v. Agro Distribution LLC, 555 F.3d 462, 469 n. 8 (5th Cir. 2009); Lytes v. D.C. Water & Sewer Auth., 572 F.3d 936, 940-42 (D.C. Cir. 2009); Milholland v. Sumner County Bd. of Educ., 569 F.3d 562, 565-66 (6th Cir. 2009). Although the Eleventh Circuit has not squarely confronted the issue, see Shannon v. Postmaster Gen., 2009 WL 1598442 at *2 n. 5 (11th Cir. June 9, 2009) (noting the absence of an Eleventh Circuit published opinion on the issue), district courts in Florida have held the ADAAA does not apply retroactively. See, e.g., Lawson v. Plantation Gen. Hosp., L.P., 2010 WL 1258058 at *12-14 (S.D. Fla. 2010).

panic attack in the classroom means missing part of the lecture. In the examination room, however, the same impairments can be detrimental. As a result, for Forbes along with many disabled students, "test-taking" emerges as the area in which the manifestations of a mental impairment seem most acute (and perhaps most easily accommodated), even though the disability may pose a comparable obstacle in the library, lecture hall, or study group. In any event, although Forbes complains most about test-taking, she also sought accommodations for classroom activities, including permission to digitally record lectures and to be given advanced notice when the professor planned to discuss issues of rape or call on her during class. Forbes's description of her limitation was also not specifically related to test-taking:

> I was agitated and had problems focusing. I couldn't even read a book. I had some kind of sleeping problems. I had anxiety problems. I had even speech problems a little bit. Like I got nervous, I didn't want to talk over the phone. I needed--I didn't really go anywhere unless my parents made me go. I hate to admit it, but I had hygiene problems. . . . [and] [r]eally just the concentration. Oh, and eating issues.

Forbes Dep. Vol I at 45-46. She later elaborated on the concentration problems she has experienced since college:

> It's hard to concentrate on things. Like stuff like a book, like you can't read a novel. Especially--when I say you can't read a novel, like it's cumulative. Like you have to keep going back to the front part to see what happened in the end. It wouldn't make sense to you. It's also accompanied with anxiety.

14

Id. at 60. Forbes also testified about memory retention problems from the PTSD, panic attacks, depression, and feelings of discomfort or anxiety when proctors walked behind her in the exam room. She described one episode during her civil procedure exam when a proctor walked behind her and appeared beside her desk, causing a startle response and a twenty-minute panic attack due to PTSD. See Forbes Dep. Vol. II at 189-193. Forbes claims she explained these difficulties in her meetings with the dean. At one point during her second semester, a fellow student called an ambulance when Forbes suffered a panic attack in the school's hallway. Clearly, Forbes's alleged PTSD-related problems limit her abilities both inside and outside the exam room. On the present record, the Court is satisfied that Forbes has at least raised a material factual dispute about whether her PTSD substantially limits her learning, which is a major life activity under the statute, see Singh, 508 F.3d at 1104-1105, or that she was "regarded as" having such an impairment under § 12102(1)(C).[8]   The

---

[8] The Court notes that Forbes claims Peter Kelly told her she was dismissed because the law school felt she was unable to handle certain course material "[b]ecause of [her] disability, because [she was] raped," raising factual disputes about whether Forbes was "regarded as" disabled (whether or not she was in fact). Under the ADAAA, a person is "regarded as having [] an impairment" under § 12102(C) if she "establishes that [she] has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment *whether or not* the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A) (emphasis added). Under this provision, a person is "disabled" under the ADA even if her impairment (actual or perceived) is perceived to limit only *non-major* life activities.

Court will now address whether St. Thomas was required to give Forbes the accommodations she requested.

