Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.:  07-22502 - CIV HOEVELER
MAGISTRATE JUDGE BROWN


RANDALL VANESSA FORBES,          )
                                 )
                  Plaintiff,     )
                                 )
vs.                              )
                                 )
ST. THOMAS UNIVERSITY, INC.,     )
                                 )
                  Defendant.     )
------------------------------X



                              155 South Miami Avenue
                              Suite 210
                              Miami, Florida
                              Friday, February 27, 2009
                              10:30 a.m.







                    DEPOSITION

                         OF

              JOHN F. HERNANDEZ

```
 1    APPEARANCES:

 2

 3          On behalf of the Plaintiff:
                PHILLIPS LANIER
                One Biscayne Tower
 4              2 South Biscayne Boulevard
                PH #3800
 5              Miami, Florida  33131
                (305) 350-5299
 6              By:  EMILY PHILLIPS, ESQ.

 7

 8          On behalf of the Defendant:
                GAEBE, MULLEN, ANTONELLI, ESCO & DIMATTEO
                420 South Dixie Highway
 9              Third Floor
                Coral Gables, Florida  33146
10              (305) 667-0223
                By:  MAXIMO A. SANTIAGO, ESQ.

11

12          On behalf of the Defendant:
                J. PATRICK FITZGERALD, P.A.
13              110 Merrick Way
                Suite 3-B
14              Coral Gables, Florida  33134
                (305) 443-9162
15              By:  ROBERTO J. DIAZ, ESQ.

16

      ALSO PRESENT:
17
                Randall Vanessa Forbes
18

19

20

21

22

23

24

25
```

Page 3

1                          I N D E X

2     WITNESS                                    PAGE

3     JOHN F. HERNANDEZ

4     Direct examination by Ms. Phillips          4

5

6                      E-X-H-I-B-I-T-S

7

8     Plaintiff's Exhibit No. 1                   11
      (Special Accommodations Guidelines)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1    THEREUPON:

2                        JOHN F. HERNANDEZ,

3    having been duly sworn, was examined and testified as

4    follows:

5                        DIRECT EXAMINATION

6    BY MS. PHILLIPS:

7         Q    Good morning, Mr. Hernandez.

8         A    Good morning.

9         Q    Thank you for coming this morning.

10             My name is Emily Phillips and I'm an attorney

11   representing Randall Forbes in the case pending that she

12   has filed against St. Thomas University, as you're

13   probably aware.

14             Have you ever had your deposition taken before?

15        A    I don't believe so.

16        Q    Okay.  Just a couple rules that I'm going to

17   start with.

18             First of all, please answer all questions, give

19   verbal responses, as opposed to nodding your head or using

20   your hands.

21        A    Yes.

22        Q    Just so because the court reporter can only take

23   down verbal response.

24             Please wait until I've completed my question

25   before you answer, because it's difficult for her to, you

Page 5

1   know, take your testimony and me talking down at the same

2   time.

3         If you don't understand any question that I ask,

4   I'm going to ask you to please let me know and I'll be

5   happy to restate it.  And that's about it.

6         Please state your full name for the record.

7    A    John F. Hernandez.

8    Q    What is your current address?

9    A    My home address?

10    Q    Business address is fine.

11    A    16401 Northwest 37th Avenue, Miami Gardens,

12   Florida 33054.

13    Q    Are you currently employed by St. Thomas

14   University School of Law?

15    A    Yes.

16    Q    What is your current position with them?

17    A    Assistant dean for student affairs.

18    Q    How long have you had that position?

19    A    Approximately two years.

20    Q    Have you held any other positions with the

21   university?

22    A    Yes.

23    Q    What are those positions?

24    A    I was previously director of student affairs.

25    Q    How long were you director of student affairs?

Forbes vs. St. Thomas                                                February 27, 2009

Page 6

1        A     For a couple of years.  I've been an associate

2    professor of law there.  I'm also currently a visiting

3    associate professor of law.  I've been an adjunct

4    professor of law.  And I had one other administrative

5    position that I don't remember the exact title for.

6        Q     What classes do you teach at the law school?

7            MR. SANTIAGO:  Currently?

8    BY MS. PHILLIPS:

9        Q     Currently.

10       A     Currently?  Torts I and Torts II.  And I also

11   taught international criminal law in the summer in the

12   Spain program recently.

13       Q     Okay.  What is your educational background?

14       A     Starting from where?

15       Q     High school.  Where did you graduate high

16   school, I guess, college?