## 2.   Did St. Thomas provide reasonable accommodations?

Courts have long faced disputes between disabled students (or potential students) and academic institutions about whether a school is required to modify academic requirements. In the academic setting, "reasonable accommodations" jurisprudence contemplates an interactive process between the student and school, under which both sides have a responsibility to bring the issue of reasonable accommodations front and center. The initial burden is on the student, who must identify her disability and make a case for specific accommodations. See Stern v. Univ. of Osteopathic Med. and Health Sci., 220 F.3d 906 (8th Cir. 2000); see also Taylor v. Principal Fin. Group, Inc., 93 F.3d 155, 165 (5th Cir. 1996) (where either disability or necessary accommodations "are not open, obvious, and apparent, the initial burden rests primarily on the

This is a departure from the Supreme Court's prior interpretation of the "regarded as" prong in Sutton v. United Air Lines, Inc., 527 U.S. 471, 490 (1999) ("An employer runs afoul of the ADA when it makes an employment decision based on a physical or mental impairment, real or imagined, *that is regarded as substantially limiting a major life activity*.") (emphasis added); see also Hilburn v. Murata Elecs. North America, Inc., 181 F.3d 1220, 1230 (11th Cir. 1999) ("[a]s with actual disabilities, a perceived impairment must be believed to substantially limit a major life activity of the individual"). At least one Circuit specifically addressed the retroactivity of the 2008 expansion of the "regarded as" prong, and held that this aspect of the ADAAA is also not retroactive. See Milholland v. Sumner County Bd. of Educ., 569 F.3d 562, 566-567 (6th Cir. 2009). This Court agrees. See footnote 7, supra.

16

[individual] to specifically identify the disability. . . and to suggest the reasonable accommodations"). Then the school is required to consider the request and make a reasoned decision to grant or deny it. Because academic faculties have a special understanding about which aspects of the educational experience can be modified, a school's decision about accommodations will be upheld unless it is plainly not based on professional judgment. Here, St. Thomas makes two arguments about reasonable accommodations. The first is that Forbes never made a proper request for accommodations; the second is that, even if she did, her request was unreasonable.

### a.  Did Forbes request accommodations?

St. Thomas contends that Forbes never made a proper request for testing accommodations, because she ignored the school's written procedures for requesting accommodations and she never provided medical documentation about her learning disabilities. Although a disabled student's disregard of written procedures can certainly be fatal to her subsequent discrimination claim, St. Thomas has not yet proven this is such a case. In its summary judgment papers, St. Thomas makes references to a special student handbook that dictates the proper procedure for seeking accommodations. However, the handbook is not in evidence and the Court has no information about what the handbook says or which of the law school's procedures Forbes violated. In fact, the only

17

record evidence about St. Thomas's accommodation procedures comes from the plaintiff's deposition testimony. According to her, she did everything Dean Hernandez asked her to do. Her unrebutted testimony was that Dean Hernandez eventually promised to provide the same accommodations she received at the University of Miami--i.e., time-and-a-half and a private room--and that these accommodations were not made contingent upon Forbes's submission of medical information.[9] Thus, viewing the evidence in a light favorable to Forbes, she presented her request for testing accommodations in an appropriate manner. Put differently, there is no evidence of record that she disregarded instructions from Dean Hernandez such that her accommodations request could be rejected for that reason alone.

Next, St. Thomas argues that when Forbes petitioned the Academic Standing Committee, she never suggested her poor grades were the result of being denied a private exam room.[10] This contention seems to overlook an important point. So far as it

---

[9] It was only if Forbes wanted *additional* benefits (such as classroom accommodations and extended test breaks) that she would have to visit a disability specialist, at least according to Forbes. This version of the facts might be countered and disproved once St. Thomas submits evidence from the school officials involved.

[10] Prior to the hearing, Forbes allegedly met with a Committee member to discuss her presentation strategy. He allegedly advised her not to talk about being denied accommodations, because it would seem like she was trying to blame her poor grades on Dean Hernandez, who was also a Committee member.

appears, Forbes's petition for readmission was *itself* a request for an ADA accommodation. Specifically, it was a request to be excused from the 2.0 GPA requirement. The Committee knew the pertinent facts of Forbes's ordeal: She claimed learning disabilities as a result of PTSD; she informally sought accommodations in the fall semester but her request was too late; in the spring, she sought and was granted testing accommodations and her grades improved to an acceptable level, even though her cumulative GPA was still too low. The pertinent accommodation she requested at the hearing was conditional readmission so she could improve her grades over the summer semester.