17       A     I went to Key West High School and graduated

18   from there.  Went to college at the University of Florida.

19   Graduated from there with a Bachelor's in business

20   administration.  Went to Georgetown University Law Center

21   in Washington, D.C.  Graduated from there with a jurist

22   doctorate.  And went to the University of Florida and have

23   an LLM in taxation from there.

24       Q     Okay.  Have you worked for any other

25   universities in similar positions that you hold right now

Forbes vs. St. Thomas                                        February 27, 2009

Page 7

1   at St. Thomas?

2        A    Not really -- I taught at Florida International

3   University as an adjunct in their business school.  And I

4   used to be an attorney for the -- it's called the Office

5   of Chief Counsel, which actually was in the Department of

6   Treasury, which actually represented the IRS.  And as part

7   of that program, they had a specialized program, I taught

8   at Emory University school of Law as a visiting professor

9   of law there for one year.

10        Q    Okay.  During the 2006-2007 school year, what

11   were your responsibilities as associate dean of the law

12   school?

13        A    A lot of things.  I sort of oversee a number of

14   different kinds of areas involving the students.  I

15   oversee the registrar's office, although we have a

16   registrar, so she does the more day-to-day stuff.  But I'm

17   involved in administrative decisions involving the

18   registrar's office.  I also am involved in admissions,

19   either -- I'm either on the admissions committee or in an

20   administrative capacity reviewing applications at the

21   request of the admissions director.  I'm -- I oversee the

22   creation and dissemination of the student catalogs, the

23   creation and dissemination of the student handbook.  I

24   handle day-to-day problems that come up -- presented by

25   the students with regard to issues involving academics

Forbes vs. St. Thomas                                          February 27, 2009

Page 8

1   and/or personal issues.  I report to the dean with regard

2   to anything that he delegates to me.  Periodically I serve

3   on university committees.  I serve as the primary person

4   with regard to persons who want to make claims for or seek

5   special accommodations.  There's sort of my analog on the

6   university side that I interact with with some regularity,

7   depending whether it's a university-wide issue or an issue

8   involving a law student in the university setting, say a

9   problem with housing or a problem with financial aid or a

10  problem with the business office.  I'm sort of like the --

11  I'm sort of the linchpin between the law school, at least

12  with regard to student problems, and the other aspects of

13  the university.

14          So it's a whole multitude of tasks.  And it can

15  vary from day-to-day, anything that's even not necessarily

16  specifically delegated to something.  Somebody could walk

17  in my office and then it becomes sort of my job to find

18  out who's handling it or how it gets resolved.

19  Q      Okay.  So is it fair to say you do have a lot of

20  interaction with the law students --

21  A      Yes.

22  Q      -- day-to-day?

23          Okay.  Did you say that you were responsible for

24  preparing the special accommodations guidelines for the

25  university and the handbook that includes them?

 1      A     For the law school, not the university.

 2      Q     I'm sorry.  For the law school.

 3            Are you the final authority on, you know, what

 4   to include in those guidelines or are there other people

 5   who also work with you on that and make those decisions?

 6      A     I don't know if I'd say I was the final

 7   authority, because anything I generate, I generally

 8   disseminate to the dean and/or other people within the

 9   university as, say, here's what I'm proposing to do, do

10   you have any feedback, or something like that.

11      Q     Who was the dean of the law school during the

12   '06-'07 school year?

13      A     I think it was -- I think it was Bob

14   Butterworth, but I'm not a hundred percent sure, because

15   we had a change in deans from Bob Butterworth to Alfredo

16   Garcia, who's our current dean.  And I'm not really sure

17   when that change took place.

18      Q     Okay.  Does the law school have systems in place

19   currently to accommodate students with disabilities?

20      A     Yes.

21      Q     And could you explain those systems or the

22   process or -- and how it works?

23      A     In the student handbook there's a general

24   reference to the -- if a student is seeking accommodations

25   or has a disability and thinks they might want to seek

Forbes vs. St. Thomas                                                    February 27, 2009

Page 10

1    accommodations, it refers them basically to my office and

2    to a disability accommodations booklet.  And then the

3    booklet sets out the basic guidelines that we use,

4    depending upon exactly what it is that's the nature of the

5    disability and what it is that's being sought as

6    accommodations.  It kind of bifurcates it into classroom

7    accommodations and into testing accommodations.  And the

8    booklet basically says that the student -- a student

9    seeking accommodations needs to provide to my office a

10   report from an expert that demonstrates the expert's

11   credentials as to why he or she is an expert.  And then a

12   diagnosis or evaluation of a disability, the basis for

13   that diagnosis or determination that the student has a

14   disability, and recommendations for any accommodations.