Thus, based on the present record, there are sufficient (and so far, unrebutted) facts for a jury to conclude that Forbes identified her disabilities and presented a case to St. Thomas for specific accommodations in the form of: (1) a private testing room, and (2) an exception to the 2.0 GPA requirement. The Court may eventually be persuaded that Forbes failed to seek these accommodations in the proper manner and/or never proved her disability. But right now it is impossible to reach this conclusion, because the record contains no statements from St. Thomas employees involved in denying Forbes's requests. Cf. Krolik v. Nat. Bd. of Med. Exam'rs, 276 Fed. Appx. 594, 594-595 (9th Cir. 2008) ("Indeed, the record establishes that the reason that the [National Board of Medical Examiners ("NBME")] denied Krolik's

19

request for accommodations was precisely because it concluded that he did not have any such impairment. In its denial, the NBME explained to Krolik that 'the documentation submitted with your request for accommodation does not adequately support an ADHD diagnosis or the existence of a disability.'").

**b.   Were Forbes's requests unreasonable?**

Assuming for now that Forbes was disabled and she adequately presented her accommodation requests through the correct channels, St. Thomas nevertheless argues the school was not required to grant her requests because they were unreasonable. Federal law obviously does not require a university to provide every accommodation that might help a disabled student perform better. Schools need only provide accommodations that they deem reasonable. See Southeastern Comm. Coll. v. Davis, 442 U.S. 297, 413 (1979) (anti-discrimination laws to not require "an educational institution to lower or to effect substantial modifications of standards to accommodate a handicapped person"). Given the specialized nature of the academic environment, it is settled that courts "should only reluctantly intervene in academic decisions." Kaltenberger v. Ohio Coll. of Podiatric Med., 162 F.3d 432, 437 (6th Cir. 1998) (internal citation omitted). The Supreme Court instructs that when reviewing the substance of academic decisions, courts "should show great respect for the faculty's professional judgment." Regents of Univ. of Mich. v. Ewing, 474 U.S. 214, 225 (1985). It is equally clear

20

that "[u]niversity faculties must have the widest range of discretion in making judgments as to academic performance of students. . . ." Id. at 225 n. 11 (internal citation omitted). Nevertheless, judicial deference to the academic decisions is not absolute, as deference only attaches to decisions evincing some amount of reasoned consideration or professional judgment. In Wynne v. Tufts Univ. Sch. of Med., 932 F.2d 19 (1st Cir. 1991), the First Circuit Court of Appeals considered whether the dismissal of a dyslexic medical student violated the Rehabilitation Act in light of the student's claim that allowing for testing in a manner other than multiple-choice exams was a reasonable accommodation that would have allowed him to remain as a medical student. Id. at 22. Tufts submitted an affidavit of its dean indicating that it was the judgment of the medical educators that the skills required for the practice of medicine are best tested by multiple-choice exams. Id. at 27. The First Circuit held that this affidavit alone did not constitute sufficient evidence to entitle Tufts to summary judgment on the plaintiff's disability discrimination claim.[11] The case was

---

[11] Chief Judge (now Supreme Court Justice) Breyer disagreed and would have accepted the single affidavit as a sufficient basis to find that the medical school complied with the Act. In his dissent, Justice Breyer noted that "[f]irst, Mr. Wynne's particular disability, a psychological learning disadvantage, is closely related to the kind of characteristic, namely an inability to learn to become a good doctor, to which Tufts reasonably, and lawfully, need not 'accommodate.'" Wynne, 932 F.2d at 30-31. Justice Breyer cautioned against "applying reasonable-sounding legal standards in a way that, as a practical matter, would force universities to produce the kinds of proofs that seem to appeal especially to

remanded and Tufts later filed a second summary judgment motion, accompanied by six new affidavits. Id. at 793. The district court granted summary judgment in favor of Tufts and the plaintiff again appealed. In Wynne v. Tufts Univ. Sch. of Med., 976 F.2d 791 (1st Cir. 1992) ("Wynne II"), the court affirmed the entry of summary judgment because the new affidavits demonstrated Tufts reached a "rationally justifiable conclusion that accommodating the plaintiff would lower academic standards or otherwise unduly affect its program." Id. at 793. The panel wrote that:

> Tufts demythologized the institutional thought
> processes leading to its determination that it
> could not deviate from its wonted format to
> accommodate Wynne's professed disability....
> To be sure, Tufts' explanations, though
> plausible, are not necessarily ironclad. . . .
> But, the point is not whether a medical school
> is "right" or "wrong" in making program-
> related decisions. Such absolutes rarely apply
> in the context of subjective decisionmaking,
> particularly in a scholastic setting. The
> point is that Tufts, after undertaking a
> diligent assessment of the available options,
> felt itself obliged to make "a professional,
> academic judgment that [a] reasonable
> accommodation [was] simply not available."
> Wynne, 932 F.2d at 27-28. Phrased another way,
> Tufts decided, rationally if not inevitably,
> that no further accommodation could be made
> without imposing an undue (and injurious)

---

courts--'hard' evidence, tests of tests, statistical studies--for to do this is to take a basic educational decision away from those who may know the most about it, teachers using their own subjective judgment and experience, and to place it in the hands of those (say, lawyers) who will have to defend an academic decision in court." Id. The Court will be mindful of Justice Breyer's insights once St. Thomas supplements the record.

hardship on the academic program.

Id. at 795. In sum, Mr. Wynne's request for accommodation challenged the faculty's assumption that multiple choice exams were necessary to train medical students, and the First Circuit concluded that this kind of challenge logically called for some rumination by Tufts about its testing methods. The court of appeals found that one affidavit explaining Tufts's reasoning was not enough, but seven affidavits were ample. In the present case, Forbes challenges the school's denial of her requests to take tests alone and for an exception to the minimum GPA policy. Certainly, St. Thomas need not convene a blue-ribbon panel of experts to ruminate about why students are not permitted to take exams alone. Perhaps there are too few exam rooms, or perhaps the school is concerned about cheating.[12] More fundamentally, St. Thomas might rightly believe that offering private tests would alter an important aspect of legal education. Myriad rationales could demonstrate St. Thomas came to a justifiable conclusion. Likewise, although St. Thomas need not fundamentally re-evaluate its minimum GPA requirement each time a disabled student seeks an exemption, Forbes is at least entitled to some explanation why her request for an accommodation was denied, particularly in light of Peter Kelly's alleged comments from the June 12 meeting. Counsel for St. Thomas

---

[12]Though whatever St. Thomas's explanation, it must hold water. For example, a "cheating" rationale might be inapplicable for "open book" exams, and so forth.

instead argues:

> [S]tandards for continued enrollment [in St. Thomas Law
> School] were based on a specific, recognizable benchmark:
> maintaining a grade point average of 2.0--which Forbes
> also failed to do. St. Thomas did not change its
> standards for Forbes, nor would it have been reasonable
> to have expected it to do so *even if* Forbes had a
> documented disability.

As the Court noted earlier, however, if Dean Hernandez did not

regard Forbes as having a disability (or was not satisfied she

properly documented a disability) for which accommodations were

required, St. Thomas must say so by submitting an affidavit or

other competent evidence. The Court cannot ignore the fact that

Dean Hernandez *did* provide accommodations, and with them Forbes

earned a 2.1 GPA. If she was statutorily entitled to those

accommodations, then St. Thomas cannot instinctively invoke the

"across-the-board" 2.0 GPA requirement as the only basis for

Forbes's dismissal because her cumulative GPA was affected by her

first semester grades. Rather, the school must take into account

Forbes's performance with reasonable accommodations in the second

semester and make an individual assessment about the 2.0 GPA

requirement. Even then, the Court expresses no opinion about

whether St. Thomas would be required to give Forbes a second

chance. But given the state of the factual record, St. Thomas

cannot prevail on summary judgment unless the school explains what

it took into account and how it reached its decision. In short, the

Court cannot defer to St. Thomas's academic judgment without at

least some evidence the school denied Forbes's requests based on a rational belief that no further accommodation could be made without imposing a hardship on the academic program. Accordingly, it is hereby

**ORDERED AND ADJUDGED:** St. Thomas's motion for summary judgment is denied, without prejudice. St. Thomas may file a renewed motion for summary judgment within 45 days with additional evidence in support of its positions.

**DONE AND ORDERED** in Miami, Florida, September 30, 2010.

WILLIAM M. HOEVELER
SENIOR UNITED STATES DISTRICT JUDGE