15            MS. PHILLIPS:  Okay.  I'm going to mark this as

16        Plaintiff's Exhibit No. 2.  This is a booklet that I

17        personally printed online.  It looks like the cover's

18        called Special Accommodations Guidelines.

19            MR. SANTIAGO:  Are you going to -- just for

20        clarification purposes, are you going to attach this

21        to Mr. Hernandez's deposition as well?

22            MS. PHILLIPS:  Oh, no.  I'm sorry.  Sorry.

23            MR. SANTIAGO:  So this is Exhibit 1.

24   A    Do you have a question?

25   Q    I'm going to let him look at that and then I'll

Case 1:07-cv-22502-WMH   Document 94-1   Entered on FLSD Docket 11/12/2010   Page 11 of 34
Forbes vs. St. Thomas                                                February 27, 2009

Page 11

1    ask you a question.

2            (Plaintiff's Exhibit No. 1 was marked for

3    Identification.)

4    BY MS. PHILLIPS:

5        Q    Is that what you mentioned just a moment ago

6    during your testimony as the disability accommodations

7    booklet or is there something other than that?

8        A    No, this is the booklet, but I don't know if

9    this is the booklet that was applicable in 2006-2007.

10       Q    Okay.  Was there a booklet available or

11   something similar to that during 2006-2007?

12       A    Yes.

13       Q    Do you know if it was available online during

14   that time as well?

15       A    I don't know for sure.  I believe so, but I

16   don't know for sure.  If it wasn't available online, it

17   was available in a hard copy behind the registrar's -- in

18   a case that was accessible to students located near the

19   registrar's counter.

20       Q    And you think it was also referenced in this

21   student handbook during 2006?

22       A    It definitely was referenced in the student

23   handbook.

24       Q    Okay.  Does that handbook, does it address both

25   physical and psychological disabilities, are you aware?

Forbes vs. St. Thomas                                                      February 27, 2009

Page 12

 1        A     I don't think it differentiates.  I think it may

 2   either say any disability or it might group them together.

 3   I don't remember the exact phraseology, but it doesn't

 4   differentiate -- it doesn't differentiate say -- it

 5   doesn't have two different categories saying here's how

 6   you do it for physical disability, here's how you do it

 7   for a learning disability or something like that.

 8        Q     When a student comes to you and meets with you

 9   regarding a disability and then he or she submits various

10   documentation from a medical expert, do you on a case by

11   case basis make accommodations for that student?

12        A     Yes.

13        Q     So it depends on the personal circumstances of

14   each different student; is that correct?

15        A     I'm not sure I understand your question.

16        Q     You know, I guess -- like, for example, maybe

17   one student's disability is a little more severe or, you

18   know, you need to provide additional accommodations to

19   them than the other one.  It's not like you have blanket

20   accommodations?

21        A     Right.

22            MR. SANTIAGO:  I'm going to object to the form

23        of the question.

24            You can go ahead and answer.

25        A     What I basically do is largely defer to the

Page 13

1   experts, both their determination and their

2   recommendations.  Now, if they make recommendations that

3   are something that I don't think we can appropriately make

4   in a law school setting, then I may not necessarily

5   provide that accommodation.  But I generally don't modify

6   the -- it's either -- it's generally the recommendation

7   provided by the expert.

8       Q    Okay.  What do the accommodations typically

9   include?  Can you give me some examples, please?

10          MR. SANTIAGO:  Object to the form of the

11      question.

12          Go ahead and answer.

13      A    Are you talking about testing accommodations and

14  classroom accommodations?

15      Q    Both.

16      A    And you're talking about for physical disability

17  or learning disability?

18      Q    Yes, both.

19      A    Okay.  Then I guess we'll go -- we'll kind of

20  separate them into categories.

21      Q    Okay.

22      A    Classroom accommodations, generally there aren't

23  many classroom accommodations.  I don't get many requests

24  for classroom accommodations.  It would depend

25  specifically on the student.  Like it might be a larger

Forbes vs. St. Thomas                                         February 27, 2009

Page 14

1    writing surface; the ability to tape the class.  Sometimes
2    they've requested note takers, although I generally
3    haven't provided note takers.  We had a student with a
4    hearing impairment, so we provided her with hearing aides
5    so that she could hear what was going on in class.  We've
6    had students that needed stuff in larger print, so we
7    provided them materials in a larger print format.  But
8    there aren't that many requests for accommodations with
9    regard to classroom accommodations.  But those are the
10   kinds of things.
11        Q    Okay.
12        A    With regard to testing accommodations, it
13   depends entirely on the nature of the disability.  We've
14   had people with physical disabilities.  One kid had -- I
15   guess it was a thalidomide child, I think.  Well, anyway,
16   had deformed arms with little tiny hands on the ends of
17   his elbows.  So I provided him with a different kind of
18   bigger writing surface and an opportunity to have more
19   time to be able to write and be able to manipulate the
20   exam.  Oh, also, I guess, with regard to classroom
21   accommodations.  We have some students that have some
22   physical disabilities like problems walking and stuff.
23   And we put in automatic door openers and things like that.
24             So, I'm sorry, back to testing accommodations.
25   The most routine testing accommodations, to be perfectly

Page 15

1    honest, are usually done in the context of the student

2    requesting accommodations for either ADD or ADHD,

3    depending on what is characterized in their expert's

4    report.  And the most routine accommodations are extra

5    time and/or some form of being put either in a room by him

6    or herself or in a room of what they call limited

7    distraction.  Again, depending upon what the expert says.

8    And the way that we interpret a room of limited

9    distraction means that it's a room where the student might

10   be in a room with one or two other students, but not in a

11   general classroom where there might be 30 to 40 students.

12        Q    Do you ever permit a student who's requesting an

13   accommodation for a disability to be in a room alone and

14   take a test?

15        A    Yes.

16        Q    Okay.  Is there a way that you're still able to

17   monitor, you know, that that student isn't cheating or

18   something, if he or she is in a room alone?

19        A    Well, when you mean alone with no other student,

20   yes.  They're small rooms.

21        Q    But they're in a room with another teacher or

22   proctor?

23        A    Well, their proctors in the hallways.  But the

24   proctor may enter the room or an administrator may enter

25   the room to make sure that there's nothing going on that's

Page 16

1    not supposed to be going on.

2         Q    Okay.  Is there a rule that the students have to

3    follow about any given semester when they need to come to

4    the university or come to you by a specific date to

5    request these accommodations?

6         A    Yes, it's set out in the guidelines.  It's set

7    at based upon -- I think it's set up based upon -- we kind

8    of backtrack from when the finals are and backtrack

9    several weeks to try to give us time to administratively

10   handle the accommodations.

11        Q    And if a student doesn't timely request the

12   accommodations, does that mean the request is denied?

13        A    No.

14        Q    How many times have you met with the plaintiff

15   in this case, Ms. Forbes?

16        A    I don't recall.

17        Q    Approximately how many times do you think you've

18   met with her in the past?

19        A    I would be just act -- I meet with literally

20   hundreds of students.  And I meet with sometimes 20 to 30

21   students a day.  Some of them walk in my office for a

22   moment and ask a question.  Others, you know, I meet with

23   for an hour.  And you're talking about two years ago.  I

24   know I met with her.  And I think it was more than once.

25   But I don't recall anything beyond that.

Forbes vs. St. Thomas                                      February 27, 2009

Page 17

1        Q    When you did meet with her, do you remember why,

2   what the reason was that you were meeting with her?

3        A    As I recall, she had sort of sent in a -- she

4   sent some sort of e-mail in which she was quite

5   distressed, in which she attached some information

6   about -- about, I think, some sexual assault or some

7   previous problems she was having.  And we met, I believe,

8   briefly about that.

9             And then also an issue came up because after the

10  first semester, she had been placed on academic probation.

11  And we have a rule that precludes students who are on

12  academic probation from serving as officers in student

13  organizations and/or as representatives in the Student Bar

14  Association.  And so I know we met about the fact that I

15  think she had been serving as parliamentarian.  And I

16  notified her and several other students who were similarly

17  situated that they could no longer serve in that capacity

18  as an officer of an organization until they brought

19  themselves into good standing.

20       Q    And how did you notify her of that?  Was it

21  through e-mail or letter?

22       A    I believe it was both.  And probably verbally as

23  well.  But I do remember that she was quite upset about

24  that, that she thought it was gonna have some

25  significantly adverse effect on her resume.

Case 1:07-cv-22502-WMH   Document 94-1   Entered on FLSD Docket 11/12/2010   Page 18 of 34
Forbes vs. St. Thomas                                    February 27, 2009

Page 18

1         Q      Was it you personally that verbally delivered

2    that message or was it someone within your office, that

3    she would no longer be a member of the organization?

4         A      It could have been -- I don't know.  I mean, I

5    don't know who in my office would have done it.  Somebody

6    in my office -- my assistant may have said, here's a

7    letter, I'm giving it to her, or may have said, Dean

8    Hernandez told you.  I don't know.  I mean, I think I did

9    tell her verbally myself.  I don't remember meeting with

10   her, to tell you the truth.

11        Q      Do you remember, during one of your meetings

12   with Ms. Forbes, her requesting testing accommodations?

13        A      I remember her raising the issue of this

14   traumatic event.  And I think it was in like January or

15   February -- it was sort of all happening at the same time

16   with the issue concerning her not being able to serve in

17   the capacity as a parliamentarian of the Black Lawsuits

18   Association and also, I guess, with her distress

19   associated with being placed on academic probation,

20   because all this happened after the first semester.  And

21   so I recall meeting with her sometime like in January,

22   February.  And I think I advised her to go see the school

23   counselor.  And I also advised her of the procedures that

24   we had in place for seeking accommodations.

25        Q      Are there counselors on the campus to work with

1   students that suffer from post-traumatic stress disorder?

2       A    There's a -- there's a person in that position,

3   yes.  I mean not specifically to -- not specifically to

4   treat somebody with post-traumatic stress disorder.

5       Q    Okay.

6       A    But there's a school counselor that's a trained

7   psychologist who meets with students and acts in a

8   counseling capacity to some extent, acts as a referral

9   resource to some extent.  I don't know that they do

10  ongoing treatment of, you know, of people with -- with

11  some sort of mental problem or something.

12      Q    When you met with Ms. Forbes, did you give her a

13  copy of the Disability Guidelines Handbook or did you

14  instruct her on where she could obtain a copy?

15      A    I don't remember.  I would have -- I would have

16  either -- I would have done one or the other or both.

17  Because they were -- at that time, I know they were

18  readily available behind the registrar's counter.

19      Q    Just so I understand, when a student comes to

20  you and is asking for accommodations and then they advise

21  you of a disability and it has to be documented, some type

22  of -- by a medical doctor, is it the student's

23  responsibility to pay for those exams and then --

24      A    Yes.

25      Q    -- produce all that information that's requested

Page 20

1   by the university?

2        A    Yes.

3        Q    There's no counselor or no doctor on campus that

4   they can go see, you know, specifically for that purpose?

5   It's the student's sole responsibility, correct?

6        A    This -- yeah.  The student -- the university

7   doesn't provide any mechanism, nor does it pay for testing

8   for any student seeking accommodations.  At least the law

9   school doesn't.  I don't know if they do anything

10  differently at the actual university, but I don't believe

11  they do.

12       Q    Okay.  Do you remember, when you were meeting

13  with Ms. Forbes, whether or not you gave her a certain

14  deadline, a due date by what time she would need to

15  provide additional documentation regarding her disability?

16       A    I don't remember.

17       Q    Do you remember, when you were meeting with

18  Ms. Forbes, whether or not she spoke to you about the

19  accommodations made by the University of Miami while she

20  was a student there?

21       A    I don't have an independent recollection of

22  that, although I looked at the documentation that she did

23  provide prior to this -- to this deposition.  And so I

24  know that, I think, in April she provided documentation

25  that she had either acquired from or it was somehow

Forbes vs. St. Thomas

February 27, 2009

Page 21

1   associated with the University of Miami because it had a

2   cover sheet on it from the university of Miami.

3        Q    In April, you mean April 2007, correct?

4        A    Right.

5        Q    Okay.  Do you remember what Ms. Forbes' demeanor

6   was during the meeting that you had with her sometime in

7   February of 2007?  I think the date was February 2, 2007.

8        A    I don't have a specific recollection about her

9   demeanor at any particular meeting.  The most I recall

10  about her demeanor was that she seemed really upset about

11  this parliamentarian issue.

12       Q    Okay.  Do you have any recollection of anyone at

13  the university calling the police on Ms. Forbes while she

14  was a student there?

15       A    I was told that happened, but I think I was in

16  Spain at the time.  So I don't have any firsthand

17  knowledge.

18       Q    Okay.  Do you remember Ms. Forbes having any

19  other problems with the university, like disciplinary

20  problems or getting in trouble for any other activity on

21  the university, other than the incidents where the police

22  were called?

23            MR. SANTIAGO:  Object to the form of the

24       question.

25       A    When?

Page 22

1      Q     Just during the 2006 --

2      A     At any point in her relationship with the law

3  school?

4      Q     2006-2007 school year, correct.

5      A     Everything I know subsequent to our meeting in

6  April is just based upon stuff I read in e-mails or stuff

7  people told me.  If that's what you're asking me about, I

8  can tell you what I heard or read.

9      Q     Okay.  You can tell me that, what you heard or

10  read.

11      A     I heard or read, and I'm not sure even which it

12  is, to tell you the truth, that she had become quite

13  distressed after she got academically dismissed and had

14  gone to the chapel and had threatened to hurt -- injure

15  herself in some way or at least created some fear that she

16  was gonna impose some harm upon herself.

17      Q     Are you a member of the committee who decides

18  whether or not students will be readmitted?

19      A     Sometimes.

20      Q     How many times have you served on a committee

21  like that?

22      A     Oh --

23      Q     Approximately.

24      A     Over the entire time I've been there?

25      Q     Yes.

Forbes vs. St. Thomas                                                    February 27, 2009

                                                                        Page 23

1          A     Fifteen or 20 maybe.

2          Q     Did you serve on the committee that made that

3     decision about Ms. Forbes' enrollment at the university?

4          A     You mean when she applied --

5          Q     For readmission.

6          A     -- for readmission?  No, I wasn't on the

7     committee, no.

8          Q     Okay.  How many people usually comprise that

9     committee?

10         A     Five.  I mean, there's five people making a

11    decision at any one time.  But since sometimes there are

12    people who can only attend hearings, there might be -- at

13    any one hearing date there might be more than five

14    committee members, but only five would actually be

15    considering a particular -- as far as I recall.  I'm not

16    in charge of that committee.  Dean Dykes is in charge of

17    that committee.

18         Q     Okay.  Does the committee actually meet with the

19    student who's filed the petition for readmission?

20         A     If the student wants -- You want me to explain

21    the process?

22         Q     Yes, please.

23         A     The student files a petition in writing,

24    provides whatever documentation he or she wants to

25    provide.  They're given notice of this and deadlines for

Forbes vs. St. Thomas                                                    February 27, 2009

Page 24

1   all of this.  And then the student, if they want, and most

2   of the students do elect to do so, can have a hearing in

3   which they can make a presentation to the committee in

4   addition to whatever they've presented in writing.  And so

5   most students avail themselves of that opportunity.  And

6   so there's a day in which there's a -- in which a day or

7   days, depending upon the number of students that are

8   petitioning, in which the student is given a time.  They

9   show up before the committee.  The committee members that

10  make that decision have all of that written information.

11  The student makes his or her presentation and then

12  responds to questions from the committee members.

13       Q    Okay.  And does the committee also meet outside

14  of that student's presence to make the determination?

15       A    Yes.

16       Q    Okay.

17       A    Once the student leaves, generally the committee

18  then makes a decision, and then before the next student

19  walks in usually.

20       Q    And what criteria is used in making that

21  decision?

22       A    It's articulated in the handbook, but I think

23  it's something like, you know, whether or not the

24  committee has a reasonable expectation that the student

25  could academically succeed.  And there's also something

Page 25

1    articulated in the criteria about what would be in the

2    best interest of the institution.

3         Q    When you say "handbook," do you mean the student

4    handbook?

5         A    Right.  The student handbook contains the whole

6    petitioning process for the students to -- so that they

7    would understand it.  Plus we provide it to them in

8    writing additionally.

9         Q    Could you estimate approximately how much time

10   is spent, you know, on each student's case to determine

11   whether or not their petition for readmission would be

12   granted or denied?

13        MR. SANTIAGO:  Object to the form of the

14        question.

15        A    It varies enormously.  Sometimes the student has

16   little to say; there's not much to consider.  And so it

17   can be a matter of 15 to 20 minutes.  And we've had some

18   of them last two hours.  So it depends on what it is the

19   student's saying.  What it is that's on the minds of the

20   people in the committee.

21        Q    More often than not, are those petitions granted

22   or are they denied?  Just take a guess.

23        MR. SANTIAGO:  Object to the form of the

24        question.

25        A    I don't know.  It would -- I don't know, like

Page 26

1    over the course of the entire -- if you're talking about

2    since the beginning of the institution, I have no idea at

3    all.

4         Q    From your personal experience is what I'm

5    speaking to.

6              MR. SANTIAGO:   Object to the form of the

7         question.

8              I don't want you to guess.  If you don't

9         know, you don't know.

10        A    Okay.  I don't know.

11        Q    Are you aware of any accommodations that the law

12   school made for Ms. Forbes during her second semester of

13   law school there?

14        A    Yes.

15        Q    What were those accommodations?

16        A    She was given time and a half, which means

17   150 percent of the time that's otherwise allocated for the

18   exam, in a room of limited distraction.

19        Q    "A room of limited distraction" meaning that

20   there were, you know, Ms. Forbes and a couple of other

21   students?  Is that generally what that means?

22        A    Yes.

23        Q    Did you at first tell Ms. Forbes that she would

24   not be receiving any accommodations and then later change

25   your mind, or was her request -- when she made her

Forbes vs. St. Thomas                                    February 27, 2009

Page 27

1    request, was she told right up front that she'd be given

2    the accommodations?

3              MR. SANTIAGO:   Object to the form of the

4         question.

5    BY MS. PHILLIPS:

6         Q    If you remember.

7         A    I don't -- I don't -- I don't remember.

8         Q    Okay.  Did you ever mention to Ms. Forbes

9    anything about her having panic attacks during tests or

10   while she was a student at the university?

11        A    I have no recollection of that at all.

12        Q    Did you ever mention to Ms. Forbes anything

13   about her ability to handle the work load or material of

14   the different classes at the university?

15        A    I don't -- I don't -- I don't have any

16   independent recollection of these kind of conversations

17   with her, although they would not be atypical of a

18   conversation with a student who was on academic probation

19   about trying to counsel them and how they might be more

20   effective in handling the course load and being more

21   effective in studying and preparing for exams.  So I

22   assume I would have probably talked to her about that.

23        Q    Did you ever mention anything to Ms. Forbes

24   about these accommodations and how much money they cost

25   the university?

Forbes vs. St. Thomas                                    February 27, 2009

Page 28

1          A     Cost, no.

2               MR. SANTIAGO:   Object to the form of the

3      question.

4          A     Cost?

5          Q     Yeah, cost.

6          A     No.

7          Q     No?  Did Ms. Forbes ever advise you that she had

8      been a victim of sexual assault in the past?

9          A     I believe it was contained in that -- in that

10     letter that was attached to the e-mail she sent me.

11         Q     Did you ever make a comment to Ms. Forbes about,

12     how do I know you won't run out of the class screaming

13     anytime someone mentions the word "rape" or if it's a fact

14     pattern in a class?  Did you ever say anything like that

15     to her?

16         A     Not that I recall.

17              MS. PHILLIPS:  Can we take a break for a few

18     minutes, please?

19              (There was a brief recess.)

20     BY MS. PHILLIPS:

21         Q     Just a few more questions.

22         A     Okay.

23         Q     Okay.  Mr. Hernandez, do you recall, during any

24     of your meetings with Ms. Forbes, Ms. Forbes specifically

25     requesting as an accommodation to be alone while taking

Forbes vs. St. Thomas                                                February 27, 2009

Page 29

1    her test in a room, alone in a room while taking her

2    tests?

3         A    No.

4         Q    You don't recall that at all?

5         A    (Shaking head).

6         Q    And you did testify earlier that that is an

7    accommodation that is available to some students at the

8    university; is that correct?

9         A    But the accommodations are driven by what the

10   expert recommends, not by what the student necessarily

11   requests.

12        Q    I understand that.  But is that at times an

13   accommodation that is given certain students?

14        A    If the expert recommends it, yes.

15        MS. PHILLIPS:  Okay.  No further questions.  I'm

16        finished for now.  I don't think I'm going to have

17        any other questions in future.  I would like to

18        reserve my right to -- we're done for today.  But in

19        the event something happens later on and I want to

20        take your deposition.  He's going to object again,

21        but --

22        MR. SANTIAGO:  Right.

23        MS. PHILLIPS:  -- I'd just like to reserve my

24        right on the record to do so.

25        MR. SANTIAGO:  Just for the record, we object to

Page 30

1        producing Mr. Hernandez at any point in the future.

2        That's it.  For any other deposition.

3               THE WITNESS:  We're done?

4               MR. SANTIAGO:  Yes, we're done.

5               And we'll read.

6               (Thereupon, the deposition concluded at

7    11:25 a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Forbes vs. St. Thomas                                                    February 27, 2009

Page 31

1                        CERTIFICATE OF OATH

2

3    STATE OF FLORIDA     )

4    COUNTY OF MIAMI-DADE)

5

6            I, the undersigned authority, certify that

7    JOHN F. HERNANDEZ personally appeared before me and was

8    duly sworn.

9            WITNESS my hand and official seal this 20th day

10   of October, 2010.

11

12

13

14                    _____

15                    LILLIAN GADOMSKI, RPR
                      Notary Public - State of Florida
16                    My Commission No. DD621488
                      Expires:  January 4, 2011
17

18

19

20

21

22

23

24

25

Forbes vs. St. Thomas                                    February 27, 2009

Page 32

CERTIFICATE

1

2

3    STATE OF FLORIDA      )

4                         )  SS:

5    COUNTY OF MIAMI-DADE)

6

7          I, LILLIAN GADOMSKI, Registered Professional

8    Reporter and Notary Public, certify that I was authorized

9    to and did stenographically report the deposition of

10   JOHN F. HERNANDEZ; that a review of the transcript was

11   requested; and that the transcript is a true and complete

12   record of my stenographic notes.

13          I further certify that I am not a relative,

14   employee, attorney, or counsel of any of the parties, nor

15   am I a relative or employee of any of the parties'

16   attorney or counsel connected with the action, nor am I

17   financially interested in the action.

18          Dated this 20th day of October, 2010.

19

20

21                        _____

22                        LILLIAN GADOMSKI, RPR
                          and Notary Public

23

24

25

ERRATA SHEET

IN RE:  RANDALL VANESSA FORBES vs. ST. THOMAS UNIVERSITY, INC.

CASE NO.:  07-22502 - CIV HOEVELER

DEPOSITION OF:  JOHN F. HERNANDEZ

DATE TAKEN:  FEBRUARY 27, 2009

PAGE NO.        LINE NO.                    CORRECTION OR CHANGES

_____        _____          _____

_____        _____          _____

_____        _____          _____

_____        _____          _____

_____        _____          _____

_____        _____          _____

_____        _____          _____

_____        _____          _____

                                  _____

        Sworn to and subscribed before me this

_____ day of _____, 2010, by JOHN F. HERNANDEZ

who produced _____ as Identification.

                  ------------------------------------
                  Notary Public - State of Florida
                  My Commission No.
                  Expires:

```
        TAYLOR, JONOVIC, WHITE, GENDRON & KIRCHER-ECHARTE
                  FLORIDA REALTIME REPORTING
                  110 EAST BROWARD BOULEVARD
                         SUITE 1850
                  FORT LAUDERDALE, FLORIDA  33301
                       (954) 759-4560
```

October 20, 2010
Gaebe, Mullen, Antonelli, Esco & Dimatteo
Attn:  John F. Hernandez
c/o Maximo A. Santiago, Esquire
420 South Dixie Highway
Third Floor
Coral Gables, Florida  33146

Dear Mr. Hernandez:

With reference to the deposition taken on February 27, 2009, please be advised that the transcript of the deposition has been completed and is awaiting signature.

Please arrange to stop by our office for the purpose of reading and signing the deposition.  Our office hours are 9:00 a.m. to 5:00 p.m., Monday through Friday.  You may, however, read a copy of the transcript provided by any of the attorneys connected with the case, denoting any corrections by page and line number on a separate sheet of paper.  This correction page must be signed by you and returned to us for filing with the original.

If this has not been taken care of, however, within the next 30 days, or by the time of trial, whichever comes first, I shall then conclude that the reading, subscribing and notice of filing have been waived.

The original of this deposition has been forwarded to the ordering party, and your errata sheet, once received, will be forwarded to all counsel of record.

Sincerely,


Lillian Gadomski